Cory A. Baskin (SBN 240517)
cb@witkowlaw.com
Brandon J. Witkow (SBN 210443)
bw@witkowlaw.com
witkow | baskin
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
Tel:    818.296.9508
Fax:    818.296.9510

Attorneys for *Plaintiff*
SKAII INVESTMENT, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF ORANGE

**Assigned for All Purposes**
Judge Gassia Apkarian

| | |
|---|---|
| SKAII INVESTMENT, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>AMGUARD INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 30-2025-01512230-CU-IC-CJC<br><br>**COMPLAINT FOR:**<br><br>1. **DECLARATORY RELIEF**<br>2. **INJUNCTIVE RELIEF**<br>3. **BAD FAITH / BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**JURY TRIAL DEMANDED** |

witkow | baskin

---
**COMPLAINT**

1  COMES NOW, Plaintiff SKAII INVESTMENT, LLC, to file its Complaint against

2  Defendants AMGUARD INSURANCE COMPANY, and DOES 1-10, inclusive, alleging as follows.

3  **PARTIES**

4  1.    Plaintiff Skaii Investment, LLC ("Plaintiff" or "Skaii") is now, and was at the time of

5  the filing of this Complaint and at all intervening times, a California limited liability company,

6  having its principal place of business at 15170 Goldenwest Circle, Westminster, California 92683.

7  Skaii is the owner of the real and personal property located at 9241 Bishop Place, Westminster,

8  California 92683 (the "Property").

9  2.    On information and belief, according to the company's website (guard.com/amguard-

10  insurance-company/) Defendant AmGUARD Insurance Company ("AmGUARD" or "Defendant")

11  is a wholly owned subsdiary of WestGUARD Insurance Company and operates under the trade

12  name "Berkshire Hathaway GUARD Insurance Companies. AmGUARD's principal place of

13  business is located at 39 Public Square, Wilkes-Barre, PA 18703, it is domiciled in Nebraska, and its

14  NAIC Company Code is #42390.

15  3.    The true names and capacities, whether individual, corporate, associate or otherwise,

16  of Defendants herein names as DOES 1-10, inclusive, are unknown to Plaintiff. Plaintiff therefore

17  sues said Defendant by such fictitious names. When the true names and capacities of said

18  Defendants have been ascertained, Plaintiff will amend this pleading accordingly.

19  4.    Plaintiff further alleges that all Defendants, including those sued herein by fictitious

20  names, are jointly, severally and concurrently liable and responsible with one another upon the

21  causes of action hereinafter set forth.

22  5.    Plaintiff is informed and believes and thereon alleges that at all times mentioned

23  herein Defendants, and each of them, were the agents, servants and employees of every other

24  Defendant and the acts of each Defendant, as alleged herein, were performed within the course and

25  scope of that agency, service or employment.

26  **JURISDICTION AND VENUE**

27  6.    This Court has personal jurisdiction over AmGUARD as AmGUARD transacts

28  business in this jurisdiction and specifically transacted with Plaintiff who, at all relevant times,

1

witkow|baskin

1   resides in this jurisdiction, and the insured Property that is the subject of this action is also located in

2   this jurisdiction.

3          7.      The amount in controversy in this action exceeds the minimum required in this Court.

4          8.      Venue is proper in this Court pursuant to Cal. Civ. Proc. Code § 395(a) because the

5   parties entered into the contracts at issue and contractual performance was required within Orange

6   County.

7                                    **FACTUAL BACKGROUND**

8          9.      On or about March 29, 2012, Skaii entered into a written lease agreement (the

9   "Lease") with certain tenants ("Tenants") to occupy and operate a business at the Property known as

10  Tieng Thu Gift Shop aka Tieng Thu Warehouse for a term of five (5) years. On or about July 10,

11  2017, the Tenants exercised their option to renew the Lease for an additional three-year period.

12         10.     For the period from April 25, 2018 through April 25, 2019, Skaii maintained an

13  insurance policy with AmGUARD, Business Policy No. SKBP981657 (the "Policy"), insuring the

14  Property for, among other things, fire losses. The Policy includes replacement cost coverage for the

15  insured structure(s) up to a limit of $2,142,000 (plus a 2% auto increase, which, according to

16  AmGUARD, increased the Policy limit to $2,173,924.60 (hereinafter, the "Policy Limit")), subject

17  to a $1,000 deductible, as well as business income and extra expense coverage for actual loss

18  sustained up to 12 months. A true and correct copy of the Policy is attached hereto as Exhibit 1. A

19  true and correct copy of the California-specific endorsements included as part of the Policy are

20  attached hereto as Exhibit 2.

21         11.     On or about January 23, 2019, during the course of the Lease and Policy term, a fire

22  occurred at the Property causing significant damage (the "Loss"). Specifically, an electrical

23  failure/arc from the Tenants' relocatable power cap ignited cardboard boxes maintained by Tenants,

24  causing significant damage to the Property, including destruction of the roof above the northern

25  portion of the Property and internal fixtures.

26         12.     At the time of the Loss, the Property was a one-story warehouse divided into six

27  leasable units. As a result of the fire damage, the entire warehouse was rendered completely

28  unusable/unleasable.

2
**COMPLAINT**

1    13.    The day after the Loss, on or about January 24, 2019, Skaii promptly notified

2  AmGUARD of the Loss and submitted a claim (the "Claim") for coverage under the Policy.

3    14.    Skaii is informed and believes that AmGUARD thereafter engaged Engle Martin &

4  Associates ("Engle Martin") as a purported independent adjuster to assist in the coverage

5  investigation, as well as building consultant, JS Held ("JSH") to determine the scope and cost of

6  necessary building repairs, and accounting firm TD Davidson ("TDD") to evaluate Skaii's claim for

7  lost business income due to the Loss.

8    15.    On or about April 10, 2019, AmGUARD issued Skaii a $250,000 advance for

9  building damage.

10    16.    In or about September 2019, AmGUARD issued another payment to Skaii in

11  connection with the Claim in the amount of $404,273.86 based upon JSH's initial repair cost value

12  ("RCV") and actual cash value ("ACV") estimates of $838,340 and $654,273.86 (after applying the

13  Policy's $1,000 deductible), respectively.[1] AmGUARD also issued a separate payment in the

14  amount of $75,000 as a placeholder for Skaii's lost business income. These amounts, however, were

15  expressly considered to be "preliminary" and subject to further revision once shoring at the Property

16  was completed so that AmGUARD's adjuster could perform an additional review and analysis of the

17  work required to repair/replace the warehouse on the Property.

18    17.    By October 2019, AmGUARD had increased the total paid to Skaii for lost business

19  income from $75,000 to $114,450.65.

20    18.    On or about December 6, 2019, Skaii completed the shoring work at the Property and

21  thus promptly requested that AmGUARD's adjuster return to the Property to perform the still

22  outstanding analysis and adjustment of Skaii's Claim.

23    19.    In or about January 2020, however, AmGUARD's adjuster informed Skaii that he

24  needed Skaii to obtain and provide a contractor's estimate in order to amend and increase his

25  original loss estimate.

26

27  [1] Plaintiff is informed and believes that AmGUARD calculated ACV by subtracting its estimate of

28  depreciation in the amount of $183,066.48 from the RCV.

3

**COMPLAINT**

**witkow|baskin**

20.    On or about February 7, 2020, Skaii submitted a quote from A's Contractor, Inc. estimating repair/replacement of the Property with a comparable warehouse to cost $1,589,444.24. Crucially, this estimate did NOT include or account for subcontractor work, permits, or engineering costs, among other things.

21.    Despite Skaii's prompt provision of this estimate upon request, on or about March 21, 2020 (and again on or about March 24, 2020), AmGUARD's adjuster changed course and stated that he would not be making any further increased adjustment accounting for demolition and replacement of the manifestly damaged concrete tilt-up wall panels and roof structure of the Property.

22.    AmGUARD's intransigent position surprised and astonished Skaii. Indeed, back on or about March 13, 2019, after completing a walk through of the Property, Jason Sewer, the original adjuster assigned to the Claim by AmGUARD (via Engle Martin) confirmed to Skaii that all three damaged units at the Property would need to be completely gutted, and that this included complete removal of the roofs and tilt-up concrete walls and panels.

23.    On or about October 14, 2020, Skaii's counsel sent AmGUARD a letter which included two additional estimates prepared by other reputable contractors for the repair/replacement of the Property with a comparable warehouse (these estimates ranged from $1,456.620.00 to $1,844,882.00—significantly higher than AmGUARD's estimate, even without key additional line items and expenses factored in) and advised that "if we do not receive a satisfactory response from you by the close of business on October 30, 2020 as to whether you will agree to revise the preliminary adjustment to reflect the actual replacement value of the Property as reflected in the estimates, or agree to the Further Adjustment Process, we will assume that you do not intend to comply with the terms of the insurance contract and we will proceed with litigation." A true and correct copy of this letter is attached hereto as Exhibit 3.

24.    In response to this letter, AmGUARD agreed to conduct a further engineering analysis of the Property and make appropriate further adjustments based thereon. But AmGUARD's representatives communications with Skaii's representatives in this regard was frustratingly circular and opaque.

**COMPLAINT**

25.     Between roughly October 2020 and October 2021, Skaii and its representatives, diligently, repeatedly, and exasperatingly sought clarity from AmGUARD and its adjuster regarding the status of the Claim and, in particular, the status of AmGUARD's adjuster's full and complete engineering assessment and report concerning core testing of the concrete tilt-up wall panels at the Property. A true and correct copy of representative email correspondence between Skaii representatives and AmGUARD representatives during this period is attached hereto as Exhibit 4.

26.     In or about December of 2021, Skaii received an updated estimate from A's Contracting in the amount of **$2,739,547.86**, which now included subcontracting costs and other fees previously unaccounted for in its June 2020 preliminary estimate of $1,589,444. A true and correct copy of this estimate is attached hereto as Exhibit 5.

27.     In light of this estimate well above the Policy Limit, and Skaii's continuing inability to find any contractor willing to warrant a limited repair of the Property that included the reuse of the damaged pre-existing concrete structures, Skaii continued to insist that AmGUARD reassess the damage to the Property and readjust the estimated RCV amounts based upon full replacement not just repair.

28.     On or about December 21, 2021, AmGUARD's adjustment and engineering team performed a site visit in tandem with Skaii's adjuster to review and assess the condition of the Property, in particular the concrete tilt-up panels.

29.     On or about February 4, 2022, AmGUARD's engineers (JSH) submitted their updated report and estimate to AmGUARD concerning the Property damage. Amazingly, the report still recommended that only one of the Property's concrete panels be replaced while the others, despite extensive cracking and manifest damage, be reused along with other infrastructure at the Property. True and correct copies of JSH's February 3, 2022 engineering report and February 4, 2022 revised estimate based thereon are attached hereto, respectively, as Exhibits 6 & 7.

30.     AmGUARD's position in this regard shocked and disappointed Skaii, particularly because, since at least March 2019, based upon AmGUARD's then adjuster's representations, Skaii had reasonably understood that the parties agreed that the damage to the Property—in particular the concrete walls and roof—was so extensive as to require a complete demolition and replacement.

5

**COMPLAINT**

1    Moreover, to date, every single contractor with whom Skaii had consulted concerning the repair of
2    the Property had recommended complete demolition and replacement of the damaged roof and walls
3    of the Property.

4        31.    On or about March 30, 2022, Skaii kindly requested that AmGUARD at least update
5    its estimate to current 2022 market prices and provide Skaii with this revised estimate.

6        32.    On or about June 6, 2022, however, AmGUARD advised that it would only be
7    providing an estimate using the same price list from its previous estimate.

8        33.    In response that same day, Skaii requested that AmGUARD release (pay) all
9    remaining undisputed amounts owed at this time, while Skaii continued to evaluate AmGUARD's
10   most recent report and estimate and worked on preparing its own counter-report and estimate for
11   AmGUARD's consideration.

12       34.    On or about June 23, 2022, AmGUARD transmitted the Sworn Statement it required
13   Skaii to execute in exchange for receiving an additional ACV payment. On or about June 27, 2022,
14   Skaii executed and transmitted the form back to AmGUARD. Crucially, however, Skaii plainly
15   disputed various representations made by AmGUARD on the Sworn Statement by inserting and
16   initialing several handwritten notations. Specifically, Skaii wrote:

17       &bull;  "NOT INCLUDE 2% INFLATION" next to AmGUARD's representation that the
18           Policy Limit was $2,142,000;

19       &bull;  "NOT FINAL SETTLEMENT" next to AmGUARD's representation that
20           $1,167,393.97 was the "Undisputed RCV"; and

21       &bull;  "NOT FINAL SETTLEMENT" next to AmGUARD's representation that
22           $405,298.31 was the remaining "Undisputed ACV".

23   A true and correct copy of Skaii's executed Sworn Statement from June 27, 2022 is attached hereto
24   as Exhibit 8.

25       35.    On or about July 12, 2022, AmGUARD issued a further ACV payment to Skaii in the
26   amount of $405,298.31. AmGUARD did not, however, indicate that this payment was being made in
27   final settlement of the Claim or that no further adjustments would be made. Instead, AmGUARD
28   expressly invited Skaii to submit its own further estimate for AmGUARD's consideration.

witkow|baskin

**COMPLAINT**

1     36.     By now, Skaii reasonably believed that replacement of the insured Property with a

2     comparable like-for-like warehouse structure at 2022 construction prices would end up costing at

3     least as much as the full $2 million+ Policy Limit and that, under any fair and objective analysis,

4     AmGUARD's $1,167,393.97 "adjusted" RCV purportedly based upon a 2021 price list and

5     replacement of only one of the Property's concrete walls was manifestly unfair and inadequate.

6     37.     Indeed, by mid-2022, due to the Covid-19 Pandemic and its destructive and

7     transformative impact on the construction supply chain and materials prices, Plaintiff is informed

8     and believes that construction costs had increased by 20-40% across the board since 2021 (and

9     approximately double that since the start of the Pandemic in 2020).

10    38.     Moreover, AmGUARD's estimators and adjusters continued to insist that, despite

11    manifest extensive cracking, all concrete tilt-up wall panels (except for a single panel on the west

12    wall of one of the warehouse units) were in sufficiently satisfactory condition to remain in place and

13    be reused as part of any replacement construction. But Skaii could not find any licensed and

14    reputable contractor willing to warrant reconstruction work incorporating those manifestly damaged

15    and defective wall panels. Accordingly, the scope of work on any and all estimates Skaii obtained

16    always included full replacement of these wall panels, at a sizable additional expense.

17    39.     In this regard, in or about late July 2022, Skaii engaged architectural expert, Jeff

18    Bergsma, at Team Design Construction in Huntington Beach, California, to determine whether it

19    would be feasible or prudent to repair the Property in the limited fashion recommended in JSH's

20    February 2022 report and estimate. Skaii's expert ultimately concluded:

21          **It is my opinion that with a building with this sever[sic] of damage it**

22          **would be prudent to demolish all existing building components and**

23          **start over, building to today's structural building code**. Please note that

24          the Building Department Engineer may require these components to be

25          replaced to meet current code. [¶] There are risks in depending on these

26          components structurally (Seismic Standards), as well as practically trying

27          to salvage substandard components during renovation." (Emphasis added).

28

1    A true and correct copy of Mr. Bergsma's August 8, 2022 opinion letter is attached

2    hereto as Exhibit 9.

3        40.    In or about November 2022, Skaii submitted to AmGUARD an updated repair bid

4    from J.A. Stowell Construction, Inc. ("Stowell"), estimating the replacement cost, at 2022 prices, to

5    be $2,556,755.60. This estimate was/is consistent with the updated estimate it had received in June

6    2021 from A's contractors, increasing its prior incomplete estimate of $1,589,444 to $2,739,547.86

7    after subcontracting, permits, and other necessary fees were factored into the total.

8        41.    AmGUARD's adjuster objected that the Stowell bid was not sufficiently detailed and

9    requested "some type of scope break down necessary to compare the repair estimates."

10       42.    Thereafter, from late 2022 continuing into late 2024, Skaii repeatedly provided

11   AmGUARD and its adjuster with further details supporting Stowell's bid, including Excel

12   spreadsheets, invoices (for onsite plumbing, lights, temporary roof, inspections, cleaning, consulting,

13   architectural services, etc.), proposals for structural plans and engineering services and multiple

14   repair cost bids from subcontractors.

15       43.    During this time, one of Skaii's principals, Mimi Nguyen, also was in the midst of a

16   battling a severe health crisis after receiving a potentially life-threatening (and certainly life-altering)

17   diagnosis.

18       44.    On or about March 4, 2024, after reviewing the aforementioned supporting materials

19   (or at least some of them) submitted by Skaii, AmGUARD acknowledged that its prior lost business

20   income reimbursements to Skaii were insufficient in that it had only accounted for 11 months of lost

21   rent for certain of the warehouse units and that Skaii was entitled to additional funds under the

22   Policy.

23       45.    On March 29, 2024, AmGUARD issued a supplemental payment for lost business

24   income to Skaii in the amount of $9,510.47.

25       46.    However, by October 2024, Skaii had still not received any response from

26   AmGUARD to its request for a further adjustment of its Claim based upon the Stowell bid. On

27   October 10, 2024, a physically and mentally exhausted Mimi Nguyen contacted AmGUARD to

28   request an update on the status of the Claim, explaining that "the condition of the building remains

witkow|baskin

8

COMPLAINT

1 │ exactly the same as when . . . your adjuster from Engle Martin & Associates, last visited the site . .

2 │ .", and "[w]e are still paying for the shoring equipment rental, which was put in place back in 2019 .

3 │ . . to stabilize the building for assessment."

4 │      47.     Understandably, Skaii was loath to commence replacement construction of the

5 │ warehouse until it had received a fair and reasonable updated construction cost estimate from

6 │ AmGUARD reflecting post-Pandemic pricing realities and accounting for the full scope of the

7 │ project cost (i.e., demo and replacement of the entire Property). Skaii knew without a shadow of a

8 │ doubt that the replacement construction cost would exceed the Policy Limit. But, to date,

9 │ AmGUARD had still failed to confirm, among other things: (i) that the $1,059.572.17 in ACV

10 │ payments it had made to Skaii thus far was in fact the final "ACV" and that no further ACV

11 │ payments were forthcoming; and/or (ii) that it would be willing to reimburse Skaii after replacement

12 │ construction was completed in any amount greater than the $106,821.80 "holdback" amount (after

13 │ applying the $1,000 Policy deductible) between the $1,167,393.97 it continued to insist was the

14 │ RCV and the $1,059,572.17 amount of ACV payments made to Skaii thus far.

15 │      48.     The lack of clarity from AmGUARD with respect to the ACV amount put Skaii in a

16 │ decidedly unfair predicament. Per the California Changes Addendum to paragraphs E.5.d.(1)(d) of

17 │ the Policy, Skaii had only 24 months (the Covid-Pandemic qualified as a state of emergency

18 │ extending the period from 12 months to 24 months) after AmGUARD's payment of the ACV to

19 │ complete the repairs to/replacement of the Property. But Skaii still did not know when this 24-month

20 │ period would start running because AmGUARD had not confirmed that all ACV payments had been

21 │ made and more than 24 months had already passed since AmGUARD had transmitted its last ACV

22 │ payment of $405,298.31 in July 2022. Moreover, Skaii had just recently issued a substantial

23 │ supplemental lost business income payment, thereby reasonably implying to Skaii that the ACV

24 │ and/or RCV amounts would be increased/supplemented as well.

25 │      49.     Thus, before it commenced replacement construction, Skaii required (and was entitled

26 │ to) clarity from AmGUARD as to: (i) whether any more ACV payments would be made; (ii) whether

27 │ AmGUARD would be readjusting the lowball RCV $1,167,393.97 based upon an updated price list

28 │ that reflected post-Covid economic realities and/or the need to replace the tilt-up walls that no

9

**COMPLAINT**

1    reputable contractor would warrant as part of any replacement construction; (iii) the deadline for

2    completion of such replacement construction in order to remain eligible for replacement cost

3    reimbursement under the Policy; and (iv) whether, if replacement costs exceeding the paltry

4    $106,821.80 "holdback" were reasonably incurred—which Skaii knew to be an inevitability—

5    AmGUARD would honor its obligation to reimburse Skaii in the full amount of the Policy Limit

6    minus ACV amounts already paid, i.e., $2,173,924.60 - $1,059,572.17 - $1,000 = $1,113,352,43

7    (hereinafter, the "Delta").

8        50.    On or about January 23, 2025, AmGUARD sent Skaii a letter (hereinafter, the

9    "Position Letter") providing a reasonably detailed (albeit self-serving) description of its

10    "investigation of Policy coverage for the Loss including prior payments made by AmGUARD to

11    Skaii, as well as AmGUARD's coverage position concerning the Loss." A true and correct copy of

12    the Position Letter is attached hereto as Exhibit 10.

13        51.    Among other things, the Position Letter stated:

14        •    AmGUARD would not be making any further payments to Skaii for lost business

15            income beyond the $123,961.12 already paid;

16        •    AmGUARD would not be making any further ACV payments to Skaii beyond the

17            $1,059,572.17 already paid;

18        •    "AmGUARD hereby agrees to extend the time for Skaii to complete repairs to the

19            Property, necessary to recover replacement cost benefits under the Policy, to one year

20            from the date of this letter [i.e., January 23, 2026]" (the "Replacement Deadline");

21            and

22        •    Skaii is prohibited from filing suit against AmGUARD relative to the Loss because

23            the Policy barred any such filing more than two years after the Loss.

24        52.    On or about March 7, 2025, Skaii, through counsel, sent AmGUARD a detailed

25    written response to the Position Letter with the goal of obviating any "misunderstanding between or

26    among the parties with respect to their continuing obligations and/or responsibilities under the

27    Policy" and setting forth Skaii's position concerning "the pertinent circumstances and conditions

28

1  giving rise to Skaii's receipt of further payments from AmGUARD under the Policy." A true and

2  correct copy of this letter is attached hereto as Exhibit 11.

3      53.    Skaii's response to the Position Letter addressed three main issues:

4      • First, Skaii requested that, given the bureaucratic realities of obtaining municipal

5          construction approvals in Southern California, AmGUARD agree to extend the

6          Replacement Deadline to at least one year from the date Skaii receives permission

7          from the pertinent authority(ies) to commence replacement construction;

8      • Second, Skaii requested that AmGUARD clarify whether Skaii would still be eligible

9          to receive replacement cost reimbursements under the Policy up to the full amount of

10         the Delta, assuming such costs were reasonably and expeditiously incurred; and

11     • Third, Skaii advised AmGUARD that, because all reasonable estimates it was able to

12         obtain for the repair of the warehouse exceeded the Policy Limit, Skaii believed it

13         was not required—under either the Policy or California law interpreting similar

14         policy language—to replace the Property with a like-for-like warehouse, but could

15         instead construct townhomes as a replacement for the Property and remain entitled to

16         replacement cost reimbursements under the Policy in the full amount of the Delta.

17     54.    Skaii's letter further advised AmGUARD that if it did not receive satisfactory written

18  responses from AmGUARD confirming its shared understanding with respect to these three issues,

19  Skaii would have no choice but to commence legal proceedings against AmGUARD seeking, among

20  other things, injunctive and/or declaratory relief.

21     55.    Over the ensuing months, the parties, via their legal counsel, engaged in extensive

22  further correspondence, setting forth their respective arguments regarding the Policy's coverages,

23  obligations, and responsibilities. Unfortunately, the parties' positions remained wildly divergent.

24     56.    In the hopes of avoiding litigation, the parties jointly agreed to submit their dispute to

25  non-binding mediation conducted by former insurance litigator, Doug deVries of Judicate West, on

26  July 24, 2025.

27     57.    After mediation proved unsuccessful, Skaii made one final eminently reasonable

28  proposal to AmGUARD, which it hoped would forestall litigation.

witkow | baskin

58.    Specifically, on or about August 1, 2025, Skaii, via counsel, advised AmGUARD, in writing, that it would agree to settle the Claim pursuant to California Code of Regulations, Title 10, Section 2695.9(d)(2). To this end, Skaii explained that it would agree to forego its plans to construct townhomes to replace the Property so long as AmGUARD agreed to provide "the name of at least one repair individual or entity that will make the repairs for the amount of the written estimate" and that AmGUARD assume responsibility for any and all constructions costs or expenses in excess of this amount. A true and correct copy of Skaii's counsel's August 1, 2025 letter to AmGUARD's counsel is attached hereto as Exhibit 12.

59.    Disappointingly, AmGUARD refused to even countenance performance under Section 2695.9(d)(2), instead insisting that it had fully satisfied its obligations under Section 2695.9(d)(3) by "reasonably" adjusting the RCV to $1,167,393.97. A true and correct copy of AmGUARD's counsel's August 11, 2025 letter in this regard is attached hereto as Exhibit 13.

60.    On August 19, 2025, Skaii's counsel sent AmGUARD's counsel a letter refuting the arguments and justifications in AmGuard's August 11, 2025 letter and explaining that "AmG[UARD'S] refusal to provide Skaii with a contractor pursuant to Section 2695.9(d)(2) who will agree to complete the work within the policy limit (let alone the $1,167,393.97 amount AmG[UARD] purports to be 'reasonable') puts Skaii in an unfair and untenable predicament." Skaii urged AmGUARD one final time to reconsider its position vis-à-vis Section 2695.9(d)(2) to avoid the expense, inconvenience, and further uncertainty of litigation. A true and correct copy of Skaii's counsel's August 19, 2025 letter is attached hereto as Exhibit 14.

61.    On August 20, 2025, AmGUARD's counsel confirmed to Skaii's counsel via email that AmGUARD would not be reconsidering its position.

## FIRST CAUSE OF ACTION

### (For Declaratory Relief)

62.    Plaintiff hereby re-alleges and incorporates by reference each of the foregoing allegations in this Complaint as though fully set forth herein.

63.    Plaintiff has done all, or substantially all, of the significant of it under the Policy, except for any obligations that may have been expressly, impliedly, equitably, or legally excused.

12

**COMPLAINT**

witkow|baskin

64.     Under California Code of Civil Procedure Section 1060, et seq., the court may declare rights, duties, statuses, and other legal relations, regardless of whether further relief is or could be claimed.

65.     An actual controversy has arisen between Plaintiff and Defendants as to their respective rights and duties under the Policy.

66.     Resolution of the parties' respective rights and duties under the Policy by declaration of the Court is necessary, as there exists no adequate remedy at law.

67.     First, Plaintiff contends and Defendants dispute that the reasonable cost to restore the Property to no less than its condition prior to the Loss and which will allow for repairs to be made in a manner which meets accepted trade standards for good and workmanlike construction is greater than the Policy Limit. Indeed, Plaintiff has been unable to find or engage any reputable contractor to provide an estimate for less than this amount and Defendants have refused Plaintiffs' request to locate and engage such a contractor on Plaintiff's behalf. Plaintiff is informed and believes that Defendants have so refused because they are well aware that no reputable contractor would provide (or at least abide by) such an estimate.

68.     Second, Plaintiff contends and Defendants dispute that Section E.5 (Loss Payment) of the Policy entitles Plaintiff to replace the damaged warehouse Property with other property(ies) that need not be of "like kind or quality" (i.e., residential townhomes) because Defendants have elected under paragraph E.5.a to have Skaii undertake the replacement construction (rather than electing to assume this responsibility themselves) and because the Policy Limit is, under any fair and reasonable estimation, the lowest of the three amounts that are (or could be) spent to replace the Property under paragraph E.5.d.(1)(a).

69.     Third, Plaintiff contends and Defendants dispute that the January 23, 2026 deadline unilaterally and arbitrarily set by Defendants in their January 23, 2025 Position Letter to Plaintiff is fair or reasonable given that Defendants did not confirm that no more ACV payments would be made until transmission of the Position Letter. Accordingly and at a minimum, Plaintiff should have at least 24 months from January 23, 2025 to complete the repairs to/replacement of the Property under paragraph E.5.d.(1)(d), or, in the alternative, at least one year from the date Plaintiff receives

13

**COMPLAINT**

1     all necessary approvals from the pertinent local authority(ies) to commence replacement

2     construction, while still remaining entitled under the Policy for full reimbursement up to the Policy

3     Limit (or rather, the full amount of the Delta between the Policy Limit and ACV payments already

4     made by Defendants to Plaintiff).

5         70.    Fourth, Plaintiff contends and Defendants dispute that Section E.4 (Legal Action

6     Against Us) of the Policy does NOT bar this suit even though this action was not brought within two

7     years after the date on which the direct physical loss or damage occurred. Application of this

8     contractual statute of limitations in this case would be abhorrent and unfair because, as set forth in

9     great detail above, at least until January 23, 2025, Defendants had not clearly or definitively

10    communicated their final position(s) as to the amount of the Loss (either ACV or RCV) or the

11    Replacement Deadline because the parties were still actively negotiating these issues and

12    Defendants' Claim investigation remained open. Accordingly, under California law, there was and is

13    good cause for this contractual limitations provision to be tolled and/or disregarded to allow this suit

14    to proceed.

15        71.    Plaintiff therefore seeks a declaratory judgment regarding each of Plaintiff's

16    contentions set forth in this cause of action.

17                        **SECOND CAUSE OF ACTION**

18                          **(For Injunctive Relief)**

19        72.    Plaintiff hereby re-alleges and incorporates by reference each of the foregoing

20    allegations in this Complaint as though fully set forth herein.

21        73.    In the alternative, to the declaratory judgment(s) sought in the First Cause of Action

22    herein, and because, absent such declarations from the Court, no other adequate remedy exists at law

23    to provide Plaintiff with the benefit of its bargain under the Policy, Plaintiff requests that Defendants

24    be required, via mandatory injunctive relief ordered by this Court, to settle Plaintiff's Claim pursuant

25    to California Code of Regulations, Title 10, Section 2695.9(d)(2), i.e., that Defendants be ordered to

26    promptly provide "the name of at least one repair individual or entity that will make the repairs for

27    the amount of the written estimate" of $1,167,393.97, which Defendants' purport to be the

28    reasonable RCV of the Property. In so doing, Defendants "shall cause the damaged property to be

witkow | baskin

1   restored to no less than its condition prior to the loss and which will allow for repairs in a manner

2   which meets accepted trade standards for good and workmanlike construction at no additional cost to

3   [Plaintiff] other than as stated in the policy or as otherwise allowed by the [California's insurance]

4   regulations."

5        74.    The import and effect of this Court's order for the injunctive relief under Section

6   2695.9(d)(2) requested in this cause of action is that Plaintiff shall only be obligated to pay

7   Defendants' chosen contractor the $1,054,352.17 ACV amount it has heretofore received from

8   Defendants, while Defendants shall remain solely liable for any and all construction costs or

9   expenses in excess of this amount.

10                          **THIRD CAUSE OF ACTION**

11        **(For Bad Faith Breach of Implied Covenant of Good Faith and Fair Dealing)**

12        75.    Plaintiff hereby re-alleges and incorporates by reference each of the foregoing

13   allegations in this Complaint as though fully set forth herein.

14        76.    In every insurance policy there is an implied obligation of good faith and fair dealing

15   that neither the insurance company nor the insured will do anything to injure the right of the other

16   party to receive the benefits of the agreement. To fulfill its implied obligation of good faith and fair

17   dealing, an insurance company must give at least as much consideration to the interests of the

18   insured as it gives to its own interests. To breach the implied obligation of good faith and fair

19   dealing, an insurance company must, unreasonably or without proper cause, act or fail to act in a

20   manner that deprives the insured of the benefits of the policy. It is not a mere failure to exercise

21   reasonable care. However, it is not necessary for the insurer to intend to deprive the insured of the

22   benefits of the policy.

23        77.    When Defendants issued the instant Policy, they thus undertook and were bound to

24   the covenants implied by law that they would deal fairly and in good faith with Plaintiff, and not to

25   engage in any acts, conduct, or omissions that would impair or diminish the rights and benefits due

26   to Plaintiff, according to the terms of the Policy.

27        78.    Plaintiff has done all, or substantially all, of the significant of it under the Policy,

28   except for any obligations that may have been expressly, impliedly, equitably, or legally excused.

witkow|baskin

15

**COMPLAINT**

79.    Defendants have breached the implied covenant of good faith and fair dealing arising out of the Policy by engaging various acts and omissions unreasonably and in bad faith, including, without limitation:

- Failing and refusing to adjust/readjust the replacement cost estimate for the Property at market prices at the time replacement construction would be performed, thereby causing Plaintiff to legitimately fear that that it would not be fully reimbursed for the reasonable costs incurred in repairing/replacing the Property and inducing Plaintiff to delay commencing replacement construction given its inability to find any reputable contractor willing to repair or replace the Property and warrant said work at anywhere near as low as Defendants' replacement cost estimate;

- Representing to Plaintiff that it was continuing to evaluate the detailed estimates Plaintiff submitted for the repair/replacement of the Property through January 23, 2025 without providing any final determination of their position regarding the Loss and/or clarifying whether further ACV or lost business income payments would be made to Plaintiff and/or informing Plaintiff that (at least under Defendants' interpretation of the Policy), Plaintiff would be barred from filing suit against Defendants in connection with the Claim unless such action were brought within two years after the date on which the direct physical loss or damage occurred even though the parties were continuing to engage in good faith (at least on Plaintiff's part) negotiations related to the still open Claim, thereby leading Plaintiff to refrain from initiating this suit against Defendants within the Policy's purported 2-year period while such negotiations were ongoing;

- Unilaterally and arbitrarily extending Plaintiff's deadline to complete repairs/replacement construction under the Policy to only one year from the date of the January 23, 2025 Position Letter, even though the realities of seeking and obtaining construction approvals in Orange County, coupled with the scope of the project, render project completion by such deadline impossible (or at least implausible), while, at the same time, asserting in the Position Letter that Plaintiff

16

**COMPLAINT**

is/was barred under Section E.4 (Legal Action Against Us) of the Policy from filing suit against Defendants related to the Claim to extend this deadline or otherwise seek any judicial determination regarding Plaintiff's rights under the Policy; and

- Refusing Plaintiff's request to settle the Claim pursuant to California Code of Regulations, Title 10, Section 2695.9(d)(2), while, at the same time, refusing to confirm—assuming Plaintiff provided proof that such repair/replacement costs were reasonably incurred—that Plaintiff would be reimbursed (as required under the Policy and California law) for repair/replacement costs in excess of the $106,821.80 "holdback."

80.     As a result of Defendants' bad faith acts and omissions as set forth hereinabove and/or as may otherwise or additionally be established during the course of this litigation, Plaintiff was compelled to retain legal counsel to obtain the benefits due under the Policy. Defendants are thus liable to Plaintiff for these attorneys' fees and all costs of litigation reasonably and necessary incurred by Plaintiff to obtain the benefits of the Policy.

81.     As a result of Defendants' bad faith acts and omissions as set forth hereinabove and/or as may otherwise or additionally be established during the course of this litigation, Plaintiff also suffered and will continue to suffer damages. Accordingly, Plaintiff is entitled to seek and recover in connection with this cause of action, an award of general damages and other monetary damages, including all foreseeable consequential and incidental damages, loss of use, and out-of-pocket expenses, plus interest, in an amount to be determined at trial.

82.     Moreover, in engaging in the conduct alleged hereinabove, Defendants acted with oppression, fraud, malice, and/or a wanton and willful disregard for Plaintiff's rights, thereby justifying an award of punitive and exemplary damages against them in an amount to be determined at trial appropriate to punish or set an example of Defendants and to deter future similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For a declaration adopting each of Plaintiff's contentions set forth in the above cause of action for Declaratory Relief;

17
**COMPLAINT**

2.     For injunctive relief enjoining and restraining Defendants' unlawful conduct as alleged herein and/or mandating Defendants' prompt performance under California Code of Regulations, Title 10, Section 2695.9(d)(2) as set forth in the above cause of action for Injunctive Relief;

3.     For general and compensatory damages in an amount to be determined at trial;

4.     For exemplary and punitive damages in an amount to be determined at trial;

5.     For Plaintiff's costs of suit;

6.     For Plaintiff's reasonable attorneys' fees incurred in this action as authorized by law or contract;

7.     For pre-judgment interest and all other amounts to which Plaintiff is entitled;

8.     For such other relief that the Court deems appropriate.

Dated: September 17, 2025

Respectfully submitted,

witkow | baskin

By: _____
       Cory A. Baskin
Attorneys for *Plaintiff*
SKAII INVESTMENT, LLC

**witkow | baskin**

18
**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and causes of action for which a jury trial is permitted.

Dated: September 17, 2025                    Respectfully submitted,

                                             witkow | baskin

                                             By: _____
                                                    Cory A. Baskin
                                                    Attorneys for *Plaintiff*
                                                    SKAII INVESTMENT, LLC

19
**COMPLAINT**

# EXHIBIT 1

BP IN 01 01 10

# BUSINESSOWNER'S COVERAGE FORM INDEX

This index is provided only as a convenience. It should not be assumed to provide a reference to every provision that can affect a question, claim or coverage. To determine the full scope of coverage and pertinent restrictions and exclusions, the policy (including endorsements) must be read in its entirety. The features may also be affected by related provisions not referenced at all in the index, or noted elsewhere in it. For instance, an **Exclusion** feature addresses a specific policy exclusion; but restrictions of coverage and exclusions also appear within the areas where coverage, covered causes of loss, etc., are described.

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Abandonment Property Loss Condition | 21 | Business Liability Coverage | 30-32 |
| Accounts Receivable Coverage Extension | 14 | Business Personal Property Coverage | 1 |
| Accounts Receivable Exclusion | 20 | Business Personal Property Limit – Seasonal Increase (Limit Of Insurance) | 20-21 |
| Acts Or Decisions Exclusion | 19 | Cancellation Condition | 46 |
| Additional Coverages | 3-12 | Certain Computer-related Losses Exclusion | 16-17 |
| Additional Exclusion – Loss Or Damage To Products Exclusion | 19 | Changes Condition | 46 |
| "Advertisement" Definition | 42 | Changes In Or Extremes Of Temperature Exclusion | 18 |
| Aggregate Limits (Liability And Medical Expenses Limits Of Insurance) | 41 | Civil Authority Additional Coverage | 7-8 |
| Aircraft, Auto Or Watercraft Exclusion | 35 | Collapse Additional Coverage | 4-5 |
| Appraisal Property Loss Condition | 21 | Collapse Exclusion | 18 |
| "Auto" Definition | 42 | "Computer" Definition | 28 |
| Bankruptcy General Condition | 41 | Concealment, Misrepresentation Or Fraud Condition | 46 |
| "Bodily Injury" Definition | 42 | Consequential Losses Exclusion | 17 |
| Building Coverage | 1 | Continuous Or Repeated Seepage Or Leakage Of Water Exclusion | 19 |
| Building Limit – Automatic Increase (Limits Of Insurance) | 20 | Contractual Liability Exclusion | 33 |
| Business Income Additional Coverage | 5-7 | Control Of Property General Condition | 25 |
| Business Income And Extra Expense Exclusions | 19-20 | "Counterfeit Money" Definition | 29 |
| Business Income From Dependent Properties Additional Coverage | 9-10 | Coverage Extension – Supplementary Payments (Business Liability Coverage) | 31-32 |

**BUSINESSOWNER'S COVERAGE FORM INDEX**

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Coverage Extensions – Section I – Property | 12-14 | Errors Or Omissions Exclusion | 19 |
| "Coverage Territory" Definition | 42 | Examination Of Your Books And Records Condition | 46 |
| Covered Causes Of Loss | 2 | Exclusions – Section I – Property | 14-20 |
| Covered Property | 1 | Exclusions – Section II – Liability | 32-40 |
| Damage To Impaired Property Or Property Not Physically Injured Exclusion | 36 | "Executive Officer" Definition | 43 |
| Damage To Property Exclusion | 36 | Expected Or Intended Injury Exclusion | 33 |
| Damage To Your Product Exclusion | 36 | Exposed Property Exclusion | 18 |
| Damage To Your Work Exclusion | 36 | Extended Business Income Coverage (Business Income Additional Coverage) | 6-7 |
| Dampness Or Dryness Of Atmosphere Exclusion | 18 | Extra Expense Additional Coverage | 7 |
| Debris Removal Additional Coverage | 3-4 | False Pretense Exclusion | 18 |
| Deductibles | 21 | Fire Department Service Charge Additional Coverage | 4 |
| Dishonesty Exclusion | 17-18 | Fire Extinguisher Systems Recharge Expense Additional Coverage | 10 |
| Duties In The Event Of Loss Or Damage Property Loss Condition | 21-22 | Forgery Or Alteration Additional Coverage | 8 |
| Duties In The Event Of Occurrence, Offense, Claim Or Suit General Condition | 41-42 | Frozen Plumbing Exclusion | 17 |
| Earth Movement Exclusion | 15 | "Fungi" Definition | 29 |
| Electrical Apparatus Exclusion | 17 | "Fungi", Wet Rot Or Dry Rot Exclusion | 17 |
| Electrical Disturbance Exclusion | 19 | Glass Expenses Additional Coverage | 10 |
| Electronic Data Additional Coverage | 10-11 | Governmental Action Exclusion | 15 |
| "Electronic Data" Definition | 29 | "Hostile Fire" Definition | 43 |
| Electronic Data Exclusion | 38 | "Impaired Property" Definition | 43 |
| "Employee" Definition | 42 | Increased Cost Of Construction Additional Coverage | 8-9 |
| Employee Dishonesty Optional Coverage | 26-27 | Inspections And Surveys Condition | 47 |
| Employer's Liability Exclusion | 33 | Insurance Under Two Or More Coverages Condition | 47 |
| Equipment Breakdown Protection Optional Coverage | 28-29 | "Insured Contract" Definition | 43 |

   Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.   BP IN 01 01 10

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| Installation, Testing, Repair Exclusion | 19 | Money Orders And "Counterfeit Money" Additional Coverage | 8 |
| Interruption Of Computer Operations Additional Coverage | 11 | Mortgageholders Property General Condition | 25 |
| "Leased Worker" Definition | 43 | Neglect Exclusion | 18 |
| Legal Action Against Us General Condition Section II – Liability | 42 | Negligent Work Exclusion | 19 |
| Legal Action Against Us Property Loss Condition – Section I – Property | 22 | Nesting Or Infestation Exclusion | 18 |
| Liability And Medical Expenses Definitions | 42-45 | Newly Acquired Or Constructed Property Coverage Extension | 13 |
| Liability And Medical Expenses General Conditions | 41-42 | No Benefit To Bailee Property General Condition | 25 |
| Liability And Medical Expenses Limits Of Insurance | 41 | Nuclear Energy Liability Exclusion | 38-40 |
| Liberalization Condition | 47 | Nuclear Hazard Exclusion | 15 |
| Limitations | 2-3 | "Occurrence" Definition | 44 |
| Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage | 11-12 | "Operations" Definition | 29 |
| Limits Of Insurance – Section I – Property | 20 | Optional Coverages | 25-29 |
| Liquor Liability Exclusion | 33 | Ordinance Or Law Exclusion | 15 |
| "Loading Or Unloading" Definition | 43 | Other Insurance Condition | 47 |
| Loss Payment Property Loss Condition | 22-24 | Other Types Of Loss Exclusion | 18 |
| "Manager" Definition | 29 | Outdoor Property Coverage Extension | 13 |
| Marring Or Scratching Exclusion | 18 | Outdoor Signs Optional Coverage | 25-26 |
| Mechanical Breakdown Exclusion | 18 | "Period Of Restoration" Definition | 29 |
| Medical Expenses Coverage | 32-33 | "Personal And Advertising Injury" Definition | 44 |
| Medical Expenses Exclusions | 38-40 | Personal And Advertising Injury Exclusion | 37 |
| "Member" Definition | 29 | Personal Effects Coverage Extension | 13 |
| "Mobile Equipment" Definition | 43-44 | Personal Property Off-premises Coverage Extension | 13 |
| Mobile Equipment Exclusion | 35 | Policy Period, Coverage Territory Property General Condition | 25 |
| Money And Securities Optional Coverage | 26 | Pollutant Clean-up And Removal Additional Coverage | 7 |
| "Money" Definition | 29 | "Pollutants" Definition – Section I – Property | 29 |

**BUSINESSOWNER'S COVERAGE FORM INDEX**

| Businessowners Coverage Feature | Page Number | Businessowners Coverage Feature | Page Number |
|---|---|---|---|
| "Pollutants" Definition – Section II – Liability | 44 | "Specified Causes Of Loss" Definition | 30 |
| Pollution Exclusion – Section I – Property | 18 | Steam Apparatus Exclusion | 17 |
| Pollution Exclusion – Section II – Liability | 33-35 | "Stock" Definition | 30 |
| Premium Audit Condition | 47-48 | "Suit" Definition | 45 |
| Premiums Condition | 47 | "Temporary Worker" Definition | 45 |
| Preservation Of Property Additional Coverage | 4 | Transfer Of Rights Of Recovery Against Others To Us Condition | 48 |
| "Products-completed Operations Hazard" Definition | 44-45 | Transfer Of Your Rights And Duties Under This Policy Condition | 48 |
| Professional Services Exclusion | 35-36 | Utility Services Exclusion | 15-16 |
| "Property Damage" Definition | 45 | Vacancy Property Loss Condition | 24-25 |
| Property Definitions | 29-30 | Valuable Papers And Records Coverage Extension | 14 |
| Property General Conditions | 25 | "Valuable Papers And Records" Definition | 30 |
| Property Loss Conditions | 21-25 | Violation Of Customer Protection Statutes Exclusion | 38 |
| Property Not Covered | 2 | Virus Or Bacteria Exclusion | 17 |
| Recall Of Products, Work Or Impaired Property Exclusion | 37 | "Volunteer Worker" Definition | 45 |
| Recovered Property Loss Condition | 24 | War And Military Action Exclusion | 16 |
| Resumption Of Operations Property Loss Condition | 24 | War Exclusion | 35 |
| Rust Or Other Corrosion Exclusion | 18 | Water Damage, Other Liquids, Powder Or Molten Material Damage Additional Coverage | 5 |
| Section I – Property | 1-30 | Water Exclusion | 16 |
| Section II – Liability | 30-45 | Wear And Tear Exclusion | 18 |
| Section III – Common Policy Conditions | 46-48 | Weather Conditions Exclusion | 19 |
| "Securities" Definition | 29 | Who Is An Insured | 40-41 |
| Separation Of Insureds General Condition | 42 | Workers' Compensation And Similar Laws Exclusion | 33 |
| Settling, Cracking, Shrinking Or Expansion Exclusion | 18 | "Your Product" Definition | 45 |
| Smog Exclusion | 18 | "Your Work" Definition | 45 |
| Smoke, Vapor, Gas Exclusion | 17 | | |

# BUSINESSOWNER'S COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

In Section II – Liability, the word "insured" means any person or organization qualifying as such under Paragraph **C.** Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph **H.** Property Definitions in Section I – Property and Paragraph **F.** Liability And Medical Expenses Definitions in Section II – Liability.

## SECTION I – PROPERTY

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **2.** Property Not Covered.

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

(4) Your personal property in apartments, rooms or common areas furnished by you as landlord;

(5) Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(6) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the buildings or structures;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

**b.** Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 100 feet of the described premises, including:

(1) Property you own that is used in your business;

(2) Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.5.d.(3)(b)**;

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(4) Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **1.b.(2)**; and

(5) Exterior building glass, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

**BUSINESSOWNER'S POLICY**

2. **Property Not Covered**

Covered Property does not include:

a. Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

b. "Money" or "securities" except as provided in the:

(1) Money And Securities Optional Coverage; or

(2) Employee Dishonesty Optional Coverage;

c. Contraband, or property in the course of illegal transportation or trade;

d. Land (including land on which the property is located), water, growing crops or lawns;

e. Outdoor fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants, all except as provided in the:

(1) Outdoor Property Coverage Extension; or

(2) Outdoor Signs Optional Coverage;

f. Watercraft (including motors, equipment and accessories) while afloat;

g. Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided in this policy;

h. "Computer(s)" which are permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration. This paragraph does not apply to "computer(s)" while held as "stock";

i. "Electronic data", except as provided under Additional Coverages – Electronic Data. This Paragraph i. does not apply to your "stock" of prepackaged software.

j. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings.

3. **Covered Causes Of Loss**

Risks of direct physical loss unless the loss is:

a. Excluded in Paragraph **B.** Exclusions in Section **I;** or

b. Limited in Paragraph **4.** Limitations in Section **I.**

4. **Limitations**

a. We will not pay for loss of or damage to:

(1) Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

(2) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

(3) Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Optional Coverage for Money and Securities.

(4) Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

(5) The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

(a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

(b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

b. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

(1) Animals, and then only if they are killed or their destruction is made necessary.

(2) Fragile articles such as glassware, statuary, marble, chinaware and porcelain, if broken. This restriction does not apply to:

(a) Glass that is part of the exterior or interior of a building or structure;

(b) Containers of property held for sale; or

(c) Photographic or scientific instrument lenses.

c. For loss or damage by theft, the following types of property are covered only up to the limits shown:

(1) $2,500 for furs, fur garments and garments trimmed with fur.

(2) $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

(3) $2,500 for patterns, dies, molds and forms.

**5. Additional Coverages**

**a. Debris Removal**

(1) Subject to Paragraphs (3) and (4), we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Extract "pollutants" from land or water; or

(b) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph (4), the following provisions apply:

(a) The most that we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to Paragraph (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

(4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if Paragraphs (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

(5) Examples

**Example #1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph (3).

**Example #2**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense | $ 30,000 |

**BUSINESSOWNER'S POLICY**

Debris Removal Expense
Payable

| | | |
|---|---|---|
| Basic Amount | $ | 10,500 |
| Additional Amount | $ | 10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500). The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4)**. Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500, unless a different limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**d. Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

**(1)** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**(2)** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:

**(a)** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**(b)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(c)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**(d)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(i)** A cause of loss listed in Paragraph **(2)(a)** or **(2)(b)**;

**(ii)** One or more of the "specified causes of loss";

**(iii)** Breakage of building glass;

**(iv)** Weight of people or personal property; or

**(v)** Weight of rain that collects on a roof.

**(3)** This Additional Coverage – Collapse does **not** apply to:

**(a)** A building or any part of a building that is in danger of falling down or caving in;

Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.

**(b)** A part of a building that is standing, even if it has separated from another part of the building; or

**(c)** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(4)** With respect to the following property:

  **(a)** Awnings;

  **(b)** Gutters and downspouts;

  **(c)** Yard fixtures;

  **(d)** Outdoor swimming pools;

  **(e)** Piers, wharves and docks;

  **(f)** Beach or diving platforms or appurtenances;

  **(g)** Retaining walls; and

  **(h)** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)**, we will pay for loss or damage to that property only if such loss or damage is a direct result of the abrupt collapse of a building insured under this policy and the property is Covered Property under this policy.

**(5)** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

  **(a)** The collapse of personal property was caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)** of this Additional Coverage;

  **(b)** The personal property which collapses is inside a building; and

  **(c)** The property which collapses is not of a kind listed in Paragraph **(4)**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **(5)** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**(6)** This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(7)** This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this policy.

**(8)** The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

**e. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage; but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or

**(2)** Is directly caused by freezing.

**f. Business Income**

  **(1) Business Income**

    **(a)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

**BUSINESSOWNER'S POLICY**

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(i) The portion of the building which you rent, lease or occupy; and

(ii) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

(b) We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

(c) Business Income means the:

(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

(ii) Continuing normal operating expenses incurred, including payroll.

(d) Ordinary payroll expenses:

(i) Means payroll expenses for all your employees except:

i. Officers;

ii. Executives;

iii. Department Managers;

iv. Employees under contract; and

v. Additional Exemptions shown in the Declarations as:

⊙ Job Classifications; or

⊙ Employees.

(ii) Include:

i. Payroll;

ii. Employee benefits, if directly related to payroll;

iii. FICA payments you pay;

iv. Union dues you pay; and

v. Workers' compensation premiums.

**(2) Extended Business Income**

(a) If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(i) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

(ii) Ends on the earlier of:

i. The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

ii. 30 consecutive days after the date determined in Paragraph (a)(i) above, unless a greater number of consecutive days is shown in the Declarations.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

(b) Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(3)** With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; or

**(b)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**(4)** This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**g. Extra Expense**

**(1)** We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**(2)** Extra Expense means expense incurred:

**(a)** To avoid or minimize the suspension of business and to continue "operations":

**(i)** At the described premises; or

**(ii)** At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

**(b)** To minimize the suspension of business if you cannot continue "operations".

**(c)** To:

**(i)** Repair or replace any property; or

**(ii)** Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **f.** Business Income.

**(3)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**(4)** We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**h. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**i. Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**BUSINESSOWNER'S POLICY**

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority coverage for necessary Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority coverage for Business Income ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**j. Money Orders And "Counterfeit Money"**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**(1)** Money orders issued by any post office, express company or bank that are not paid upon presentation; or

**(2)** "Counterfeit money" that is acquired during the regular course of business.

The most we will pay for any loss under this Additional Coverage is $1,000.

**k. Forgery Or Alteration**

**(1)** We will pay for loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange or similar written promise of payment in "money", that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

**(2)** If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

**(3)** For the purpose of this coverage, check includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

**(4)** The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500, unless a higher Limit of Insurance is shown in the Declarations.

**l. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings insured on a replacement cost basis.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in Paragraphs **(3)** through **(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in Paragraph **(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot; or

**(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants", "fungi", wet rot or dry rot.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under Section I – Property, is $10,000. If a damaged building(s) is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for each damaged building, is $10,000.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment Property Loss Condition in Section I – Property do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in Paragraph **(6)** of this Additional Coverage, is not subject to such limitation.

**m. Business Income From Dependent Properties**

**(1)** We will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent property caused by or resulting from any Covered Cause of Loss.

However, this Additional Coverage does not apply when the only loss to dependent property is loss or damage to "electronic data", including destruction or corruption of "electronic data". If the dependent property sustains loss or damage to "electronic data" and other property, coverage under this Additional Coverage will not continue once the other property is repaired, rebuilt or replaced.

The most we will pay under this Additional Coverage is $5,000 unless a higher Limit of Insurance is indicated in the Declarations.

**(2)** We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

**(a)** Source of materials; or

**(b)** Outlet for your products.

**(3)** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**BUSINESSOWNER'S POLICY**

**(4)** Dependent property means property owned by others whom you depend on to:

**(a)** Deliver materials or services to you, or to others for your account. But services does not mean water, communication or power supply services;

**(b)** Accept your products or services;

**(c)** Manufacture your products for delivery to your customers under contract for sale; or

**(d)** Attract customers to your business.

The dependent property must be located in the coverage territory of this policy.

**(5)** The coverage period for Business Income under this Additional Coverage:

**(a)** Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the dependent property; and

**(b)** Ends on the date when the property at the premises of the dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

**(6)** The Business Income coverage period, as stated in Paragraph **(5)**, does not include any increased period required due to the enforcement of any ordinance or law that:

**(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not reduce the Business Income coverage period.

**(7)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**n. Glass Expenses**

**(1)** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

**(2)** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**o. Fire Extinguisher Systems Recharge Expense**

**(1)** We will pay:

**(a)** The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems (including hydrostatic testing if needed) if they are discharged on or within 100 feet of the described premises; and

**(b)** For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

**(2)** No coverage will apply if the fire extinguishing system is discharged during installation or testing.

**(3)** The most we will pay under this Additional Coverage is $5,000 in any one occurrence.

**p. Electronic Data**

**(1)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that "electronic data" is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the "electronic data" was stored, with blank media of substantially identical type.

**(2)** The Covered Causes of Loss applicable to Business Personal Property include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

(3) The most we will pay under this Additional Coverage – Electronic Data for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved, is $10,000, unless a higher Limit of Insurance is shown in the Declarations. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in, but not after, that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**q. Interruption Of Computer Operations**

(1) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a suspension of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" due to a Covered Cause of Loss.

(2) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) Coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" and Collapse.

(b) If the Businessowners Coverage Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage.

(c) The Covered Causes of Loss include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or

leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

(3) The most we will pay under this Additional Coverage – Interruption Of Computer Operations for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved, is $10,000 unless a higher Limit of Insurance is shown in the Declarations. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(4) This Additional Coverage – Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (3) above has not been exhausted.

(5) Coverage for Business Income does not apply when a suspension of "operations" is caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs (1) through (4) of this Additional Coverage.

(6) Coverage for Extra Expense does not apply when action is taken to avoid or minimize a suspension of "operations" caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs (1) through (4) of this Additional Coverage.

**r. Limited Coverage For "Fungi", Wet Rot Or Dry Rot**

(1) The coverage described in Paragraphs r.(2) and r.(6) only applies when the "fungi", wet rot or dry rot are the result of a "specified cause of loss" other than

**BUSINESSOWNER'S POLICY**

fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

(2) We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:

  (a) Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;

  (b) The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

  (c) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot are present.

(3) The coverage described under this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungi", wet rot or dry rot, we will not pay more than the total of $15,000 even if the "fungi", wet rot or dry rot continues to be present or active, or recurs, in a later policy period.

(4) The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

(5) The terms of this Limited Coverage do not increase or reduce the coverage provided under the Water Damage, Other Liquids, Powder Or Molten Material Damage or Collapse Additional Coverages.

(6) The following applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Business Income and/or Extra Expense Additional Coverage.

  (a) If the loss which resulted in "fungi", wet rot or dry rot does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet rot or dry rot, then our payment under the Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

  (b) If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet rot or dry rot, but remediation of "fungi", wet rot or dry rot prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

6. **Coverage Extensions**

In addition to the Limits of Insurance of Section I – Property, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

COVERAGE FORM

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Buildings, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at premises other than the one described, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Business Personal Property**

If this policy covers Business Personal Property, you may extend that insurance to apply to:

**(a)** Business Personal Property, including such property that you newly acquire, at any location you acquire;

**(b)** Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

**(c)** Business Personal Property that you newly acquire, located at the described premises.

This Extension does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Property Off-premises**

You may extend the insurance provided by this policy to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $10,000.

**c. Outdoor Property**

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants, including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $2,500, unless a higher Limit of Insurance for Outdoor Property is shown in the Declarations, but not more than $1,000 for any one tree, shrub or plant.

**d. Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees. This extension does not apply to:

**(1)** Tools or equipment used in your business; or

**(2)** Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

**BUSINESSOWNER'S POLICY**

**e. Valuable Papers And Records**

(1) You may extend the insurance that applies to Business Personal Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control caused by or resulting from a Covered Cause of Loss. This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

(2) This Coverage Extension does not apply to:

(a) Property held as samples or for delivery after sale; and

(b) Property in storage away from the premises shown in the Declarations.

(3) The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is $5,000.

(4) Loss or damage to "valuable papers and records" will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the "valuable papers and records" are not restored, the "valuable papers and records" will be valued at the cost of replacement with blank materials of substantially identical material.

(5) Paragraph **B.** Exclusions in Section I – Property does not apply to this Coverage Extension except for:

(a) Paragraph **B.1.c.,** Governmental Action;

(b) Paragraph **B.1.d.,** Nuclear Hazard;

(c) Paragraph **B.1.f.,** War And Military Action;

(d) Paragraph **B.2.f.,** Dishonesty;

(e) Paragraph **B.2.g.,** False Pretense;

(f) Paragraph **B.2.m.(2),** Errors Or Omissions; and

(g) Paragraph **B.3.**

**f. Accounts Receivable**

(1) You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

(d) Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

(2) The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $5,000.

(3) Paragraph **B.** Exclusions in Section I – Property does not apply to this Coverage Extension except for:

(a) Paragraph **B.1.c.,** Governmental Action;

(b) Paragraph **B.1.d.,** Nuclear Hazard;

(c) Paragraph **B.1.f.,** War And Military Action;

(d) Paragraph **B.2.f.,** Dishonesty;

(e) Paragraph **B.2.g.,** False Pretense;

(f) Paragraph **B.3.**; and

(g) Paragraph **B.6.,** Accounts Receivable Exclusion.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

**a. Ordinance Or Law**

(1) The enforcement of any ordinance or law:

    (a) Regulating the construction, use or repair of any property; or

    (b) Requiring the tearing down of any property, including the cost of removing its debris.

(2) This exclusion, Ordinance Or Law, applies whether the loss results from:

    (a) An ordinance or law that is enforced even if the property has not been damaged; or

    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

(1) Earthquake, including any earth sinking, rising or shifting related to such event;

(2) Landslide, including any earth sinking, rising or shifting related to such event;

(3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

(4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in Paragraphs **(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    (a) Airborne volcanic blast or airborne shock waves;

    (b) Ash, dust or particulate matter; or

    (c) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**BUSINESSOWNER'S POLICY**

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

This exclusion does not apply to loss or damage to "computer(s)" and "electronic data".

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

   (a) Foundations, walls, floors or paved surfaces;

   (b) Basements, whether paved or not; or

   (c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraphs (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation in which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs (1) through (5), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. Certain Computer-related Losses**

(1) The failure, malfunction or inadequacy of:

   (a) Any of the following, whether belonging to any insured or to others:

      (i) "Computer" hardware, including microprocessors or other electronic data processing equipment as may be described elsewhere in this policy;

      (ii) "Computer" application software or other "electronic data" as may be described elsewhere in this policy;

      (iii) "Computer" operating systems and related software;

      (iv) "Computer" networks;

      (v) Microprocessors ("computer" chips) not part of any "computer" system; or

      (vi) Any other computerized or electronic equipment or components; or

   (b) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph (a) above;

   due to the inability to correctly recognize, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

(2) Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph (1) above.

However, if excluded loss or damage, as described in Paragraph (1) above results in a "specified cause of loss" under Section I – Property, we will pay only for the loss or damage caused by such "specified cause of loss".

We will not pay for repair, replacement or modification of any items in Paragraph **(1)(a)** or **(1)(b)** to correct any deficiencies or change any features.

### i. "Fungi", Wet Rot Or Dry Rot

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.

But if "fungi", wet rot or dry rot result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungi", wet rot or dry rot result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

### j. Virus Or Bacteria

**(1)** Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**(2)** However, the exclusion in Paragraph **(1)** does not apply to loss or damage caused by or resulting from "fungi", wet rot or dry rot. Such loss or damage is addressed in Exclusion **i.;**

**(3)** With respect to any loss or damage subject to the exclusion in Paragraph **(1),** such exclusion supersedes any exclusion relating to "pollutants".

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

### a. Electrical Apparatus

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(1)** Electrical current, including arcing;

**(2)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(3)** Pulse of electromagnetic energy; or

**(4)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by fire.

We will pay for loss or damage to "computer(s)" due to artificially generated electrical, magnetic or electromagnetic energy if such loss or damage is caused by or results from:

**(1)** An occurrence that took place within 100 feet of the described premises; or

**(2)** Interruption of electric power supply, power surge, blackout or brownout if the cause of such occurrence took place within 100 feet of the described premises.

### b. Consequential Losses

Delay, loss of use or loss of market.

### c. Smoke, Vapor, Gas

Smoke, vapor or gas from agricultural smudging or industrial operations.

### d. Steam Apparatus

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

### e. Frozen Plumbing

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

### f. Dishonesty

Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**BUSINESSOWNER'S POLICY**

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

With respect to accounts receivable and "valuable papers and records", this exclusion does not apply to carriers for hire.

This exclusion does not apply to coverage that is provided under the Employee Dishonesty Optional Coverage.

**g. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**h. Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

**i. Collapse**

**(1)** Collapse, including any of the following conditions of property or any part of the property:

**(a)** An abrupt falling down or caving in;

**(b)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(c)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph **i.(1)(a)** or **i.(1)(b).**

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**(2)** This Exclusion **i.**, does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage – Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**j. Pollution**

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

**k. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**l. Other Types Of Loss**

**(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

This exclusion does not apply with respect to the breakdown of "computer(s)";

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in Paragraphs **(1)** through **(7)** above results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**m. Errors Or Omissions**

Errors or omissions in:

**(1)** Programming, processing or storing data, as described under "electronic data" or in any "computer" operations; or

**(2)** Processing or copying "valuable papers and records".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this coverage form.

**n. Installation, Testing, Repair**

Errors or deficiency in design, installation, testing, maintenance, modification or repair of your "computer" system including "electronic data".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this coverage form.

**o. Electrical Disturbance**

Electrical or magnetic injury, disturbance or erasure of "electronic data", except as provided for under the Additional Coverages of Section I – Property.

However, we will pay for direct loss or damage caused by lightning.

**p. Continuous Or Repeated Seepage Or Leakage Of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b. Acts Or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Additional Exclusion**

The following applies only to the property specified in this Additional Exclusion.

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**5. Business Income And Extra Expense Exclusions**

**a.** We will not pay for:

**(1)** Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage.

**BUSINESSOWNER'S POLICY**

(2) Any other consequential loss.

b. With respect to this exclusion, suspension means:

(1) The partial slowdown or complete cessation of your business activities; and

(2) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

### 6. Accounts Receivable Exclusion

The following additional exclusion applies to the Accounts Receivable Coverage Extension:

We will not pay for:

a. Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

b. Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

c. Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

## C. Limits Of Insurance

1. The most we will pay for loss or damage in any one occurrence is the applicable Limits of Insurance of Section I – Property shown in the Declarations.

2. The most we will pay for loss of or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

3. The amounts of insurance applicable to the Coverage Extensions and the following Additional Coverages apply in accordance with the terms of such coverages and are in addition to the Limits of Insurance of Section I – Property:

a. Fire Department Service Charge;

b. Pollutant Clean-up And Removal;

c. Increased Cost Of Construction;

d. Business Income From Dependent Properties;

e. Electronic Data; and

f. Interruption Of Computer Operations.

4. **Building Limit – Automatic Increase**

a. In accordance with Paragraph **C.4.b.**, the Limit of Insurance for Buildings will automatically increase by 8%, unless a different

percentage of annual increase is shown in the Declarations.

b. The amount of increase is calculated as follows:

(1) Multiply the Building limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Building limit by:

(a) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 7% is .07); or

(b) .08, if no percentage of annual increase is shown in the Declarations; and

(2) Multiply the number calculated in accordance with **b.(1)** by the number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Building limit, divided by 365.

**Example:**

If:

The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

The amount of increase is

$100,000 x .08 x 146 ÷ 365 = $3,200.

### 5. Business Personal Property Limit – Seasonal Increase

a. Subject to Paragraph **5.b.**, the Limit of Insurance for Business Personal Property is automatically increased by:

(1) The Business Personal Property – Seasonal Increase percentage shown in the Declarations; or

(2) 25% if no Business Personal Property – Seasonal Increase percentage is shown in the Declarations;

to provide for seasonal variances.

b. The increase described in Paragraph **5.a** will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

(1) The 12 months immediately preceding the date the loss or damage occurs; or

**(2)** The period of time you have been in business as of the date the loss or damage occurs.

## D. Deductibles

1. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance of Section I – Property.

2. Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages in any one occurrence is the Optional Coverage Deductible shown in the Declarations:

   **a.** Money and Securities;

   **b.** Employee Dishonesty;

   **c.** Outdoor Signs; and

   **d.** Forgery or Alteration.

   But this Optional Coverage Deductible will not increase the Deductible shown in the Declarations. This Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

3. No deductible applies to the following Additional Coverages:

   **a.** Fire Department Service Charge;

   **b.** Business Income;

   **c.** Extra Expense;

   **d.** Civil Authority; and

   **e.** Fire Extinguisher Systems Recharge Expense.

## E. Property Loss Conditions

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3.** Duties In The Event Of Loss Or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section I – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**(9)** Resume all or part of your "operations" as quickly as possible.

**BUSINESSOWNER'S POLICY**

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance and the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

a. There has been full compliance with all of the terms of this insurance; and

b. The action is brought within two years after the date on which the direct physical loss or damage occurred.

5. **Loss Payment**

In the event of loss or damage covered by this policy:

a. At our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph d.(1)(e) below.

b. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

c. We will not pay you more than your financial interest in the Covered Property.

d. Except as provided in Paragraphs (2) through (7) below, we will determine the value of Covered Property as follows:

(1) At replacement cost without deduction for depreciation, subject to the following:

(a) If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

(i) The Limit of Insurance under Section I – Property that applies to the lost or damaged property;

(ii) The cost to replace, on the same premises, the lost or damaged property with other property:

(i. Of comparable material and quality; and

ii. Used for the same purpose; or

(iii) The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original premises.

(b) If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance that applies to the property:

(i) The actual cash value of the lost or damaged property; or

(ii) A proportion of the cost to repair or replace the lost or damaged property, after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the cost of repair or replacement.

(c) You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

(d) We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

However, if the cost to repair or replace the damaged building property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs **d.(1)(a)** and **d.(1)(b)** above whether or not the actual repair or replacement is complete.

**(e)** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Actual Cash Value – Buildings option applies, as shown in the Declarations, Paragraph **(1)** above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

**(3)** The following property at actual cash value:

**(a)** Used or secondhand merchandise held in storage or for sale;

**(b)** Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

**(c)** Household contents, except personal property in apartments or rooms furnished by you as landlord;

**(d)** Manuscripts; and

**(e)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marble, bronzes, porcelain and bric-a-brac.

**(4)** Glass at the cost of replacement with safety glazing material if required by law.

**(5)** Tenants' Improvements and Betterments at:

**(a)** Replacement cost if you make repairs promptly.

**(b)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(i)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(ii)** Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(c)** Nothing if others pay for repairs or replacement.

**(6)** Applicable only to the Optional Coverages:

**(a)** "Money" at its face value; and

**(b)** "Securities" at their value at the close of business on the day the loss is discovered.

**(7)** Applicable only to Accounts Receivable:

**(a)** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

**(i)** We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

**(ii)** We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

**(b)** The following will be deducted from the total amount of accounts receivable, however that amount is established:

**(i)** The amount of the accounts for which there is no loss or damage;

**(ii)** The amount of the accounts that you are able to reestablish or collect;

**BUSINESSOWNER'S POLICY**

    **(iii)** An amount to allow for probable bad debts that you are normally unable to collect; and

    **(iv)** All unearned interest and service charges.

**e.** Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy; and

    **(1)** We have reached agreement with you on the amount of loss; or

    **(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**6. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance of Section I – Property.

**7. Resumption Of Operations**

We will reduce the amount of your:

**a.** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**b.** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**8. Vacancy**

**a. Description Of Terms**

    **(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:

        **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

        **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

            **(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

            **(ii)** Used by the building owner to conduct customary operations.

    **(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

    **(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

        **(a)** Vandalism;

        **(b)** Sprinkler leakage, unless you have protected the system against freezing;

    **(c)** Building glass breakage;

    **(d)** Water damage;

    **(e)** Theft; or

    **(f)** Attempted theft.

  **(2)** With respect to Covered Causes of Loss other than those listed in Paragraphs **(1)(a)** through **(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

## F. Property General Conditions

### 1. Control Of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

### 2. Mortgageholders

**a.** The term "mortgageholder" includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

  **(1)** Pays any premium due under this policy at our request if you have failed to do so;

  **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

  **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this policy will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

  **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

  **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

  **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

  **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

### 3. No Benefit To Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### 4. Policy Period, Coverage Territory

Under Section I – Property:

**a.** We cover loss or damage commencing:

  **(1)** During the policy period shown in the Declarations; and

  **(2)** Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

**b.** The coverage territory is:

  **(1)** The United States of America (including its territories and possessions);

  **(2)** Puerto Rico; and

  **(3)** Canada.

## G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

### 1. Outdoor Signs

**a.** We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

**BUSINESSOWNER'S POLICY**

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

b. Paragraph **A.3.**, Covered Causes Of Loss, and Paragraph **B.**, Exclusions in Section I – Property, do not apply to this Optional Coverage, except for:

(1) Paragraph **B.1.c.**, Governmental Action;

(2) Paragraph **B.1.d.**, Nuclear Hazard; and

(3) Paragraph **B.1.f.**, War And Military Action.

c. We will not pay for loss or damage caused by or resulting from:

(1) Wear and tear;

(2) Hidden or latent defect;

(3) Rust;

(4) Corrosion; or

(5) Mechanical breakdown.

d. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Outdoor Signs shown in the Declarations.

e. The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

**2. Money And Securities**

a. We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

(1) Theft, meaning any act of stealing;

(2) Disappearance; or

(3) Destruction.

b. In addition to the Limitations and Exclusions applicable to Section I – Property, we will not pay for loss:

(1) Resulting from accounting or arithmetical errors or omissions;

(2) Due to the giving or surrendering of property in any exchange or purchase; or

(3) Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

c. The most we will pay for loss in any one occurrence is:

(1) The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

(a) In or on the described premises; or

(b) Within a bank or savings institution; and

(2) The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

d. All loss:

(1) Caused by one or more persons; or

(2) Involving a single act or series of related acts;

is considered one occurrence.

e. You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**3. Employee Dishonesty**

a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

(1) Cause you to sustain loss or damage; and also

(2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(a) Any employee; or

(b) Any other person or organization.

b. We will not pay for loss or damage:

(1) Resulting from any dishonest or criminal act that you or any of your partners or "members" commit whether acting alone or in collusion with other persons.

(2) Resulting from any dishonest act committed by any of your employees (except as provided in Paragraph **a.**), "managers" or directors:

(a) Whether acting alone or in collusion with other persons; or

(b) While performing services for you or otherwise.

(3) The only proof of which as to its existence or amount is:

    (a) An inventory computation; or

    (b) A profit and loss computation.

**c.** The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

**d.** All loss or damage:

    (1) Caused by one or more persons; or

    (2) Involving a single act or series of acts;

    is considered one occurrence.

**e.** If any loss is covered:

    (1) Partly by this insurance; and

    (2) Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

    the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

    We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

**f.** This Optional Coverage is cancelled as to any employee immediately upon discovery by:

    (1) You; or

    (2) Any of your partners, "members", "managers", officers or directors not in collusion with the employee;

    of any dishonest act committed by that employee before or after being hired by you.

**g.** We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

**h.** If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

    (1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

    (2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**i.** The insurance under Paragraph **h.** above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

    (1) This Optional Coverage as of its effective date; or

    (2) The prior insurance had it remained in effect.

**j.** With respect to the Employee Dishonesty Optional Coverage in Paragraph **G.3.**, employee means:

    (1) Any natural person:

        (a) While in your service or for 30 days after termination of service;

        (b) Who you compensate directly by salary, wages or commissions; and

        (c) Who you have the right to direct and control while performing services for you;

    (2) Any natural person who is furnished temporarily to you:

        (a) To substitute for a permanent employee as defined in Paragraph **(1)** above, who is on leave; or

        (b) To meet seasonal or short-term workload conditions;

    (3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

    (4) Any natural person who is a former employee, director, partner, member, manager, representative or trustee retained as a consultant while performing services for you; or

    (5) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside any building you occupy in conducting your business.

    But employee does not mean:

**BUSINESSOWNER'S POLICY**

**(1)** Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**(2)** Any "manager", director or trustee except while performing acts coming within the usual duties of an employee.

**4. Equipment Breakdown Protection Coverage**

**a.** We will pay for direct loss of or damage to Covered Property caused by or resulting from a mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment.

Mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment does not mean any:

**(1)** Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

**(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

**(3)** Damage to any vacuum tube, gas tube, or brush; or

**(4)** The functioning of any safety or protective device.

**b.** Paragraphs **A.4.a.(1)** and **A.4.a.(2), Limitations,** do not apply to this Optional Coverage.

**c.** With respect to the coverage provided by this Optional Coverage, the following exclusions in Paragraph **B. Exclusions** do not apply:

**(1)** Paragraph **B.2.a. Electrical Apparatus;**

**(2)** Paragraph **B.2.d. Steam Apparatus;** and

**(3)** Paragraph **B.2.l.(6) Mechanical Breakdown.**

**d.** With respect to the coverage provided by this Optional Coverage, Paragraph **G.1.c.(5)** of the **Outdoor Sign Optional Coverage** does not apply.

**e.** If a dollar deductible is shown in the Declarations for this Optional Coverage, we will first subtract the applicable deductible amount from any loss we would otherwise pay. We will then pay the amount of loss in excess of the applicable deductible up to the applicable limit for this coverage.

If no optional deductible is chosen for this Optional Coverage, the Property Deductible shown in the Declarations applies.

**f.** With respect to **Additional Coverages 5.f. Business Income** and **5.g. Extra Expense,** if the 72-hour time period in the definition of "period of restoration" (hereinafter referred to as time deductible) is amended for this Optional Coverage as shown in the Declarations, we will not pay for any Business Income loss that occurs during the consecutive number of hours shown as the time deductible in the Declarations immediately following a mechanical breakdown or electrical failure. If a time deductible is shown in days, each day shall mean 24 consecutive hours.

As respects the coverage provided by this Optional Coverage, any time deductible shown in the Declarations for Equipment Breakdown Protection Coverage supersedes any time deductible otherwise applicable to the Business Income coverage provided by this policy.

**g.** With respect to the coverage provided by this Optional Coverage, Paragraph **H. Property Definitions** is amended as follows:

**1.** "Computer" means:

**a.** Programmable electronic equipment that is used to store, retrieve and process data; and

**b.** Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

"Computer" includes those used to operate production type machinery or equipment.

**h.** Whenever any covered pressure, mechanical or electrical machinery and equipment is found to be in, or exposed to, a dangerous condition, any of our representatives may suspend coverage provided by this Optional Coverage for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment.

However, coverage provided by this Optional Coverage may be reinstated for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment if the reasons for the suspension are found by any of our representatives to no longer exist.

We may suspend or reinstate this Optional coverage by mailing or delivering a written notification regarding the suspension or re-instatement to:

**(1)** Your last known address; or

**(2)** The address where the pressure, me-chanical or electrical machinery and equipment is located.

This notification will indicate the effective date of the suspension or reinstatement.

If the coverage provided by this Optional Coverage is not reinstated, you will get a pro rata refund of premium. But the sus-pension will be effective even if we have not yet made or offered a refund.

**H. Property Definitions**

**1.** "Computer" means:

**a.** Programmable electronic equipment that is used to store, retrieve and process data; and

**b.** Associated peripheral equipment that pro-vides communication, including input and output functions such as printing and auxil-iary functions such as data transmission.

"Computer" does not include those used to op-erate production type machinery or equipment.

**2.** "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

**3.** "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, re-ferred to in the foregoing description of elec-tronic data, means a set of related electronic instructions which direct the operations and functions of a "computer" or device connected to it, which enable the "computer" or device to receive, process, store, retrieve or send data.

**4.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or re-leased by fungi.

**5.** "Manager" means a person serving in a direc-torial capacity for a limited liability company.

**6.** "Member" means an owner of a limited liability company represented by its membership inter-est, who also may serve as a "manager".

**7.** "Money" means:

**a.** Currency, coins and bank notes in current use and having a face value; and

**b.** Travelers checks, register checks and money orders held for sale to the public.

**8.** "Operations" means your business activities occurring at the described premises.

**9.** "Period of restoration":

**a.** Means the period of time that:

**(1)** Begins:

**(a)** 72 hours after the time of direct physical loss or damage for Busi-ness Income Coverage; or

**(b)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described prem-ises; and

**(2)** Ends on the earlier of:

**(a)** The date when the property at the described premises should be re-paired, rebuilt or replaced with rea-sonable speed and similar quality; or

**(b)** The date when business is resumed at a new permanent location.

**b.** Does not include any increased period required due to the enforcement of any or-dinance or law that:

**(1)** Regulates the construction, use or re-pair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**10.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**11.** "Securities" means negotiable and non-negotiable instruments or contracts represent-ing either "money" or other property and in-cludes:

**BUSINESSOWNER'S POLICY**

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

12. "Specified causes of loss" means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

(1) The cost of filling sinkholes; or

(2) Sinking or collapse of land into man-made underground cavities.

b. Falling objects does not include loss of or damage to:

(1) Personal property in the open; or

(2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

13. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

14. "Valuable papers and records" means inscribed, printed or written:

a. Documents;

b. Manuscripts; and

c. Records;

including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" or "securities".

**SECTION II – LIABILITY**

**A. Coverages**

1. **Business Liability**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Paragraph **D.** – Liability And Medical Expenses Limits Of Insurance in Section **II** – Liability; and

(2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **f.** Coverage Extension – Supplementary Payments.

b. This insurance applies:

(1) To "bodily injury" and "property damage" only if:

(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(b) The "bodily injury" or "property damage" occurs during the policy period; and

(c) Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

**(2)** To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**f. Coverage Extension – Supplementary Payments**

**(1)** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

(a) All expenses we incur.

(b) Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

(c) The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(d) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

(e) All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

(f) Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

(g) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the limit of liability.

**(2)** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

(a) The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**BUSINESSOWNER'S POLICY**

(b) This insurance applies to such liability assumed by the insured;

(c) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

(d) The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

(e) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(f) The indemnitee:

(i) Agrees in writing to:

i. Cooperate with us in the investigation, settlement or defense of the "suit";

ii. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

iii. Notify any other insurer whose coverage is available to the indemnitee; and

iv. Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(ii) Provides us with written authorization to:

i. Obtain records and other information related to the "suit"; and

ii. Conduct and control the defense of the indemnitee in such "suit".

(3) So long as the conditions in Paragraph (2) are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **B.1.b.(2)** Exclusions in Section **II** – Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

(a) We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

(b) The conditions set forth above, or the terms of the agreement described in Paragraph **(2)(f)** above are no longer met.

2. **Medical Expenses**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the Limits of Insurance of Section **II** – Liability. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

B. **Exclusions**

1. **Applicable To Business Liability Coverage**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

  **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

  **(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

  **(a)** Employment by the insured; or

  **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

  **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

    **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**BUSINESSOWNER'S POLICY**

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property dam-

age" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 51 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged; or

**(b)** The operation of any of the following machinery or equipment:

**(i)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(ii)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

**(3)** Supervisory, inspection or engineering services;

**BUSINESSOWNER'S POLICY**

**(4)** Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(5)** Any health or therapeutic service treatment, advice or instruction;

**(6)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

**(7)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(8)** Body piercing services; and

**(9)** Services in the practice of pharmacy.

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

**k. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Paragraph **D.** Liability And Medical Expenses Limit Of Insurance in Section **II** – Liability.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**l. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

o. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

p. **Personal And Advertising Injury**

"Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(5) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(6) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(7) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(8) Committed by an insured whose business is:

(a) Advertising, broadcasting, publishing or telecasting;

(b) Designing or determining content of websites for others; or

(c) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under Paragraph **F.** Liability And Medical Expenses Definitions.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting.

(9) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

(10) With respect to any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, "pollutants".

(11) Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control;

(12) Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

(13) Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

**BUSINESSOWNER'S POLICY**

**q. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**r. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**s. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage", or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.**, **d.**, **e.**, **f.**, **g.**, **h.**, **i.**, **k.**, **l.**, **m.**, **n.** and **o.** in Section II – Liability do not apply to damage by fire to premises while rented to you, or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in Paragraph **D.** Liability And Medical Expenses Limits of Insurance in Section II – Liability.

**2. Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

**a.** To any insured, except "volunteer workers".

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.** To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f.** Included within the "products-completed operations hazard".

**g.** Excluded under Business Liability Coverage.

**3. Applicable To Both Business Liability Coverage And Medical Expenses Coverage – Nuclear Energy Liability Exclusion**

This insurance does not apply:

**a.** Under Business Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

    (a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

    (b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**c.** Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the "nuclear material"; if:

    **(1)** The "nuclear material":

        (a) Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

        (b) Has been discharged or dispersed therefrom;

    **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**d.** As used in this exclusion:

    **(1)** "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

    **(2)** "Hazardous properties" include radioactive, toxic or explosive properties;

    **(3)** "Nuclear facility" means:

        (a) Any "nuclear reactor";

        (b) Any equipment or device designed or used for:

            (i) Separating the isotopes of uranium or plutonium;

            (ii) Processing or utilizing "spent fuel"; or

            (iii) Handling, processing or packaging "waste";

        (c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

        (d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

    and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

    **(4)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

    **(5)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

    **(6)** "Property damage" includes all forms of radioactive contamination of property;

    **(7)** "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

    **(8)** "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

    **(9)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

**BUSINESSOWNER'S POLICY**

(10)"Waste" means any waste material:

    (a) Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

    (b) Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraphs **(a)** and **(b)** of the definition of "nuclear facility".

**C. Who Is An Insured**

1. If you are designated in the Declarations as:

    **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

    **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

    **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

    (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

    (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

    (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)**; or

    (d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

    (a) Owned, occupied or used by,

    (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

    **b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

    **c.** Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

    **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## D. Liability And Medical Expenses Limits Of Insurance

1. The Limits of Insurance of Section II – Liability shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The most we will pay for the sum of all damages because of:

   a. "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence"; and

   b. "Personal and advertising injury" sustained by any one person or organization;

   is the Liability and Medical Expenses limit shown in the Declarations. But the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses limit shown in the Declarations.

3. The most we will pay under Business Liability Coverage for damages because of "property damage" to a premises while rented to you or in the case of fire while rented to you or temporarily occupied by you with permission of the owner is the applicable Damage To Premises Rented To You limit shown for that premises in the Declarations. For a premises temporarily occupied by you, the applicable limit will be the highest Damage To Premises Rented To You limit shown in the Declarations.

4. **Aggregate Limits**

   The most we will pay for:

   a. All "bodily injury" and "property damage" that is included in the "products-completed operations hazard" is twice the Liability and Medical Expenses limit.

   b. All:

   (1) "Bodily injury" and "property damage" except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

   (2) Plus medical expenses;

(3) Plus all "personal and advertising injury" caused by offenses committed;

is twice the Liability and Medical Expenses limit.

Subject to Paragraph a. or b. above, whichever applies, the Damage To Premises Rented To You Limit is the most we will pay for damages because of "property damage" to any one premises, while rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of Section II – Liability apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## E. Liability And Medical Expenses General Conditions

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

**BUSINESSOWNER'S POLICY**

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

**.d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this policy:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Separation Of Insureds**

Except with respect to the Limits of Insurance of Section **II** – Liability, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**F. Liability And Medical Expenses Definitions**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   (1) The repair, replacement, adjustment or removal of "your product" or "your work"; or

   (2) Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph (2) above and supervisory, inspection or engineering services.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**BUSINESSOWNER'S POLICY**

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law or motor vehicle registration law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

**BUSINESSOWNER'S POLICY**

**SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)**

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** Five days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy;

   **(1)** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

   **(a)** Seasonal unoccupancy; or

   **(b)** Buildings in the course of construction, renovation or addition.

   Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

   **(2)** After damage by a Covered Cause of Loss, permanent repairs to the building:

   **(a)** Have not started, and

   **(b)** Have not been contracted for,

   within 30 days of initial payment of loss.

   **(3)** The building has:

   **(a)** An outstanding order to vacate;

   **(b)** An outstanding demolition order; or

   **(c)** Been declared unsafe by governmental authority.

   **(4)** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

   **(5)** Failure to:

   **(a)** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

   **(b)** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

   **b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

   **c.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This policy;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.    BP 00 03 01 10

**E. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe and healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**H. Other Insurance**

1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section I – Property.

2. Business Liability Coverage is excess over:

   a. Any other insurance that insures for direct physical loss or damage; or

   b. Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**I. Premiums**

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

   a. Paid to us prior to the anniversary date; and

   b. Determined in accordance with Paragraph **2.** above.

   Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

**J. Premium Audit**

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

**BUSINESSOWNER'S POLICY**

2. Premium shown in this policy as advance pre-mium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

3. The first Named Insured must keep records of the information we need for premium computa-tion, and send us copies at such times as we may request.

**K. Transfer Of Rights Of Recovery Against Others To Us**

1. Applicable to Businessowners Property Cover-age:

   If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our pay-ment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

   a. Prior to a loss to your Covered Property.

   b. After a loss to your Covered Property only if, at time of loss, that party is one of the fol-lowing:

      (1) Someone insured by this insurance;

      (2) A business firm:

         (a) Owned or controlled by you; or

         (b) That owns or controls you; or

      (3) Your tenant.

   You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

   This will not restrict your insurance.

2. Applicable to Businessowners Liability Cover-age:

   If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**L. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal represen-tative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

# EXHIBIT 2

Skaii Investment LLC
15170 Goldenwest Cir
Westminster, CA 92683-5222



**BUSINESSOWNER'S POLICY DECLARATIONS**

## AmGUARD Insurance Company
## A Stock Company

**Issued:** 05/04/2018

**Policy No.:**
SKBP981657

**Renewal of:** NEW

### POLICY INFORMATION PAGE

**[1]**  **Named Insured and Mailing Address**
Skaii Investment LLC
15170 Goldenwest Cir
Westminster, CA 92683

**[2]**  **Agency**
NHUY INSURANCE SERVICES
3777 Stevens Creek Blvd.
#455
Santa Clara, CA 95051

**[3]**  **Policy Period**
From April 25, 2018 to April 25, 2019, 12:01 AM, standard time at the insured's mailing address.

**[4]**  **Description of Business**
Other Activities Related to Real Estate

**[5]**  **Coverage**
This policy consists of the Coverage Forms listed on the **Schedule of Forms and Endorsements (IIT SF 01 05).**

**[6]**  **Premium**
The premium shown below may be subject to adjustment.

| | |
|---|---:|
| Certified Acts of Terrorism | $463.00 |
| TOTAL POLICY PREMIUM | $5,142.00 |
| TOTAL PAYABLE | $5,142.00 |

**[7]**  **Payment of Premium**
In return for your payment of premium, and subject to all terms of this policy, we agree with you to provide insurance as stated in this policy.



**BUSINESSOWNER'S POLICY
DECLARATIONS**

Issued: 05/04/2018

| | |
|---|---|
| **Policy No.:** SKBP981657 | **Effective Date:** 04/25/2018 |

## SECTION I – PROPERTY COVERAGES AND LIMITS OF INSURANCE

**LOCATION: 001   BUILDING: 001**
**9241 Bishop Pl # 9265**
**Westminster, CA 92683-6503**
**Orange County**

**Property Deductible: $1,000**
**Optional Coverages/Glass Deductible: $500**
**Classification: 67635 - Shopping Center - No Full Cooking Restaurants**

**COVERAGES:**

| | |
|---|---|
| **Awnings Coverage** | |
| Limit | $2,500 |
| **Building Coverage** | |
| Limit | $2,142,000 |
| Valuation | Replacement Cost |
| Inflation Guard % | 2 |
| **Liability** | |
| IMPORTANT NOTE | THIS COVERAGE IS RATED BASED ON AN ESTIMATE AND IS SUBJECT TO AUDIT |
| Limit | Included |
| **Accounts Receivable** | |
| On-Premises Limit | $25,000 |
| Off-Premises Limit | 25,000 |
| **Debris Removal** | |
| Limit | 25%/$10,000 |
| **Equipment Breakdown Coverage (HSB)** | |
| Inspection Contact Name | Lan Nguyen |
| Phone Number | 714-908-6341 |
| **Money and Securities** | |
| On Premises Limit | $5,000 |
| Off Premises Limit | $5,000 |
| **Ordinance or Law - Increased Cost Of Construction** | |
| Limit | $10,000 |
| **Outdoor Property** | |
| Limit | $10,000 |
| **Outdoor Signs - Optional Coverage** | |
| Limit | $5,000 |
| **Valuable Papers and Records** | |
| On-Premises Limit | $25,000 |
| Off-Premises Limit | $25,000 |
| **Water Back-up and Sump Overflow** | |
| Covered Property Limit | $5,000 |

IIT DS 01 05

**BUSINESSOWNER'S POLICY
DECLARATIONS**

Issued: 05/04/2018

**Policy No.:** SKBP981657                                    **Effective Date:** 04/25/2018

| | |
|---|---|
| Business Income and Extra Expense Limit | $5,000 |
| **Windstorm Or Hail Losses To Roof Surfacing - Actual Cash Value Loss Settlement** | |
| Coverage Description | Refer to Form BP 14 04 |

**BUSINESSOWNER'S POLICY
DECLARATIONS**

Issued: 05/04/2018

**Policy No.:** SKBP981657                          **Effective Date:** 04/25/2018

## SECTION II – LIABILITY COVERAGES AND LIMITS OF INSURANCE

**Each paid claim for the following coverages reduces the amount of insurance we provide during the applicable annual period. Please refer to Section II – Liability in the Businessowners Coverage form and any attached endorsements.**

| Coverage | Limits of Insurance |
|---|---|
| Liability and Medical Expenses - Each Occurrence | $1,000,000 |
| General Aggregate (Other than Products and Completed Operations) | $2,000,000 |
| Personal & Advertising Injury | Included |
| Products & Completed Operations Aggregate | $2,000,000 |
| Medical Expenses (Each Person) | $5,000 |
| Liability Property Damage Deductible | None |
| Liability Deductible - Bodily Injury | None |

**BUSINESSOWNER'S POLICY
DECLARATIONS**

Issued: 05/04/2018

**Policy No.:** SKBP981657                                          **Effective Date:** 04/25/2018

### POLICY WIDE COVERAGES AND LIMITS OF INSURANCE

**Appurtenant Structures**

| | |
|---|---|
| Limit | $50,000 combined Building/BPP |

**Business Income & Extra Expense**

| | |
|---|---|
| Limit | Actual Loss Sustained up to 12 Months |

**Damage To Premises Rented To You**

| | |
|---|---|
| Limit | $50,000 |

**Data Compromise**

| | |
|---|---|
| Section 1 - Response Expenses | - |
| Annual Aggregate Limit | $50,000 |
| Named Malware (Sec. 1) Sublimit | $50,000 |
| Forensic IT Review Sublimit | $5,000 |
| Legal Review Sublimit | $5,000 |
| PR Services Sublimit | $5,000 |
| Response Expenses Deductible | $1,000 |
| Section 2 - Defense & Liability | - |
| Annual Aggregate Limit | $50,000 |
| Named Malware (Sec. 2) Sublimit | $50,000 |
| Defense & Liability Deductible | $1,000 |

**Electronic Data**

| | |
|---|---|
| Limit | $10,000 |

**Employee Dishonesty**

| | |
|---|---|
| Limit | $10,000 |

**Fire Department Service Charge**

| | |
|---|---|
| Limit | $25,000 |

**Fire Extinguisher Systems Recharge Expense**

| | |
|---|---|
| Limit | $5,000 |

**Forgery or Alteration**

| | |
|---|---|
| Limit | $10,000 |

**Fungi, Wet Rot, Dry Rot & Bacteria (Mold)**

| | |
|---|---|
| Property Limit | $15,000 |
| Business Income/EE Number of Days | 30 |
| Liability Coverage Option | Exclude Coverage |

**Glass Expense**

| | |
|---|---|
| Limit | Actual Loss Sustained |

**Interruption of Computer Operations**

| | |
|---|---|
| Limit | $10,000 |

**Loss by Theft of furs, fur garments, garments trimmed with fur**

| | |
|---|---|
| Limit | $2,500 |

**Loss by Theft of jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals**

| | |
|---|---|
| Limit | $5,000 |

**Loss by Theft of patterns, dies, molds and forms**

| | |
|---|---|
| Limit | $2,500 |

**Money Orders and "Counterfeit Money"**

| | |
|---|---|
| Limit | $1,000 |

**Newly Acquired Or Constructed Property - Buildings**

| | |
|---|---|
| Limit | 25% of Building Limit/Not more than $500,000/Bldg |

**Newly Acquired Or Constructed Property - Business Personal Property**

| | |
|---|---|
| Limit | $250,000 |

**Personal Effects**

| | |
|---|---|
| Limit | $5,000 |

**BUSINESSOWNER'S POLICY
DECLARATIONS**

Issued: 05/04/2018

**Policy No.:**  SKBP981657                                      **Effective Date:**  04/25/2018

**Personal Property Off Premises**

| Limit | $10,000 |

**Pollutant Clean Up and Removal**

| Limit | $10,000 |

**Preservation of Property**

| Limit | Within 30 Days |

**Terrorism**

| Certified Acts | Include Coverage |

**BUSINESSOWNERS POLICY DECLARATIONS**

Issued:  05/04/2018

**Policy No.:**  SKBP981657                                      **Effective Date:**  04/25/2018

### SCHEDULE OF FORMS AND ENDORSEMENTS

| Form Number | Title |
|---|---|
| IIT DS 01 05 | Businessowners Policy Declarations |
| BP 00 03 01 10 | Businessowners Coverage Form |
| BP IN 01 01 10 | Businessowners Coverage Form Index |
| END SCHD | Schedule Of Forms And Endorsements |
| IL 99 00 08 13 | Authorization and Attestation |
| IL P 001 01 04 | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholder |
| PRIV POL | Privacy Policy |
| MORTGAGEE INFO | Mortgagee Info |
| BP 99 CA 09 16 | CA Policy Customizations |
| BP 01 55 05 17 | California Changes |
| BP 99 75 05 13 | California Changes -Cancellation Premium Due |
| BP 04 12 04 17 | Limitation of Coverage to Designated Premises, Project or Operation |
| BP 04 17 01 10 | Employment - Related Practices Exclusion |
| BP 05 01 07 02 | Calculation Of Premium |
| BP 05 15 01 15 | Disclosure Pursuant To Terrorism Risk Insurance Act |
| BP 05 23 01 15 | Cap On Losses From Certified Acts Of Terrorism |
| BP 05 38 01 15 | Exclusion Of Other Acts Of Terrorism Committed Outside The United States; Cap On Losses From Certified Acts Of Terrorism |
| BP 05 42 01 15 | Exclusion Of Punitive Damages Related To A Certified Act Of Terrorism |
| BP 12 03 01 10 | Loss Payable Clauses |
| BP 14 04 01 10 | Windstorm Or Hail Losses To Roof Surfacing - Actual Cash Value Loss Settlement |
| BP 99 04 01 10 | Equipment Breakdown Coverage |
| BP 99 188 06 16 | Deductible Endorsement - Property |
| BP 99 60 03 12 | Water Back-up and Sump Overflow |
| BP 99 91 11 14 | Data Compromise Coverage |

AUTHORIZATION
AND ATTESTATION
IL 99 00 08 13

## THIS ENDORSEMENT AUTHORIZES THE POLICY.

# AUTHORIZATION AND ATTESTATION

This endorsement authorizes the insurance contract between you and the insurance company subsidiary listed on the DECLARATIONS PAGE of your insurance policy.

In Witness Whereof, this page executes and fully attests to this policy. If required by state law, the policy shall not be valid unless countersigned by our authorized representatives.

Authorizing signatures

Michael J. Dulin
General Counsel and Secretary

Sy Foguel, ACAS, FILAA
Chief Executive Officer and President

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004

# Privacy Policy

We are committed to treating and using personal financial information about you and your employees responsibly. We will not disclose nonpublic, personal information about you and your employees to anyone except as permitted or required by law.

This disclosure is made on behalf of the following and applicable affiliates:

Berkshire Hathaway GUARD Insurance Companies

AmGUARD Insurance Company

We collect nonpublic, personal information from you about you and your employees to properly maintain and service your policy. This nonpublic, personal information may come from the following sources:

- Application Information and Other Forms. On the application for insurance or other forms completed by you, you provide us with most of the information we need to process policies and claims.

- Transaction Information. We may develop information about you and your employees based on transactions and experiences you have with us, our affiliates, or others.

- Third-Party Information. This is information that we receive to verify or supplement your application or claims.

**Disclosing Information**

In the course of conducting business and as permitted or required by law, we may share nonpublic personal information about you and your employees with our affiliated companies. We do not disclose any nonpublic, personal information about you and your employees to any nonaffiliated third parties, except for the conduct of our business or as permitted or required by law. Information may be supplied to others providing business services for us. Additionally, we may provide information for audit or research purposes or to law enforcement agencies to help us prevent fraud.

**Securing Information**

We restrict access to nonpublic personal information about you and your employees to our employees who need to know the information necessary to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with applicable regulations to guard the nonpublic, personal information of you and your employees.

A Current Copy of Our Privacy Policy is Always Available at our web site.

---

P.O. Box A-H • 16 S. River Street • Wilkes-Barre, PA 18703-0020 • www.guard.com

Telephone: 570-825-9900 • Customer Service Hotline: 800-673-2465

**BUSINESSOWNERS POLICY DECLARATIONS**

Issued:  05/04/2018

**Policy No.:**  SKBP981657                                **Effective Date:**  04/25/2018

## MORTGAGE HOLDER INFORMATION

**LOCATION 001, BUILDING 001**
GBC International Bank ISAOA
5670 Wilshire Blvd Ste 1780
Los Angeles, CA 90036
Mortgage Account Number:
Rank:

BUSINESSOWNER'S
BP 99 CA 09 16

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CA POLICY CUSTOMIZATIONS

This endorsement modifies insurance provided under the following:

BUSINESSOWNER'S COVERAGE FORM

The following is a summary of the coverages and limits provided by this endorsement.  For complete details on specific coverages, see the applicable coverage wording.  The limits of insurance stated in this endorsement apply unless higher limits are shown in the Declarations.

### SCHEDULE OF LIMIT CHANGES
#### Section I – Property

| Coverage | BP 00 03 Limit | Revised Limit |
|---|---|---|
| Accounts Receivable | $10,000 at premises $5,000 not at premises | $25,000 at premises $25,000 not at premises |
| Appurtenant Structures | n/a | $50,000 |
| Awnings | Included in Building Limit | $2,500 |
| Employee Dishonesty | Optional | $10,000 |
| Fire Department Service Charge | $2,500 | $25,000 |
| Forgery Or Alteration | $2,500 | $10,000 |
| Loss or Damage by Theft | | |
| Jewelry, Watches, etc. | $2,500 | $5,000 |
| Newly Acquired Or Constructed Property | | |
| Buildings | $250,000 | 25% Buildings Limit/ $500,000 each Building |
| Business Personal Property | $100,000 | $250,000 |
| Outdoor Property / any one tree, shrub or plant | $2,500 / $1,000 | $10,000 / $1,000 |
| Outdoor Signs | $1,000 attached to buildings only | $5,000 all outdoor signs |
| Personal Effects | $2,500 | $5,000 |
| Premises Boundary Increased | 100 feet | 1,000 feet |
| Valuable Papers And Records | $10,000 at premises $5,000 not at premises | $25,000 at premises $25,000 not at premises |

#### Section II – Liability

| Coverage | BP 00 03 Limit | Revised Limit |
|---|---|---|
| Supplementary Payments - Cost Of Bail Bonds | $250 | $1,000 |
| Supplementary Payments - Loss Of Earnings | $250 | $500/day |

---

BP 99 CA 09 16        Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.        Page 1 of 6

**CA POLICY CUSTOMIZATIONS**

Any reference in **Section I — Property** of the Business-owner's Coverage Form to within 100 feet of the described premises is amended to read within 1,000 feet of the described premises.

**Section I – Property, A.1., Covered Property** is amended as follows:

1. The following is added to Paragraph **a.**

    (7) Building Glass, meaning glass that is part of a building or structure.

**Section I – Property, A.4., Limitations** is amended as follows:

1. Paragraph **b.(2)** is deleted.

2. Paragraph **c.** is deleted and replaced with the following:

    c. For loss or damage by theft, the following types of property are covered only up to the limits shown:

        (1) $2,500 for furs, fur garments and garments trimmed with fur.

        (2) $5,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $500 or less per item.

        (3) $2,500 for patterns, dies, molds and forms.

3. Paragraph **d.** is added:

    d. For loss or damage by any covered cause of loss, we will only pay up to $2,500 per occurrence for awnings.

**Section I – Property, A.5., Additional Coverages** is amended as follows:

1. Paragraph **c. Fire Department Service Charge** is replaced with the following:

    When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000, unless a different limit is shown in the Declarations, for your liability for fire department service charges:

        (1) Assumed by contract or agreement prior to loss; or

        (2) Required by local ordinance.

2. Paragraph **k. - Forgery Or Alteration -** Paragraph **(4)** is replaced with the following:

        (4) The most we will pay for any loss, including legal expenses, under this Additional Coverage is $10,000, unless a higher Limit of Insurance is shown in the Declarations.

**Section I – Property, A.6., Coverage Extensions** is amended as follows:

1. The last paragraph in Paragraph **a. – Newly Acquired Or Constructed Property** under **(1) Buildings** is replaced with the following:

    The most we will pay in any one occurrence for loss or damage under this Extension is 25% of the Limit of Insurance for Buildings shown in the Declarations, but not more than $500,000 at each building.

2. The last paragraph in Paragraph **a. – Newly Acquired Or Constructed Property** under **(2) Business Personal Property** is replaced with the following:

    The most we will pay for loss or damage under this Extension is $250,000 at each building.

3. The last sentence in Paragraph **b. – Personal Property Off-premises** is amended as follows:

    The most we will pay for loss or damage under this Extension is $10,000, unless a higher Limit of Insurance for Personal Property Off-premises is shown in the Declarations.

4. Paragraph **c. - Outdoor Property** is replaced with the following:

    c. **Outdoor Property**
       You may extend the insurance provided by this policy to apply to your outdoor:

        (1) Fences, signs (other than signs attached to buildings), trees, shrubs and plants, including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:
            (a) Fire;
            (b) Lightning;
            (c) Explosion;
            (d) Riot or Civil Commotion; or
            (e) Aircraft.

        (2) Radio and television antennas (including satellite dishes), including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:
            (a) Fire;
            (b) Lightning;
            (c) Windstorm;
            (d) Ice, Snow, Sleet or Hail;
            (e) Explosion;

**CA POLICY CUSTOMIZATIONS**

(f) Riot or Civil Commotion; and
(g) Aircraft.

The most we will pay for loss or damage under this Extension is $10,000, unless a higher Limit of Insurance for Outdoor Property is shown in the Declarations, but not more than $1,000 for any one tree, shrub or plant.

5.  Paragraph **d. – Personal Effects** is replaced with the following:

    You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees. This extension does not apply to:

    (1) Tools or equipment; or
    (2) Loss or damage by theft.

    The most we will pay for loss or damage under this Extension is $5,000 at each described premises.

6.  Paragraph **e. – Valuable Papers And Records** Paragraph **(3)** is replaced with the following:

    (3) The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $25,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Declarations.

    For "valuable papers and records" not at the described premises, the most we will pay is $25,000.

7.  Paragraph **f. – Accounts Receivable** Paragraph **(2)** is replaced with the following:

    (2) The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $25,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

    For accounts receivable not at the described premises, the most we will pay is $25,000.

8.  Paragraph **f. – Accounts Receivable** Paragraph **(3)** is replaced with the following:

    (3) Paragraph **B. Exclusions** in **Section I – Property** does not apply to this Coverage Extension except for:

    (a) Paragraph **B.1.c. Governmental Action**;

(b) Paragraph **B.1.d. Nuclear Hazard**;
(c) Paragraph **B.1.f. War And Military Action**;
(d) Paragraph **B.2.f. Dishonesty**;
(e) Paragraph **B.2.g. False Pretense**;
(f) Paragraph **B.2.o. Electrical Disturbance**
(g) Paragraph **B.3.**; and
(h) Paragraph **B.6. Accounts Receivable Exclusion.**

9.  Paragraph **g. – Appurtenant Structures** is added:

    g.  **Appurtenant Structures**

    (1) When there is a Building Limit of Insurance shown in the Declarations at the described premises, you may extend the insurance provided by this Coverage Form to apply to direct physical loss or damage caused by or resulting from a Covered Cause of Loss to incidental appurtenant structures within 1,000 feet of the described premises.

    (2) When there is a Business Personal Property Limit of Insurance shown in the Declarations at the described premises, you may extend the insurance provided by this Coverage Form to apply to direct physical loss or damage caused by or resulting from a Covered Cause of Loss to Business Personal Property within incidental appurtenant structures within 1,000 feet of the described premises.

    (3) Incidental appurtenant structures include storage buildings, carports, garages and similar structures which have not been specifically described in the Declarations.

    The most we will pay for loss or damage under this Coverage Extension in any one occurrence for any combination of loss or damage to Building and Business Personal Property is $50,000.

**Section I – Property, B. Exclusions 2.** is amended as follows:

1.  Paragraph **q. Asbestos** is added:

    q.  **Asbestos**
    Any loss, damage or expense which would not have occurred in whole or in part but for the presence of asbestos.

**CA POLICY CUSTOMIZATIONS**

**Section I – Property, G. Optional Coverages** is amended as follows:

1. Paragraph **1. – Outdoor Signs** Paragraph **d.** is replaced with the following:

   The most we will pay for loss or damage in any one occurrence is $5,000, unless a higher Limit of Insurance for Outdoor Signs is shown in the Declarations.

2. Paragraph **3. – Employee Dishonesty** Paragraph **c.** is replaced with the following:

   The most we will pay for loss or damage in any one occurrence is $10,000, unless a higher Limit of Insurance for Employee Dishonesty is shown in the Declarations.

**Section II – Liability, A. Coverages** is amended as follows:

1. Under **Business Liability** Paragraph **f., Coverage Extension – Supplementary Payments**, Paragraph **(1)**, sections **(b)**, **(c)** and **(d)** are replaced with the following:

   (b) Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

   (c) The cost of appeal bonds or bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

   (d) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

**Section II – Liability, B. Exclusions** is amended as follows:

1. Under **1., Applicable To Business Liability Coverage**, Paragraph **a., Expected Or Intended Injury** is deleted and replaced with the following:

   a. **Expected Or Intended Injury**
   "Bodily injury" or "property damage" (including any unexpected or unintended portion thereof) if any "bodily injury" or "property damage" was expected or intended from the standpoint of any insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

2. Under **1., Applicable To Business Liability Coverage**, Paragraph **j., Professional Services (8)** and **(9)** are amended and **(10)** is added as follows:

   (8) Any body piercing services (not including ear lobe piercing), tattooing and similar services;

   (9) Services in the practice of pharmacy; and

   (10) Computer or software design, advice or consultation, programming services including virus protection, firewall or web site design.

3. Under **1., Applicable To Business Liability Coverage**, Paragraph **k., Damage To Property,** the following is added to the last paragraph:

   Paragraphs **(3)** and **(4)** of this exclusion do not apply to "property damage" to borrowed equipment while not being used to perform operations at a job site.

4. Under **1., Applicable To Business Liability Coverage**, Paragraph **m., Damage To Your Work**, the following is deleted:

   This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

5. Under **1., Applicable To Business Liability Coverage**, Paragraph **p. Personal And Advertising Injury**, Paragraph **(1)** is deleted and replaced with the following:

   (1) Caused by or at the direction of or with the consent or acquiescence of any insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

6. Under **1., Applicable To Business Liability Coverage**, Paragraph **p., Personal and Advertising Injury**, the following is added:

   (14) Arising out of:
   (a) Your placement of advertising for others on your web site or a link to or a reference to a web site or web address of others on your web site.
   (b) Your placement of content or company brand or product information from others on your web site or on any frame or border within your web site.
   (c) Software or programming related to your web site's design, appearance or functions.

**CA POLICY CUSTOMIZATIONS**

**(15)** Arising out of discrimination, harassment or humiliation by an officer, director, member or partner of the insured.

**(16)** Arising out of representations made by you or your agents regarding the value or suitability of any securities, or the fluctuation in value or price of any stocks, bonds or other securities.

**(17)** Violation of antitrust laws, state and federal laws governing restrictions on trade, unfair competition or deceptive advertising.

**7.** Under **1., Applicable To Business Liability Coverage,** Paragraph **r. Criminal Acts** is deleted and replaced with the following:

**r.    Criminal Acts**
"Bodily injury", "property damage", or "personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**8.** Under **1., Applicable To Business Liability Coverage,** Paragraphs **t., u. and v.** are added as follows:

**t.    Asbestos**
**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of an exposure or threat of exposure to the actual or alleged properties of asbestos and includes the mere presence of asbestos in any form.
**(2)** Any damages, judgments, settlements, loss, costs or expenses that:
**(a)** May be awarded or incurred by reason of any claim or "suit" alleging actual or threatened injury or damage of any nature or kind to persons or property which would not have occurred in whole or in part but for the presence of asbestos;
**(b)** Arise out of any request, demand, order to statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, encapsulate, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of an asbestos presence; or
**(c)** Arise out of any claim or suit for damages because of testing for, monitoring, cleaning up, removing, encapsulating, containing, treating, detoxifying or neutralizing or in any

way responding to or assessing the effect of an asbestos presence.

**u.    Nuclear Hazard**
Nuclear reaction or radiation, or radioactive contamination, however caused. But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**v.    Fungi Or Bacteria**
**(1)** "Bodily Injury", "property damage" or "personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.
**(2)** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**Section II – Liability, D, Liability And Medical Expenses Limits Of Insurance** is amended as follows:

**1.** Paragraph **2.** is replaced with the following:

**2.** The most we will pay for the sum of all damages because of all:
**a.** "Bodily injury", "property damage" and medical expenses, arising out of any one "occurrence" including "Bodily injury" and "property damage" under the "products-completed operations hazard"; and
**b.** "Personal and advertising injury" sustained by any one person or organization;

**CA POLICY CUSTOMIZATIONS**

is the Liability and Medical Expenses –
Each Occurrence limit shown in the Decla-
rations. But the most we will pay for all med-
ical expenses because of "bodily injury" sus-
tained by any one person is the Medical
Expenses limit shown in the Declarations.

2.  Paragraph 4. is replaced with the following:

   4.  **Aggregate Limits**
      Regardless of the number of occurrences
      and subject to the Liability and Medical Ex-
      penses-Each Occurrence limit, the most we
      will pay for:

      a.  All "bodily injury" and "property dam-
         age" that is included in the "products-
         completed operations hazard" is twice
         the Liability and Medical Expenses-
         Each Occurrence limit.  This limit is
         shown in the declarations as "Products
         and Completed Operations Aggregate".

      b.  All:
         (1)  "Bodily injury" and "property dam-
            age" except damages because of
            "bodily injury" or "property damage"
            included in the "products-completed
            operations hazard";
         (2)  Plus medical expenses;
         (3)  Plus all "personal and advertising
            injury" caused by offenses commit-
            ted;

         is twice the Liability and Medical Ex-
         penses-Each Occurrence limit shown in
         the Declarations.  This limit is shown in
         the declarations as "General Aggregate
         (other than Products and Completed
         Operations Aggregate)".

      Subject to Paragraph a. or b. above, which-
      ever applies, the Damage To Premises
      Rented To You Limit is the most we will pay
      for damages because of "property damage"
      to any one premises, while rented to you, or
      in the case of fire, while rented to you or
      temporarily occupied by you with permission
      of the owner.

      The Limits of Insurance of Section II – Lia-
      bility apply separately to each consecutive
      annual period and to any remaining period
      of less than 12 months, starting with the be-
      ginning of the policy period shown in the
      Declarations, unless the policy period is ex-
      tended after issuance for an additional peri-
      od of less than 12 months. In that case, the

additional period will be deemed part of the
last preceding period for purposes of deter-
mining the Limits of Insurance.

**Section II – Liability, E. Liability And Medical Ex-
pense General Conditions** is amended as follows:

1.  Under **2., Duties In The Event Of Occurrence,
   Offense, Claim Or Suit,** Paragraphs **e.** and **f.**
   are added as follows:

   e.  If we cover a claim or "suit" under this cov-
      erage that may also be covered by other in-
      surance available to an additional insured,
      such insurance if any, shall be primary, and
      such additional insured must submit such
      claim or suit to the other insurer for defense
      and indemnity.

   f.  Paragraphs **a.** and **b.** apply to you or to any
      additional insured only when such "occur-
      rence," offense, claim or suit is known to
      you or any additional insured or your or any
      additional insured's partner, limited liability
      company manager, executive officer, trus-
      tee or political official if you or any addition-
      al insured is a political subdivision or agen-
      cy. This Paragraph **f.** applies separately to
      you and any additional insured.

2.  Paragraph **5. Representations** is added as fol-
   lows:

   5.  **Representations**
      When You Accept This Policy
      By accepting this policy, you agree:

      a.  The statements in the Declaration are
         accurate and complete;

      b.  Those statements are based upon rep-
         resentations you made to us; and

      c.  We have issued this policy in reliance
         upon your representations.

**Section II – Liability, F. Liability And Medical Ex-
pense Definitions** is amended as below:

1.  Paragraph **23.** is added as below:

   23.  "Fungi" means any type or form of fungus
      including mold or mildew and any mycotox-
      ins, spores, scents, or by-products produced
      or released by fungi.

BUSINESSOWNERS
BP 01 55 05 17

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM
INFORMATION SECURITY PROTECTION ENDORSEMENT

**A. Section I – Property** is amended as follows:

1. With respect to an "open policy", the following is added to any provision which uses the term actual cash value:

   **a.** In the event of a total loss to a building or structure, actual cash value is calculated as the Limit of Insurance applicable to that building or structure or the fair market value of the building or structure, whichever is less.

   **b.** In the event of a partial loss to a building or structure, actual cash value is calculated as **b.(1)** or **b.(2)**, whichever is less:

      **(1)** The amount it would cost to repair, rebuild or replace the property less a fair and reasonable deduction for physical depreciation of the components of the building or structure that are normally subject to repair or replacement during its useful life. Physical depreciation is based upon the condition of the property at the time of loss;

      **(2)** The Limit of Insurance applicable to the property.

   **c.** In the event of a partial or total loss to Covered Property other than a building or structure, actual cash value is calculated as **c.(1)** or **c.(2)**, whichever is less:

      **(1)** The amount it would cost to repair or replace the property less a fair and reasonable deduction for physical depreciation, based on the condition of the property at the time of loss;

      **(2)** The Limit of Insurance applicable to the property.

   **d.** An "open policy" is a policy under which the value of Covered Property is not fixed at policy inception, but is determined at the time of loss in accordance with policy provisions on valuation.

2. Paragraph **E.2. Appraisal** Property Loss Conditions is replaced by the following:

   **2. Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written request for an appraisal of the loss. If the request is accepted, each party will select a competent and impartial appraiser. Each party shall notify the other of the appraiser selected within 20 days of the request. The two appraisers will select an umpire. If they cannot agree within 15 days, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

3. Paragraph **E.5.d.(1)(c)** of the **Loss Payment** Property Loss Conditions is deleted.

    © Insurance Services Office, Inc., 2016

**4.** Paragraphs **E.5.d.(1)(d)** and **E.5.d.(5)** of the **Loss Payment** Property Loss Conditions are replaced as follows:

    **(d)** We will not pay on a replacement cost basis for any loss or damage until the lost or damaged property is actually repaired or replaced. Prior to such repair or replacement, we will pay the actual cash value of the lost or damaged property as described in Paragraph A.1. of this Endorsement. If the actual cash value does not exhaust the applicable Limit of Insurance, we will then pay the difference between the actual cash value and the replacement cost, provided that the repair or replacement is completed:

        **(i)** Within 12 months after we pay the actual cash value; or

        **(ii)** Within 24 months after we pay the actual cash value if the loss or damage relates to a state of emergency as described in Section 8558 of the Government Code;

    unless we extend the time period for good cause.

    Nothing in this Paragraph **(d)** constitutes a waiver of our right to deny the claim for any valid reason or to restrict payment in cases of suspected fraud.

  **(5)** Tenants' improvements and betterments at:

    **(a)** Replacement cost in accordance with the terms set forth in Paragraph **(d)** above.

    **(b)** A proportion of your original cost if the property is not repaired or replaced. We will determine the proportionate value as follows:

        **(i)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

        **(ii)** Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

    **(c)** Nothing if others pay for repairs or replacement.

**B. Section III – Common Policy Conditions** is amended as follows:

  **1.** Paragraphs **A.2.** and **A.3. Cancellation** are replaced by the following:

    **2. All Policies In Effect For 60 Days Or Less**

    If this Policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this Policy by mailing or delivering to the first Named Insured at the mailing address shown in the Policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

    **a.** 10 days before the effective date of cancellation if we cancel for:

      **(1)** Nonpayment of premium; or

      **(2)** Discovery of fraud by:

        **(a)** Any insured or his or her representative in obtaining this insurance; or

        **(b)** You or your representative in pursuing a claim under this Policy.

    **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

    **3. All Policies In Effect For More Than 60 Days**

    **a.** If this Policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this Policy only upon the occurrence, after the effective date of the Policy, of one or more of the following:

      **(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(2)** Discovery of fraud or material misrepresentation by:

    **(a)** Any insured or his or her representative in obtaining this insurance; or

    **(b)** You or your representative in pursuing a claim under this Policy.

**(3)** A judgment by a court or an administrative tribunal that you have violated a California or federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

    **(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

    **(b)** Continuation of the policy coverage would:

        **(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

        **(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the Policy.

    **b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the Policy, and to the producer of record, at least:

        **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

        **(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **3.a.**

**2.** The following provision is added to Paragraph **A. Cancellation:**

  **7. Residential Property**

    This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit. If such coverage has been in effect for 60 days or less and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except that we may not cancel this Policy solely because:

    **a.** Corrosive soil conditions exist on the premises; or

    **b.** The first Named Insured has:

        **(1)** Accepted an offer of earthquake coverage; or

        **(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

    However, we shall cancel this Policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

3. Paragraph **C. Concealment, Misrepresentation Or Fraud** is replaced by the following with respect to loss or damage caused by fire:

   We do not provide coverage to the insured who, whether before or after a loss, has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

   **a.** This Policy;

   **b.** The Covered Property;

   **c.** That insured's interest in the Covered Property; or

   **d.** A claim under this Policy.

4. Paragraph **C. Concealment, Misrepresentation Or Fraud** is replaced by the following with respect to loss or damage caused by a Covered Cause of Loss other than fire:

   This Policy is void if any insured, whether before or after a loss, has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

   **a.** This Policy;

   **b.** The Covered Property;

   **c.** An insured's interest in the Covered Property; or

   **d.** A claim under this Policy.

5. Paragraph **H.1. Other Insurance** is replaced by the following (with respect to coverage provided under Section I – Property):

   If there is other insurance covering the same loss or damage, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance bears to the Limits of Insurance of all insurance covering on the same basis.

   We will not pay more than the applicable Limit of Insurance of Section I – Property.

6. The following paragraph is added and supersedes any provisions to the contrary:

   **M. Nonrenewal**

   1. Subject to the provisions of Paragraphs **2.** and **3.** below, if we elect not to renew this Policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

   We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the Policy.

   2. **Residential Property**

   This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit.

   We may elect not to renew such coverage for any reason, except that we will not refuse to renew such coverage solely because:

   **a.** The first Named Insured has accepted an offer of earthquake coverage.

   However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

   **(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this Policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

   **(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

   **(3)** We have:

   **(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

(b) Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

b. The first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority that included an earthquake policy premium surcharge.

c. Corrosive soil conditions exist on the premises.

3. We are not required to send notice of nonrenewal in the following situations:

a. If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

b. If the Policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **1.**

c. If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the Policy, to obtain that coverage.

d. If the Policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

e. If the first Named Insured requests a change in the terms or conditions or risks covered by the Policy within 60 days of the end of the policy period.

f. If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph **1.**, to renew the Policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

C. The following changes apply only to Information Security Protection Endorsement **BP 15 07** if it is attached to this Policy:

1. Paragraph **(2)** of Insuring Agreement **d. Security Breach Liability** is replaced by the following:

(2) We will pay for "defense expenses" as a result of a "claim" in the form of a "regulatory proceeding" first made against the insured during the "policy period" or during the applicable Extended Reporting Period, in response to a "wrongful act" or a series of "interrelated wrongful acts" covered under Paragraph **d.(1).**

2. Paragraph **d.** of the definition of "loss" in Paragraph **V.** is replaced by the following:

d. With respect to Insuring Agreements **d.** Security Breach Liability and **g.** Web Site Publishing Liability:

Compensatory damages, settlement amounts and costs awarded pursuant to judgments or settlements.

"Loss" does not include:

(1) Civil or criminal fines or penalties imposed by law;

(2) Punitive or exemplary damages;

(3) The multiplied portion of multiplied damages;

(4) Taxes;

(5) Royalties;

(6) The amount of any disgorged profits; or

(7) Matters that are uninsurable pursuant to law.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION PREMIUM DUE

This endorsement modifies insurance provided under the following:

BUSINESSOWNER'S COVERAGE FORM

Paragraph **A.5.** of **Section III – Common Policy Conditions** is amended as follows:

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. Final Premium will not be less than the pro rata share of the minimum premium.  If the first Named Insured cancels, the refund may be less than pro rata based on our other than pro rata cancellation factor and procedure. Final Premium will not be less than the full policy minimum premium. The cancellation will be effective even if we have not made or offered a refund.

POLICY NUMBER:

BUSINESSOWNERS
BP 04 12 04 17

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

## SCHEDULE

| | |
|---|---|
| **A. Premises:** | |
| | 9241 Bishop Pl # 9265, Westminster, CA 92683-6503 |
| **B. Project Or Operation:** | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Liability** is amended as follows:

**A.** Paragraph **A.1.b.(1)** is replaced by the following:

  **(1)** To "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

    **(a)** The "bodily injury" or "property damage":

      **(i)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

      **(ii)** Arises out of the project or operation shown in the Schedule;

    **(b)** The "bodily injury" or "property damage" occurs during the policy period; and

    **(c)** Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

**B.** Paragraph **A.1.b.(2)** is replaced by the following:

  **(2)** To "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

    **(a)** The offense arises out of your business:

      **(i)** Performed on the premises shown in the Schedule; or

© Insurance Services Office, Inc., 2016

**(ii)** In connection with the project or operation shown in the Schedule; and

**(b)** The offense was committed during the policy period.

However, with respect to Paragraph **A.1.b.(2)(a)(i),** if the "personal and advertising injury" is caused by:

**(a)** False arrest, detention or imprisonment; or

**(b)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**C.** Paragraph **A.2.a. Medical Expenses** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

© Insurance Services Office, Inc., 2016

BUSINESSOWNERS
BP 04 17 01 10

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following exclusion is added to Paragraph **B.1. Exclusions – Applicable To Business Liability Coverage** in **Section II – Liability:**

This insurance does not apply to "bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraph **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraph **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

 © Insurance Services Office, Inc., 2009 □

**BUSINESSOWNERS**
**BP 05 01 07 02**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

   BUSINESSOWNERS COVERAGE FORM

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

POLICY NUMBER:

BUSINESSOWNERS
BP 05 15 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**     $463.00 |
| **Additional information, if any, concerning the terrorism premium:** |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses**     82 %     **Year:** 2018 |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses**     81 %     **Year:** 2019 |
| (Refer to Paragraph **B.** in this endorsement.) |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

## C. Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015

**BP 05 15 01 15**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Policy and apply to Property and Liability Coverages:

**A. CAP ON CERTIFIED TERRORISM LOSSES**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for loss or injury or damage that is otherwise excluded under this Policy.

© Insurance Services Office, Inc., 2015

BUSINESSOWNERS
BP 05 38 01 15

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Liability Coverage Form **BP 00 06** and **Section II – Liability** of the Businessowners Coverage Form **BP 00 03**:

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Form to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage" or "personal and advertising injury" as may be defined in any applicable Coverage Form.

 © Insurance Services Office, Inc., 2015

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   b. The act resulted in damage:

     (1) Within the United States (including its territories and possessions and Puerto Rico); or

     (2) Outside of the United States in the case of:

       (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

       (b) The premises of any United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

D. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

          © Insurance Services Office, Inc., 2015          BP 05 38 01 15

BUSINESSOWNERS
BP 05 42 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to the Businessowners Liability Coverage Form **BP 00 06** and **Section II – Liability** of the Businessowners Coverage Form **BP 00 03:**

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

© Insurance Services Office, Inc., 2015

POLICY NUMBER: SKBP981657

**BUSINESSOWNERS**
BP 12 03 01 10

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOSS PAYABLE CLAUSES

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

### SCHEDULE

| Premises Number: | 001 | Building Number: | 001 | Applicable Clause (Indicate Paragraph A, B or C): | B |
|---|---|---|---|---|---|
| **Description Of Property:** | | | | | |
| **Loss Payee Name:** | PTS 401k Trust ISAOA | | | | |
| **Loss Payee Address:** | C/O Descansando Partners, LP<br>Covina, CA, 91723 | | | | |
| **Premises Number:** | 001 | **Building Number:** | 001 | **Applicable Clause** (Indicate Paragraph A, B or C): | B |
| **Description Of Property:** | | | | | |
| **Loss Payee Name:** | Descansando Partners LP ISAOA | | | | |
| **Loss Payee Address:** | P.O. Box 4792<br>Covina, CA, 91723 | | | | |
| **Premises Number:** | 001 | **Building Number:** | 001 | **Applicable Clause** (Indicate Paragraph A, B or C): | B |
| **Description Of Property:** | | | | | |
| **Loss Payee Name:** | Equity Trust Company Custodian FBO Michael E. Holzer IRA 409 | | | | |
| **Loss Payee Address:** | ISAOA<br>P.O. Box 4792<br>Covina, CA, 91723 | | | | |
| **Premises Number:** | 001 | **Building Number:** | 001 | **Applicable Clause** (Indicate Paragraph A, B or C): | A |
| **Description Of Property:** | | | | | |
| **Loss Payee Name:** | Forbix Capitol Corp.; ISAOA | | | | |
| **Loss Payee Address:** | 15260 Ventura Boulevard, Suite 700<br>Sherman Oaks, CA, 91403 | | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | | |

Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

The following is added to the **Loss Payment** Property Loss Condition in **Section I – Property,** as shown in the Declarations or in the Schedule:

**A. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

**B. Lender's Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in that Covered Property is established by such written instruments as:

**a.** Warehouse receipts;

**b.** A contract for deed;

**c.** Bills of lading;

**d.** Financing statements; or

**e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**a.** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure for similar action on the Covered Property.

**c.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(1)** Pays any premium due under this policy at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of **Section I – Property** will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's right to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we do not renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**C. Contract Of Sale Clause**

**1.** The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest, we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

**3.** The following is added to Paragraph **H. Other Insurance** in **Section III – Common Policy Conditions:**

For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**D. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building, in which you are a tenant.

© Insurance Services Office, Inc., 2009          **BP 12 03 01 10**          □

2. We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

3. We will adjust losses to tenant's improvements and betterments with you, unless the lease provides otherwise.

POLICY NUMBER: SKBP981657

**BUSINESSOWNERS**
**BP 14 04 01 10**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WINDSTORM OR HAIL LOSSES TO ROOF SURFACING – ACTUAL CASH VALUE LOSS SETTLEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**SCHEDULE**

| |
|---|
| Location 001, Building 001 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following provision applies to **Section I – Property** with respect to the Building(s) identified in the Schedule:

The following is added to Paragraph **E.5.d.(3)** of the **Loss Payment** Property Loss Condition in **Section I – Property:**

       **(f)** Roof surfacing, if the loss or damage to roof surfacing is caused by windstorm or hail.

© Insurance Services Office, Inc., 2009

BUSINESSOWNER'S
BP 99 04 01 10

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN COVERAGE

This endorsement modifies insurance provided under the following:

  BUSINESSOWNER'S COVERAGE FORM

**A.** The following is added to **Paragraph A.3. Covered Causes of Loss** in **SECTION I – PROPERTY**:

**Additional Coverage-- Equipment Breakdown**
The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below.

1. We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

   **a.** mechanical breakdown, including rupture or bursting caused by centrifugal force;

   **b.** artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or network;

   **c.** explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

   **d.** loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   **e.** loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

2. Unless otherwise shown in a Schedule, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance.

   **a. Expediting Expenses**
   With respect to your damaged Covered Property, we will pay the reasonable extra cost to:
   **(1)** make temporary repairs; and
   **(2)** expedite permanent repairs or permanent replacement.
   The most we will pay for loss or expense under this coverage is $25,000 unless otherwise shown in a Schedule.

   **b. Hazardous Substances**
   We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

   This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **2.c.(1)(b)** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

**BUSINESSOWNER'S – Equipment Breakdown Coverage Endorsement**

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, is $25,000 unless otherwise shown in a Schedule.

**c. Spoilage**
   **(1)** We will pay:
      **(a)** for physical damage to "perishable goods" due to spoilage;
      **(b)** for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;
      **(c)** any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.
   **(2)** If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Loss Payment condition.

The most we will pay for loss, damage or expense under this coverage is $25,000 unless otherwise shown in a Schedule.

**d. Data Restoration**
   We will pay for your reasonable and necessary cost to research, replace and restore lost "electronic data."

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, is $25,000 unless otherwise shown in a Schedule.

**e. Service Interruption**
   **(1)** Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by the interruption of utility services. The interruption must result from an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not Covered Property.

   **(2)** Unless otherwise shown in a Schedule, coverage for any loss of Business Income you sustain that results from the interruption of utility services will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident." If the interruption exceeds 24 hours, coverage will begin at the time of the interruption and the deductible applicable to Business Income will apply.

   **(3)** The most we will pay in any "one accident" for loss, damage or expense under this coverage is the applicable limit for Business Income, Extra Expense or Spoilage, except that if a limit is shown in a Schedule for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

**f. Business Income and Extra Expense**
   Any insurance provided under this policy for Business Income or Extra Expense is extended to the coverage provided by this endorsement. However, if a deductible is shown in a Schedule, then as respects Equipment Breakdown coverage, the "period of restoration" will begin immediately after the "accident," and the deductible shown in the Schedule will apply.

The most we will pay for loss or expense under this coverage is the applicable limit for Business Income and Extra Expense, unless otherwise shown in a Schedule.

**B.** The following is added to **Paragraph B. Exclusions**:

---

**BUSINESSOWNER'S – Equipment Breakdown Coverage Endorsement**

**Equipment Breakdown Exclusions**

All exclusions in the Businessowners Coverage Form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

1. The following exclusions are modified:
   a. As respects this endorsement only, the next to the last paragraph in **Exclusion B.1.h.** is deleted and replaced with the following:
      However, if excluded loss or damage, as described in **Paragraph (1)** above results in an "accident," we will pay only for the loss, damage or expense caused by such "accident."

   b. As respects this endorsement only, the last paragraph of **Exclusion B.2.l.** is deleted and replaced with the following:
      But if an excluded cause of loss that is listed in 2.l.(1) through (7) results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

   c. The following is added to **Exclusions B.2.m.** and **B.2.n**:
      We will also pay for direct physical loss or damage caused by an "accident."

2. The following exclusions are added:
   a. We will not pay for loss, damage or expense caused by or resulting from:
      (1) a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment; or
      (2) any of the following:
         (a) defect, programming error, programming limitation, computer virus, malicious code, loss of data, loss of access, loss of use, loss of functionality or other condition within or involving "electronic data" of any kind; or
         (b) misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.
      However, if an "accident" results, we will pay for the resulting loss, damage or expense caused by that "accident."

   b. With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in A.1.c. above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

   c. With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:
      (1) loss caused by your failure to use due diligence and dispatch and all reasonable means to resume business; or
      (2) any increase in loss resulting from an agreement between you and your customer or supplier.

**C. Deductibles**

The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a Schedule. If a separate Equipment Breakdown deductible is shown, the following applies.

Only as regards Equipment Breakdown Coverage, provision **D. Deductibles** is deleted and replaced with the following:

1. **Deductibles for Each Coverage**

   a. Unless the Schedule indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident."

   b. We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the Schedule. We will then

**BUSINESSOWNER'S – Equipment Breakdown Coverage Endorsement**

pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

   **c.** If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident," only the highest deductible for each coverage will apply.

**2.** **Direct and Indirect Coverages**

   **a.** Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the Schedule.

   **b.** Unless more specifically indicated in the Schedule:
     **(1)** Indirect Coverages Deductibles apply to Business Income and Extra Expense loss; and
     **(2)** Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

**3.** **Application of Deductibles**

   **a.** **Dollar Deductibles**
   We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

   **b.** **Time Deductible**
   If a time deductible is shown in the Schedule, we will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident." If a time deductible is expressed in days, each day shall mean twenty-four consecutive hours.

   **c.** **Multiple of Average Daily Value (ADV)**
   If a deductible is expressed as a number times ADV, that amount will be calculated as follows:
   The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration". The number indicated in the Schedule will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

   **d.** **Percentage of Loss Deductibles**
   If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

**D.** **Conditions**
The following conditions are in addition to the Conditions in the Businessowners Coverage Form.

**1.** **Suspension**
Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:

   **a.** your last known address; or

**BUSINESSOWNER'S – Equipment Breakdown Coverage Endorsement**

      **b.** the address where the "covered equipment" is located.

      Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

  **2.**   **Jurisdictional Inspections**
      If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

  **3.**   **Environmental, Safety and Efficiency Improvements**
      If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

      However, we will not pay more than 125% of what the cost would have been to replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

  **4.**   **Coinsurance**
      If a coinsurance percentage is shown in a Schedule for specified coverages, the following condition applies.

      We will not pay for the full amount of your loss if the applicable limit is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, we will determine what percentage this calculated product is compared to the applicable limit and apply that percentage to the gross amount of loss. We will then subtract the applicable deductible. The resulting amount, or the applicable limit, is the most we will pay. We will not pay for the remainder of the loss. Coinsurance applies separately to each insured location.

**E.**  **The following definitions are added:**
  **1.**   "Boilers and vessels" means:

      **a.** Any boiler, including attached steam, condensate and feedwater piping; and

      **b.** Any fired or unfired pressure vessel subject to vacuum or internal pressure other than the static pressure of its contents.

      This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

  **2.**   "Covered equipment"

      **a.** "Covered equipment" means, unless otherwise specified in a Schedule, Covered Property:
         **(1)** that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or
         **(2)** which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

      **b.** None of the following is "covered equipment":
         **(1)** structure, foundation, cabinet, compartment or air supported structure or building;
         **(2)** insulating or refractory material;
         **(3)** sewer piping, buried vessels or piping, or piping forming a part of a sprinkler or fire suppression system;
         **(4)** water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;
         **(5)** "vehicle" or any equipment mounted on a "vehicle";
         **(6)** satellite, spacecraft or any equipment mounted on a satellite or spacecraft;
         **(7)** dragline, excavation or construction equipment; or
         **(8)** equipment manufactured by you for sale.

    Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.     

**BUSINESSOWNER'S – Equipment Breakdown Coverage Endorsement**

3.  "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

4.  "One accident" means: If an initial "accident" causes other "accidents," all will be considered "one accident." All "accidents" that are the result of the same event will be considered "one accident."

5.  "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

6.  "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale. This includes all component parts of such machine or apparatus. This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

7.  "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

    However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in a Schedule. Coverage provided under this endorsement does not provide an additional amount of insurance.

**BUSINESSOWNER'S
BP 99 188 06 16**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEDUCTIBLE ENDORSEMENT - PROPERTY

This endorsement modifies insurance provided under the following:

BUSINESSOWNER'S COVERAGE FORM

Paragraph **D.1. Deductibles** of **SECTION I – PROPERTY** is replaced with the following:

**D. Deductibles**

1. We will not pay for loss or damage to Covered Property caused by or resulting from a Covered Cause of Loss as a result of one occurrence until the amount of such loss or damage exceeds the applicable Deductible shown in the Declarations or as set forth below.  We will then pay the amount of such loss or damage in excess of the Deductible up to the applicable Limit of Insurance of **Section 1 - Property**.  In the event of loss or damage to Covered Property caused by or resulting from a Covered Cause of Loss at one or more buildings at the same location, as a result of one occurrence, only the single largest deductible scheduled for loss at such building(s) will apply to all such loss or damage regardless of the number of buildings involved in the loss.  However, this Paragraph **D.1** does not apply to loss or damage from Earthquake or Windstorm or Hail causes of loss.

**EXAMPLES**

**Example 1** - Loss at multiple buildings, same location.

A fire damages Buildings 1 and 2 which results in a spoilage loss at Buildings 3 and 4 due to a power outage from the fire.

| | |
|---|---|
| Property Deductible – Building 1: | $250 |
| Property Deductible – Building 2: | $250 |
| Limit of Insurance – Building 1: | $60,000 |
| Limit of Insurance – Building 2: | $80,000 |
| Loss to Building 1: | $50,100 |
| Loss to Building 2: | $70,000 |

| | |
|---|---|
| Spoilage Deductible – Building 3 | : |
| $500 | |
| Spoilage Deductible – Building 4 | : |
| $500 | |
| Spoilage Limit of Insurance – Building 3: | |
| $5,000 | |
| Spoilage Limit of Insurance – Building 4: | |
| $2,000 | |
| Spoilage loss at Building 3: | $2,500 |
| Spoilage loss at Building 4: | $1,500 |

The largest deductible involved in the occurrence was the $500 spoilage deductible and will be subtracted from the total Loss Payable:

```
      $   50,100 – Building 1 loss
  +   $   70,000 – Building 2 loss
  +   $    2,500 – Spoilage loss at Building 3
  +   $    1,500 – Spoilage loss at Building 4
      $  124,100 – Total loss
  -   $      500 – Largest deductible involved in loss
      $  123,600 – Total loss payable
```

**Example 2** - Identical loss occurs but only at building 1, no loss at other buildings (same deductibles and limits)

| | |
|---|---|
| Property Deductible – Building 1: | $250 |
| Limit of Insurance – Building 1: | $60,000 |
| Loss to Building 1: | $50,100 |
| Spoilage Loss at Building 1: | $2,500 |

The largest deductible involved in the occurrence was the $500 spoilage deductible for Building 1 and will be subtracted from the total Loss Payable.

```
      $   50,100 - Building 1 loss
  +   $    2,500 - Spoilage loss at Building 1
      $   52,600 - Total Loss at Building 1
  -   $      500 - Largest deductible involved in loss
      $   52,100 - Total loss payable.
```

---

BUSINESSOWNER'S
BP 99 60 03 12

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WATER BACK-UP AND SUMP OVERFLOW

This endorsement modifies insurance provided under the following:

BUSINESSOWNER'S COVERAGE FORM

### SCHEDULE

| Premises Number | Covered Property Annual Aggregate Limit Of Insurance | Business Income And Extra Expense Annual Aggregate Limit Of Insurance |
|---|---|---|
| Location 001, Building 001 | $5,000 | $5,000 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A.** We will pay for direct physical loss or damage to Covered Property, covered under Section I – Property, caused by or resulting from:

**1.** Water or waterborne material which backs up through or overflows or is otherwise discharged from a sewer or drain; or

**2.** Water or waterborne material which overflows or is otherwise discharged from a sump, sump pump or related equipment, even if the overflow or discharge results from mechanical breakdown of a sump pump or its related equipment.

However, with respect to Paragraph **A.2.**, we will not pay the cost of repairing or replacing a sump pump or its related equipment in the event of mechanical breakdown.

***THIS IS NOT FLOOD INSURANCE. We will not pay for loss or damage from water or other materials that back up or overflow from any sewer, drain or sump that itself is caused, directly or indirectly, in whole or in part, by any flood. Flood means the overflow of surface water, waves, tides, tidal waves, streams, or other bodies of water, or their spray, all whether driven by wind or not.***

**B.** The coverage described in Paragraph **A.** of this endorsement does not apply to loss or damage resulting from an insured's failure to:

**1.** Keep a sump pump or its related equipment in proper working condition; or

**2.** Perform the routine maintenance or repair necessary to keep a sewer or drain free from obstructions.

**C.** The most we will pay for the coverage provided under this endorsement for all direct physical loss or damage to Covered Property is the Covered Property Annual Aggregate Limit of Insurance. That limit is $5,000 per location, unless a different Covered Property Annual Aggregate Limit of Insurance is indicated in the Schedule of this endorsement.

The applicable Covered Property Annual Aggregate Limit of Insurance is the most we will pay under this endorsement for the total of all direct physical loss or damage sustained in any one policy year, regardless of the number of occurrences that cause or result in loss or damage to Covered Property. If loss payment for the first such occurrence does not exhaust the applicable Limit of Insurance, then the balance of that Limit is available for subsequent loss or damage sustained in, but not after, that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**D.** The following provisions apply to **Section I – Property** and supersede any provisions to the contrary:

The most we will pay under:

BUSINESSOWNER'S – Water Back-Up and Sump Overflow Endorsement

1. Paragraph **A.5.f. Business Income** Additional Coverage for all loss of Business Income you sustain due to the necessary suspension of your "operations" caused by direct physical loss or damage to Covered Property as described in Paragraph **A.** of this endorsement; and

2. Paragraph **A.5.g. Extra Expense** Additional Coverage for all necessary Extra Expense you incur and that you would not have incurred if there had been no direct physical loss or damage to Covered Property as described in Paragraph **A.** of this endorsement;

is the Business Income And Extra Expense Annual Aggregate Limit of Insurance. That limit is $5,000 per location, unless a different Business Income And Extra Expense Annual Aggregate Limit of Insurance is shown in the Schedule.

The applicable Business Income And Extra Expense Annual Aggregate Limit of Insurance is the most we will pay under this endorsement for the total of all loss of Business Income you sustain and Extra Expense you incur in any one policy year, regardless of the number of occurrences that cause or result in loss or damage to Covered Property as described in Paragraph **A.** of this endorsement. If loss payment during an earlier "period of restoration" in the policy year does not exhaust the applicable Limit of Insurance, then the balance of that Limit is available for loss of Business Income you sustain or Extra Expense you incur during a subsequent "period of restoration" beginning in, but not after, that policy year. With respect to a "period of restoration" which begins in one policy year and continues in a subsequent policy year(s), all loss of Business Income you sustain or Extra Expense you incur is deemed to be sustained or incurred in the policy year in which the "period of restoration" began.

E. With respect to the coverage provided under this endorsement, the **Water** Exclusion in **Section I – Property** is replaced by the following exclusion:

**Water**

1. Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2. Mudslide or mudflow; or

3. Water under the ground surface pressing on, or flowing or seeping through:

   a. Foundations, walls, floors or paved surfaces;

   b. Basements, whether paved or not; or

   c. Doors, windows or other openings; or

4. Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.** or **3.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **4.**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **4.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

Includes copyrighted material of the Insurance Services Office, Inc., used with its permission.

BUSINESSOWNER'S
BP 99 91 11 14

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DATA COMPROMISE COVERAGE
## RESPONSE EXPENSES AND DEFENSE AND LIABILITY

This endorsement modifies insurance provided under the following:

BUSINESSOWNER'S COVERAGE FORM

| SECTION 1 – RESPONSE EXPENSES | | |
|---|---|---|
| Data Compromise | | |
| Response Expenses Limit: | $50,000 | Annual Aggregate |
| Sublimits | | |
| Named Malware (Sec. 1) | $50,000 | Any one "Personal Data Compromise" |
| Forensic IT Review: | $5,000 | |
| Legal Review: | $5,000 | |
| PR Services: | $5,000 | |
| Response Expenses Deductible: | $1,000 | Any one "Personal Data Compromise" |
| SECTION 2 – DEFENSE AND LIABILITY | | |
| Data Compromise | | |
| Defense and Liability Limit: | $50,000 | Annual Aggregate |
| Sublimits | | |
| Named Malware (Sec. 2) | $50,000 | Any one "Personal Data Compromise" |
| Defense and Liability Deductible: | $1,000 | Each "Data Compromise Suit" |

The following is added as an Additional Coverage to the Property section:

## SECTION 1 – RESPONSE EXPENSES

### DATA COMPROMISE COVERED CAUSE OF LOSS

Coverage under this Data Compromise Coverage endorsement applies only if all of the following conditions are met:

1.  There has been a "personal data compromise"; and

2.  Such "personal data compromise" is first discovered by you during the policy period for which this Data Compromise Coverage endorsement is applicable; and

3.  Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

### COVERAGE – SECTION 1

If the three conditions listed above in DATA COMPROMISE – COVERED CAUSE OF LOSS have been met, then we will provide coverage for the following expenses when they arise directly from the covered cause of loss and are necessary and reasonable. Coverages 4 and 5 apply only if there has been a notification of the "personal data compromise" to "affected individuals" as covered under coverage 3.

1.  **Forensic IT Review**

    Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals".

    This does not include costs to analyze, research or determine any of the following:

    a.  Vulnerabilities in systems, procedures or physical security;

**BUSINESSOWNER'S – Data Compromise Coverage Endorsement**

b. Compliance with PCI or other industry security standards; or

c. The nature or extent of loss or damage to data that is not "personally identifying information" or "personally sensitive information".

If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Forensic IT Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

**2. Legal Review**

Professional legal counsel review of the "personal data compromise" and how you should best respond to it.

If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Legal Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

**3. Notification to Affected Individuals**

We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals".

**4. Services to Affected Individuals**

We will pay your necessary and reasonable costs to provide the following services to "affected individuals".

a. The following services apply to any "personal data compromise".

1) Informational Materials

A packet of loss prevention and customer support information.

2) Help Line

A toll-free telephone line for "affected individuals" with questions about the "personal data compromise". Where applicable, the line can also be used to request additional services as listed in b. 1) and 2).

b. The following additional services apply to "personal data compromise" events involving "personally identifying information".

1) Credit Report and Monitoring

A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This

service is subject to the "affected individual" enrolling for this service with the designated service provider.

2) Identity Restoration Case Management

As respects any "affected individual" who is or appears to be a victim of "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

**5. PR Services**

Professional public relations firm review of and response to the potential impact of the "personal data compromise" on your business relationships.

This includes costs to implement public relations recommendations of such firm. This may include advertising and special promotions designed to retain your relationship with "affected individuals". However, we will not pay for promotions:

a. Provided to any of your directors or employees; or;

b. Costing more than $25 per "affected individual".

**LIMITS – SECTION 1**

The most we will pay under Response Expenses coverage is the Data Compromise Response Expenses Limit indicated for this endorsement.

The Data Compromise Response Expenses Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under Section 1 arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Response Expenses Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

The most we will pay under Response Expenses coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 1) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 1) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise". This sublimit is

BUSINESSOWNER'S – Data Compromise Coverage Endorsement

part of, and not in addition to the Data Compromise Response Expenses Limit.

The most we will pay under Forensic IT Review, Legal Review and PR Services coverages for loss arising from any one "personal data compromise" is the applicable sublimit for each of those coverages indicated for this endorsement. These sublimits are part of, and not in addition to, the Data Compromise Response Expenses Limit. PR Services coverage is also subject to a limit per "affected individual" as described in 5. PR Services.

Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals". Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

**DEDUCTIBLE – SECTION 1**

Response Expenses coverage is subject to the Response Expenses Deductible indicated for this endorsement. You shall be responsible for such deductible amount as respects each "personal data compromise" covered under this endorsement.

## SECTION 2 – DEFENSE AND LIABILITY

### DEFENSE AND LIABILITY COVERED CAUSE OF LOSS

Coverage under this Data Compromise Coverage endorsement applies only if all three of the conditions in DATA COMPROMISE – COVERED CAUSE OF LOSS are met.

Only with regard to Section 2 – Defense and Liability coverage, the following conditions must also be met:

1. You have provided notifications and services to "affected individuals" in consultation with us pursuant to Response Expenses coverage; and

2. You receive notice of a "data compromise suit" brought by one or more "affected individuals" or by a governmental entity on behalf of one or more "affected individuals"; and

3. Notice of such "data compromise suit" is received by you within two years of the date that the "affected individuals" are notified of the "personal data compromise"; and

4. Such "data compromise suit" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

**COVERAGE – SECTION 2**

If all of the conditions listed above in DEFENSE AND LIABILITY – COVERED CAUSE OF LOSS have been met, then we will provide coverage for "data compromise defense costs" and "data compromise liability" directly arising from the covered cause of loss.

**LIMITS – SECTION 2**

The most we will pay under Defense and Liability coverage (other than post-judgment interest) is the Data Compromise Defense and Liability Limit indicated for this endorsement.

The Data Compromise Defense and Liability Limit is an annual aggregate limit. This amount is the most we will pay for all loss covered under Section 2 (other than post-judgment interest) arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" (other than post-judgment interest) will be subject to the Data Compromise Defense and Liability Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

The most we will pay under Defense and Liability coverage for loss arising from any "malware-related compromise" is the Named Malware (Sec. 2) sublimit indicated for this endorsement. For the purpose of the Named Malware (Sec. 2) sublimit, all "malware-related compromises" that are caused, enabled or abetted by the same virus or other malicious code are considered to be a single "personal data compromise". This sublimit is part of, and not in addition to, the Defense and Liability Limit.

**DEDUCTIBLE – SECTION 2**

Defense and Liability coverage is subject to the Defense and Liability Deductible indicated for this endorsement. You shall be responsible for such deductible amount as respects each "data compromise suit" covered under this endorsement.

## EXCLUSIONS, ADDITIONAL CONDITIONS AND DEFINITIONS APPLICABLE TO BOTH SECTION 1 AND SECTION 2

### EXCLUSIONS

The following additional exclusions apply to this coverage:

We will not pay for costs arising from the following:

1. Your intentional or willful complicity in a "personal

**BUSINESSOWNER'S – Data Compromise Coverage Endorsement**

data compromise".

2. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you.

3. Any "personal data compromise" occurring prior to the first inception of this Data Compromise Coverage endorsement or any coverage substantially similar to that described in this endorsement.

4. Costs to research or correct any deficiency. This includes, but is not limited to, any deficiency in your systems, procedures or physical security that may have contributed to a "personal data compromise".

5. Any fines or penalties. This includes, but is not limited to, fees or surcharges from affected financial institutions.

6. Any criminal investigations or proceedings.

7. Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

8. Any "personal data compromise" involving data that is being transmitted electronically, unless such data is encrypted to protect the security of the transmission.

9. Your reckless disregard for the security of "personally identifying information" or "personally sensitive information" in your care, custody or control.

10. That part of any "data compromise suit" seeking any non-monetary relief.

**ADDITIONAL CONDITIONS**

The following Additional Conditions apply to all coverages under this endorsement.

**A. Data Compromise Liability Defense**

1. We shall have the right and the duty to assume the defense of any applicable "data compromise suit" against you. You shall give us such information and cooperation as we may reasonably require.

2. You shall not admit liability for or settle any "data compromise suit" or incur any defense costs without our prior written consent.

3. If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense by tendering control of the defense to you. From that point forward, you shall, at your own expense, negotiate or defend such "data compromise suit" independently of us. Our liability shall not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense

costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

4. We shall not be obligated to pay any damages or defense costs, or to defend or continue to defend any "data compromise suit", after the Data Compromise Defense and Liability Limit has been exhausted.

5. We shall pay all interest on that amount of any judgment within the Data Compromise Defense and Liability Limit which accrues:

   a. after entry of judgment; and

   b. before we pay, offer to pay or deposit in court that part of the judgment within the Data Compromise Defense and Liability Limit or, in any case, before we pay or offer to pay the entire Data Compromise Defense and Liability Limit.

   These interest payments shall be in addition to and not part of the Data Compromise Defense and Liability Limit.

**B. Duties in the Event of a "Data Compromise Suit"**

1. If a "data compromise suit" is brought against you, you must:

   a. Immediately record the specifics of the "data compromise suit" and the date received; and

   b. Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "data compromise suit" is first received by you.

   c. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "data compromise suit";

   d. Authorize us to obtain records and other information;

   e. Cooperate with us in the investigation, settlement or defense of the "data compromise suit";

   f. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

   g. Not take any action, or fail to take any required action, that prejudices your rights or our rights with respect to such "data compromise suit".

2. You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

3. If you become aware of a claim or complaint that

**BUSINESSOWNER'S – Data Compromise Coverage Endorsement**

may become a "data compromise suit", you shall promptly inform us of such claim or complaint.

### C. Due Diligence

You agree to use due diligence to prevent and mitigate costs covered under this endorsement. This includes, but is not limited to, complying with, and requiring your vendors to comply with, reasonable and industry-accepted protocols for:

1. Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

2. Providing and maintaining appropriate computer and Internet security;

3. Maintaining and updating at appropriate intervals backups of computer data;

4. Protecting transactions, such as processing credit card, debit card and check payments; and

5. Appropriate disposal of files containing "personally identifying information" or "personally sensitive information", including shredding hard copy files and destroying physical media used to store electronic data.

### D. Legal Advice

We are not your legal advisor. Our determination of what is or is not covered under this Data Compromise Coverage endorsement does not represent advice or counsel from us about what you should or should not do.

### E. Pre-Notification Consultation

You agree to consult with us prior to the issuance of notification to "affected individuals". We assume no responsibility under this Data Compromise Coverage for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Additional Condition F. Service Providers. You must provide the following at our pre-notification consultation with you:

1. The exact list of "affected individuals" to be notified, including contact information.

2. Information about the "personal data compromise" that may appropriately be communicated with "affected individuals".

3. The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Response Expenses Limit.

### F. Service Providers

1. We will only pay under this Data Compromise Coverage for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Data Compromise Coverage. We will not unreasonably withhold such approval.

2. Prior to the Pre-Notification Consultation described in Additional Condition E. above, you must come to agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals. We will suggest a service provider. If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

   a. Such alternate service provider must be approved by us;

   b. Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

   c. Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

### G. Services

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Data Compromise coverage:

1. The effectiveness of such services depends on your cooperation and assistance.

2. All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

3. We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

4. You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you.

### DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

1. "Affected Individual" means any person who is your

---

**BUSINESSOWNER'S – Data Compromise Coverage Endorsement**

current, former or prospective customer, client, member, owner, director or employee and whose "personally identifying information" or "personally sensitive information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this endorsement. This definition is subject to the following provisions:

a. "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

b. An "affected individual" must have a direct relationship with your interests as insured under this policy. The following are examples of individuals who would not meet this requirement:

   1) If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

   2) If you store, process, transmit or transport records, the individuals whose "personally identifying information" or "personally sensitive information" you are storing, processing, transmitting or transporting for another entity do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

   3) You may have operations, interests or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of the operation insured under this policy.

c. An "affected individual" may reside anywhere in the world.

2. "Data Compromise Defense Costs" means expenses resulting solely from the investigation, defense and appeal of any "data compromise suit" against you. Such expenses must be reasonable and necessary. They will be incurred by us. They do not include your salaries or your loss of earnings. They do include premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond.

3. "Data Compromise Liability"

a. "Data compromise liability" means the following, when they arise from a "data compromise suit":

   1) Damages, judgments or settlements to "affected individuals";

   2) Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or court order; and

   3) Pre-judgment interest on that part of any judgment paid by us.

b. "Data compromise liability" does not mean:

   1) Damages, judgments or settlements to anyone who is not an "affected individual";

   2) Civil or criminal fines or penalties imposed by law;

   3) Punitive or exemplary damages;

   4) The multiplied portion of multiplied damages;

   5) Taxes; or

   6) Matters which may be deemed uninsurable under the applicable law.

4. "Data Compromise Suit"

a. "Data Compromise Suit" means a civil proceeding in which damages to one or more "affected individuals" arising from a "personal data compromise" or the violation of a governmental statute or regulation are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. "Data compromise suit" includes:

   1) An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent;

   2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent; or

   3) A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

b. "Data compromise suit" does not mean any demand or action brought by or on behalf of someone who is:

   1) Your director or officer;

   2) Your owner or part-owner; or

   3) A holder of your securities;

   in their capacity as such, whether directly, derivatively, or by class action. "Data compromise suit" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual".

c. "Data compromise suit" does not mean any demand or action brought by an organization,

**BUSINESSOWNER'S – Data Compromise Coverage Endorsement**

business, institution, or any other party that is not an "affected individual" or governmental entity. "Data compromise suit" does not mean any demand or action brought on behalf of an organization, business, institution, governmental entity or any other party that is not an "affected individual".

5. "Identity Theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

6. "Malware-Related Compromise" means a "personal data compromise" that is caused, enabled or abetted by a virus or other malicious code that, at the time of the "personal data compromise", is named and recognized by the CERT® Coordination Center, McAfee®, Secunia, Symantec or other comparable third party monitors of malicious code activity.

7. "Personal Data Compromise" means the loss, theft, accidental release or accidental publication of "personally identifying information" or "personally sensitive information" as respects one or more "affected individuals". If the loss, theft, accidental release or accidental publication involves "personally identifying information", such loss, theft, accidental release or accidental publication must result in or have the reasonable possibility of resulting in the fraudulent use of such information. This definition is subject to the following provisions:

a. At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" or "personally sensitive information" need not be at the insured premises but must be in the direct care, custody or control of:

1) You; or

2) A professional entity with which you have a direct relationship and to which you (or an "affected individual" at your direction) have turned over (directly or via a professional transmission or transportation provider) such information for storage, processing, transmission or transportation of such information.

b. "Personal data compromise" includes disposal or abandonment of "personally identifying information" or "personally sensitive information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

1) The failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

2) Such disposal or abandonment must take place during the time period for which this Data Compromise Coverage endorsement is effective.

c. "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" or "personally sensitive information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof.

d. All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise".

8. "Personally Identifying Information" means information, including health information, that could be used to commit fraud or other illegal activity involving the credit, access to health care or identity of an "affected individual". This includes, but is not limited to, Social Security numbers or account numbers.

"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

9. "Personally Sensitive Information" means private information specific to an individual the release of which requires notification of "affected individuals" under any applicable law.

"Personally sensitive information" does not mean or include "personally identifying information".

All other provisions of this policy apply.

# EXHIBIT 3

# witkow | baskin

October 14, 2020

*Via E-Mail and U.S. Mail*

Ariela Cohen, Esq.
Berkshire Hathaway Guard Insurance Companies
P.O. Box A-H
16 S. River St.
Wilkes-Barrie, Pennsylvania 18703-0020
ariela.cohen@guard.com

| Re: | Insured | : | Skaii Investment, LLC |
|---|---|---|---|
| | Policy No. | : | SKBP981657 |
| | Policy Type | : | Biz Guard Plus Businessowner's Policy |
| | Insurer | : | AmGuard Insurance Company |
| | Claim No. | : | SKBP981657-001-001-001 |

Ms. Cohen:

I am counsel to Skaii Investment, LLC (the "Insured"), the owner of the real and personal property located at 9241 Bishop Pl # 9265. Westminster, CA 92683-6503 (the "Property"). The Property is the subject of that certain Businessowner's Policy issued by AmGuard Insurance Company (the "Insurer") for the period April 25, 2018 through April 25, 2019, policy number SKBP981657 (the "Policy"). As you are aware, the Property suffered a total loss due to fire damage that occurred on January 23, 2019. The Insured promptly notified you of this loss on January 24, 2020 (hereafter, the "Claim"). Since that time, my client has been in circuitous discussions with the assigned adjuster, Corey Massaro, regarding the value of the loss. As discussed below, however, these discussions are at an impasse and, if not promptly resolved, the Insured is prepared to initiate a lawsuit in relating to your bad faith conduct in adjusting the Claim. Please consider this our final attempt to resolve this matter amicably before we are forced to proceed in a formal manner.

As specified in the January 10, 2020 letter to Sy Foguel from the Insured (which you acknowledged receiving on January 16, 2020), beginning on or around April 26, 2019, Corey Massaro was assigned as the primary adjuster for the Claim. On May 8, 2019, Mr. Massaro visited the Property. More than one month later, still having not received any report from Mr. Massaro, the Insured contacted Mr. Massaro to determine the status of the Claim. On June 17, 2019, Mr. Massaro emails the Insured providing an initial summary of the Property and Business Income loss. On July 23, 2019, Mr. Massaro sent a further email identifying the precise calculations of the Business Income loss.

Based on the above, on or about September 9, 2020, the Insurer issued preliminary payments for the Claim totaling $838,340.34, comprised of $654,273.86 for the Property loss (after $1,000 deductible) and $75,000 for the Business Income loss. This amount, however, was expressly considered to be "preliminary" and subject to further revision once shoring at the Property was completed and the adjuster could perform an additional review and analysis of what work was required to replace the building.

# witkow | baskin

Ariela Cohen, Esq.
Berkshire Hathaway Guard Insurance Companies
P.O. Box A-H
16 S. River St.
Wilkes-Barrie, Pennsylvania 18703-0020
ariela.cohen@guard.com
October 14, 2020

On December 6, 2019, shoring at the Property was completed and the Insured contacted Mr. Massaro to schedule a return visit to the Property in order to finalize his work on the Claim. Mr. Massaro failed to respond to this inquiry or further inquiries made on December 13 and 17, 2019. Finally, on January 8, 2020, Mr. Massaro emailed the Insured to state that he plans to visit the Property "sometime next week."[1]  On January 15, 2020, Mr. Massaro, Lan & Mimi Nguyen (representatives of the Insured) and Nicholas Nguyen, the public adjuster, all met at the Property. Mr. Massaro indicated that he needed a contractor estimate in order to amend his original loss estimate to reflect the additional repair items.   On February 7, 2020, the Insured provided the requested contractor estimate (A's Contractor, Inc.) to Mr. Massaro that identified these additional items. On March 13, 2020, Mr. Massaro responded that he "does not agree" with the contractor's estimate. That same day, the Insured requested that Mr. Massaro "[w]e would appreciate you tell us exactly what you need Corey.  It took over a month to tell us this.  You could have call and inform us what you need. Our estimate is more detailed [than] your Preliminary Estimate give by your contractor.....Let us be up front, what do you specifically need from us and what do you and your consultant have at hand that may help us resolve our claim?"   On March 21 and 24, 2020, after repeated follow-up emails and calls, Mr. Massaro responded that he is considering his preliminary estimate "final," and refused to provide any additional adjustment for the additional items identified in the supplemental contractor estimate but not covered in his preliminary adjustment, nor has he provided any supplementation of the Business Income loss (which continues to accrue at $43,038/month).

Mr. Massaro, and thereby the Insurer's, position is wholly without merit and we are prepared to fully litigate this issue.   To this end, please see the attached contractor bids from CRM Construction, Inc., A's Contractor, Inc. and RD Construction, Inc. that reflects replacement estimates ranging from $1,456,620.00 to $1,844,882.00.   As a final effort to resolve this matter short of litigation, we demand that you appoint a local (Southern California-based) adjuster in place of Mr. Massaro, and set up an on-site meeting between this new local adjuster, the selected contractor and my client's representatives to negotiate the required repairs and finalize the adjustment (the "Further Adjustment Process").

If you decide to not proceed with the Further Adjustment Process, based on the foregoing conduct, my client possesses highly meritorious claims against you for, among other things, breach of the insurance contract and bad faith denial of coverage which would open the policy limits under California law.  In a final effort to avoid litigation, we demand that you consider the above timeline of event, Mr. Massaro's representations during the claim process, the attached construction estimates, and our demand for a Further Adjustment Process.  If we do not receive a satisfactory response from you by the close of business on October 30, 2020 as to whether you will agree to revise the preliminary adjustment to reflect the actual replacement value of the Property as reflected in the estimates, or agree to the Further Adjustment Process, we will assume that you do not intend to comply with the terms of the insurance contract and we will proceed with litigation.

---

[1] Indeed, on January 16, 2020, you emailed the Insured to state that "an adjuster was sent out to California yesterday to inspect the supplement damages in an effort to resolve this matter amicably."

**witkow | baskin**

Ariela Cohen, Esq.
Berkshire Hathaway Guard Insurance Companies
P.O. Box A-H
16 S. River St.
Wilkes-Barrie, Pennsylvania 18703-0020
ariela.cohen@guard.com
October 14, 2020

Nothing contained herein shall be construed as a waiver or forfeiture of any of my client's rights or remedies, all of which are preserved. Please contact me immediately if you have any questions or would like to discuss this matter further.

Sincerely,

witkow | baskin

Brandon J. Witkow

Enclosure

cc:     Lan Nguyen, Skaii Investment, LLC (via email)

 **A's Contractor Inc.**

License# 936193

| | | | | |
|---|---|---|---|---|
| Client: | Bishop Place | | | |
| Property: | 9241 Bishop Pl | | | |
| | Westminster , CA 92683 | | | |

Operator:    ASCONINC

| | | | | |
|---|---|---|---|---|
| Estimator: | Octavian Petrut | | Business: | (714) 235-8486 |
| Company: | A's Contractor Inc. | | E-mail: | octavian@ascontractorinc.com |
| Business: | 2440 N Glassell St, Unit T | | | |
| | Orange, CA 92865 | | | |

| | | | |
|---|---|---|---|
| Type of Estimate: | Fire | | |
| Date Entered: | 6/29/2020 | Date Assigned: | |

| | |
|---|---|
| Price List: | CAOG8X_APR20 |
| Labor Efficiency: | Restoration/Service/Remodel |
| Estimate: | 2019-08-25-1819 |

Please note that this estimate is based on an on-site inspection and unit pricing. The estimate total price represents an amount for the project in its entirely. Any deletions or deviations from the following scope of repairs could change the line item costs. This will result in an adjustment to the total amount.

**Access to the property**

Property owner will provide access to the property at all times for the purpose of repairing the damage and inspections as necessary until the project is complete.

**Matching Problems:**

Some repairs in this estimate assume the possibility of matching an existing material or color. We will proceed under the assumption a match can be achieved. If a satisfactory match cannot be achieved, the adjuster will be notified for further consideration.

**Non-Conformity:**

The presentation of this estimate for repairs does not constitute a guarantee by the contractor that a permit may be obtained to complete the repairs as stated due to possible non-conforming conditions that might exist in this property other than what is specified in this estimate.

**Hidden Damage:**

This estimate makes no provisions for repairs to additional damage, hidden or visible, that might exist in this property other than what is specified in this estimate.

**Rot or Termite:**

This estimate does not include repairs beyond the scope listed for additional work possibly required due to termite or rot damage. Such repairs can be complete under a signed Change Order.

 **A's Contractor Inc.**

License# 936193

**Stop Work:**

Due to the nature of construction, some damage may not be apparent before the removal of materials. The contractor reserves the right to identify repairs not specifically outlined herein and stop work until financial considerations/terms are agreed for the necessary repairs.

**CODE UPGRADES:**

ADDITIONAL WORK REQUIRED BY THE DEPARTMENT OF BUILDING AND SAFETY TO MEET CURRENT BUILDING CODES WILL BE SUBMITTED AS SUPPLEMENTAL TO THIS BID.

**HAZARDOUS MATERIALS:**

REMOVAL OF HAZARDOUS MATERIALS, INCLUDING LEAD, ASBESTOS, AND MOLD WILL REQUIRE A LICENSED "SPECIALTY" CONTRACTOR IN COMPLIANCE WITH CITY AND STATE REFULATORY AGENCIES.

**WEATHER CONDITIONS:**

ADDITIONAL DAMAGES DUE TO WEATHER CONDITIONS IS NOT INCLUDED IN THE SCOPE. ANY ADDITIONAL DAMAGES WILL REQUIRE A RE-INSPECTION AND FOLLOWED BY A SUPPLEMENTAL BID TO BE BILLED AS SUCH.



**A's Contractor Inc.**

**Contractor Inc.** License# 936193

**2019-08-25-1819**

## GENERAL

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 1. Taxes, insurance, permits & fees (Bid Item) | 1.00 EA | | | | | INCURRED |
| 2. Independed Inspections | 1.00 EA | 0.00 | 3,000.00 | 0.00 | 600.00 | 3,600.00 |
| 3. Commercial Supervision / Project Management - per hour | 400.00 HR | 0.00 | 75.20 | 0.00 | 6,016.00 | 36,096.00 |
| 4. General Laborer - per hour | 864.00 HR | 0.00 | 40.79 | 0.00 | 7,048.52 | 42,291.08 |
| Needed for keeping the jobsite clean | | | | | | |
| 5. Cleaning Technician - per hour | 640.00 HR | 0.00 | 44.58 | 0.00 | 5,706.24 | 34,237.44 |
| *Concrete tilt-up walls* | | | | | | |
| 6. Epoxy injection - concrete repair (per LF of crack) | 500.00 LF | 0.00 | 35.07 | 65.10 | 3,520.02 | 21,120.12 |
| Repair tilt-up concrete walls | | | | | | |
| 7. Dumpster load - Approx. 12 yards, 1-3 tons of debris | 9.00 EA | 443.00 | 0.00 | 0.00 | 797.40 | 4,784.40 |
| 8. General Demolition - per hour | 800.00 HR | 46.37 | 0.00 | 0.00 | 7,419.20 | 44,515.20 |
| **FRAMING** | | | | | | |
| 9. Framing & Rough Carpentry (Bid Item) | 1.00 EA | 0.00 | 200,000.00 | 0.00 | 40,000.00 | 240,000.00 |
| Framing Sub-bid Including materials and labor | | | | | | |
| **STEEL** | | | | | | |
| 10. Steel Components (Bid Item) | 1.00 EA | 0.00 | 80,000.00 | 0.00 | 16,000.00 | 96,000.00 |
| Sub-bid for replacing all the compromised steel beams and columns in 9241 & 9245 | | | | | | |
| **ROOF** | | | | | | |
| 11. Roofing (Bid Item) | 1.00 EA | 0.00 | 150,000.00 | 0.00 | 30,000.00 | 180,000.00 |
| **HVAC** | | | | | | |
| 12. Heat, Vent, & Air Conditioning (Bid Item) | 1.00 EA | 0.00 | 220,000.00 | 0.00 | 44,000.00 | 264,000.00 |
| **ELECTRICAL** | | | | | | |
| 13. Electrical (Bid Item) | 1.00 EA | 0.00 | 97,000.00 | 0.00 | 19,400.00 | 116,400.00 |
| **PLUMBING** | | | | | | |
| 14. Plumbing (Bid Item) | 1.00 EA | 0.00 | 39,000.00 | 0.00 | 7,800.00 | 46,800.00 |
| Repair all damaged plumbing | | | | | | |
| **STOREFRONT** | | | | | | |
| 15. Glass, Glazing, & Storefronts (Bid Item) | 1.00 EA | 0.00 | 66,000.00 | 0.00 | 13,200.00 | 79,200.00 |
| **ROLL-UP DOORS** | | | | | | |



## A's Contractor Inc.

License# 936193

### CONTINUED - GENERAL

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 16.  Doors (Bid Item) | 1.00 EA | 0.00 | 39,000.00 | 0.00 | 7,800.00 | 46,800.00 |
| *TI Offices* | | | | | | |
| 17.  (TI bid) repair to fire damaged units | 1.00 EA | 0.00 | 278,000.00 | 0.00 | 55,600.00 | 333,600.00 |

Sub-bid for all office TI work.
Portion walls and t-bar ceiling as needed for repair, Drywall complete, Paint complete, Plumbing fixture and repair as needed for repair, Flooring complete in fire damaged units, Finished carpentry as needed for the fire damaged units, electrical and fixtures as needed for fire damaged units.

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals:  GENERAL | | | | 65.10 | 264,907.38 | 1,589,444.24 |
| **Line Item Totals: 2019-08-25-1819** | | | | **65.10** | **264,907.38** | **1,589,444.24** |



## A's Contractor Inc.

License# 936193

## Summary

| | |
|---|---:|
| Line Item Total | 1,324,471.76 |
| Material Sales Tax | 65.10 |
| | |
| Subtotal | 1,324,536.86 |
| Overhead | 132,453.69 |
| Profit | 132,453.69 |
| | |
| **Replacement Cost Value** | **$1,589,444.24** |
| **Net Claim** | **$1,589,444.24** |

Octavian Petrut

2019-08-25-1819



June 19, 2020

**9241 Bishop Place Fire Rebuild**

Attention: Mimi Nguyen
9241 Bishop Place
Westminster CA 92683

We are pleased that you are considering our company for the reconstruction of your building.  Our company is a perfect fit for the size and scope of this job.

CRM Inc. was established in 1969 and we have been contracting without interruption for the past fifty-one years.  While much has changed, what remains the same is our commitment to client satisfaction.  We are dedicated to providing quality service, cost effective solutions and a no-nonsense approach to each project.

Some of our strengths:
- Communication, can always be reached through the office or cell phone
- Financially sound
- Excellent employees and superintendents
- Years of relationships with our subcontractors
- Stay on schedule, within budget
- Excellent safety record (no OSHA citations or Workman's Compensation Claims)
- Problem solvers, provide solutions
- Integrity – reputation

Our company motto, "pride is our foundation" applies to every job, whether small in size or a multi-million dollar project.  Our longevity in business comes from operating under the basic principles of honesty, communication, planning and pride of workmanship. The utmost care is taken on every project.

We look forward to the opportunity of working with all parties involved.

If you have any questions, please give me a call.

Thank you,

Gary Tracy

5353 E. Second Street, Suite 202 Long Beach, Ca 90803 • (714)-921-3030 • (800)-501-8676
www.teamcrminc.com • License #310970



June 19, 2020

**9241 Bishop Place Fire Rebuild**

Attention: Mimi Nguyen
9241 Bishop Place
Westminster CA 92683

Reference:    Restoration of burned facilities to match exiting

***Proposal of Work***

Thank you for the opportunity to present this budget proposal. CRM Construction will furnish supervision, labor, equipment, and material for the following scope of work:

Area Preparation / Protection / Temp Services / Demo:
- Protect surrounding areas as required during construction.
- Temporary toilets for construction trades.
- Install temporary support for electrical utilities to demo and Construction.
- Demo as required for new layout per plans.
- Demo concrete walkway at entry.

Concrete / Concrete Tilt-up Panels:
- Pad footings along grid line 2, 3, and 4 to remain.
- Construct new continuous footing per plan using 3,000 PSI concrete.
- Pour 6" thick foundation slab on grade with reinforcing #4 rebar at 16" o.c.e.w. using 3,000 PSI concrete (Not included on plans, but in order to do the panels our suggestion is to remove and replace the slab).
- Install 6" concrete tilt-up panels with openings as shown on plans using 4,000 PSI concrete.
- Caulking of panel joints.
- Welding of panel connections.
- Patching and sacking as necessary.
- Apply Drypak under columns.
- Install 15 mil. Visqueen under building slab at office area.
- Engineering and erection of precast panels.
- Apply 4,000 PSI grout between top of footing and bottom of panels.
- Epoxy dowel into existing slab.



**GENERAL CONTRACTORS**
Lic. No 310970
EST. 1969

***Page-2 Bishop Rebuild***

Structural Steel:
- Install; (26) P1 6"x6"x1/2"x16' columns per SD1 Detail 4.
- Install (4) HSS 8"x8"x1/2"x17' columns per S-2 Detail 4 and S-6 Details.
- Install (9) W12x26x32' roof framing at Line 1-2 per SD-5 Detail 3.
- Install (9) W12x26x33' roof framing at Line 2-3 per S-3 Detail 8.
- Install (9) W12x26x31' roof framing at Line 3-4 per S-3 Detail 8.
- Install (9) steel plates to concrete panel per SD-5 Detail 3
- Install 81 LF of steel angle ledger per plan.
- Install 96 LF of angle iron ledger per SD-4 Detail 4.

Wood Framing (Roof Structure / Mezzanine / Wrap beams):
- All wood Framing per roof plan including front entry and skylights.
- All wood framing and stairs for mezzanine.
- Install wood cladding at entry steel columns.

Roofing:
- Install 19,000 SF new roofing including parapet walls.
  - #75 fiberglass base sheet.
  - Install Title 24 cap with additional plies at drains, valleys, and flashings.
- Install 2,300 SF of Standard concrete tile
  - Edge metal.
  - Sharkskin Ultra underlayment.
- Install (16) skylights including fall protection
- Install 600 LF of 24-gauge, galvanized coping metal

Walls / Hardlid Ceilings:
- Install 81 LF of skim coat to repair existing demising wall at lease space 103.
- Install 253 LF of wall type 3 new interior partition to match existing.
- Install 24 LF of wall type 2 new interior furred wall FH partition.
- Upgrade 89 LF water resistant board at "wet" areas.
- Allowance (1) man with (2) man days for patching and repairing of existing in new construction areas and as needed in existing suites.
- Install wall Type 2 new partition at demising wall to the underside mezzanine.
- Install 2139 SF of gyp board ceiling at Suite 100, 101, 102 gyp board ceiling SF.
- Install 89 LF of soffit drop for transitions of ceiling heights at Suite 102.
- Install 183 LF of gypsum board hard lid ceiling in new restrooms.
- Install 132 LF of gypsum board hard lid ceiling in new janitor's closets.
- Allowance of 75 LF for new 6" flat strap backing throughout as needed.
- Install 194 LF of new demising partition at the mezzanine.
- Install 17 LF new interior partition to match existing at mezzanine.

**GENERAL CONTRACTORS**
Lic. No 310970
EST. 1969

### Page-3 Bishop Rebuild

T-bar Ceilings:
- Install 2,200 SF of T-bar ceiling using 15/16" grid and 2'x4' USG Radar ceiling tiles.

Insulation:
- Install R-38 at underdeck of roof above conditioned space areas.
- Install foil skim at exposed deck areas without air.
- Install R-13 insulation in all new walls.

HVAC:
- Install (3) Carrier rooftop package units. (2) 10-ton units and (1) 12.5-ton unit
- Install (3) 11" KD roof curb
- Install (3) down discharge economizers
- Install new ductwork and registers as per design
- Install supply and return air registers per plan design
- Provide certified air balance test
- Provide 2-year PM service

Electrical:
Unit A:
- Distribution
  o Install (1) 2" conduit with (4) #3 and (1) #6 ground from meter main to new panel
  o Install Panel A: 200-amp, main lug, 120-208 volt, 3-phase, 4-wire, 42 circuit panel with bolt-on breakers
  o Install (1) 60-amp, 3-phase, weatherproof disconnect on roof for HP 12 A
  o Install (1) 40-amp, 120-volt water heater
- Convenient Power
  o Install (22) duplex receptacles
  o Install (2) GFI receptacles
  o Install (1) sign and switch
  o Install (1) exhaust fan
- Lighting
  o Install (7) 1 x 8 LED fluorescent fixtures
  o Install (2) 1 x 4 LED fluorescent fixtures
  o Install (15) 4" LED recess down lights
  o Install (3) exit signs
  o Install (5) dimmers
  o Install (2) switch sensors
  o Install (2) switches

**GENERAL CONTRACTORS**
Lic. No 310970
EST. 1969

*Page-4 Bishop Rebuild*

- Title 24
  - o Install (1) lighting control box with California approved 7-day, 24-hour digital time clock
  - o Install (1) 2-hour low voltage override switch
  - o Install (1) 12 x 12 x 6 "J" box for relay
  - o Install (1) 4-pole lighting contractors

Unit B:

- Distribution
  - o Install (1) 2" conduit with (4) #3 and (1) #6 ground from meter main to new panel
  - o Install Panel B: 200-amp, main lug, 120-208 volt, 3-phase, 4-wire, 42 circuit panel with bolt-on breakers
  - o Install (1) 60-amp, 3-phase, weatherproof disconnect on roof for HP 12 A
  - o Install (1) 40-amp, 120-volt water heater
- Convenient Power
  - o Install (28) duplex receptacles
  - o Install (2) GFI receptacles
  - o Install (1) sign and switch
  - o Install (1) exhaust fan
- Lighting
  - o Install (4) 1 x 8 LED fluorescent fixtures
  - o Install (7) 1 x 4 LED fluorescent fixtures
  - o Install (2) 1 x 4 LED surface mount
  - o Install (18) 4" LED recess down lights
  - o Install (4) exit signs
  - o Install (9) dimmers
  - o Install (2) switch sensors
  - o Install (2) switches
- Title 24
  - o Install (1) lighting control box with California approved 7-day, 24-hour digital time clock
  - o Install (1) 2-hour low voltage override switch
  - o Install (1) 12 x 12 x 6 "J" box for relay
  - o Install (1) 4-pole lighting contractors

Unit C:

- Distribution
  - o Install (1) 2" conduit with (4) #3 and (1) #6 ground from meter main to new panel
  - o Install Panel C: 200-amp, main lug, 120-208 volt, 3-phase, 4-wire, 42 circuit panel with bolt-on breakers
  - o Install (1) 100-amp circuit breaker for Panel C

**GENERAL CONTRACTORS**
Lic. No 310970
EST. 1969

*Page-5 Bishop Rebuild*

- o  Install (1) 1 ½" conduit with (4) #1 and (1) #8 ground from Panel C to new Panel D
- o  Install Panel D: 100-amp main lug, 3-phase, 4-wire, 120-208 volt, 30 circuit panel with bolt-on breakers
- o  Install (1) 60-amp, 3-phase, weatherproof disconnect on roof for HP 12 A
- o  Install (1) 40-amp, 120-volt water heater
- • <u>Convenient Power</u>
  - o  Install (23) duplex receptacles
  - o  Install (2) GFI receptacles
  - o  Install (1) sign and switch
  - o  Install (1) exhaust fan
- • <u>Lighting</u>
  - o  Install (21) 2 x 4 LED fluorescent fixtures
  - o  Install (1) 1 x 4 LED fluorescent fixtures
  - o  Install (9) 4" LED recess down lights
  - o  Install (2) exit signs
  - o  Install (7) dimmers
  - o  Install (2) switch sensors
  - o  Install (2) switches
- • <u>Title 24</u>
  - o  Install (1) lighting control box with California approved 7-day, 24-hour digital time clock
  - o  Install (1) 2-hour low voltage override switch
  - o  Install (1) 12 x 12 x 6 "J" box for relay
  - o  Install (1) 4-pole lighting contractor

<u>Plumbing:</u>
- • Tie into 1 ½" water line approximately 20 feet from restroom
- • Distribute 1 ½" and 1" water to (3) units per plan
- • Drop 1" cold water to restroom and water heater per plan
- • Connect hot and cold water to fixtures
- • Tie into sewer and distribute to each restroom
- • Supply and install (1) toilet, (1) lavatory, and (1) mop sink in each restroom and mop closet.
- • Install (2) ¾" condensation drain lines from roof top units to terminate at lavatory
- • Install (owner supplied) water meters at each unit

<u>Restrooms:</u>
- • Install mirror, toilet paper dispenser, paper towel dispenser, grab bars, waste basket, soap dispenser, and ADA Restroom signage.

**GENERAL CONTRACTORS**
Lic. No 310970
EST. 1969

***Page-6 Bishop Rebuild***

Painting:
- Prime and paint all new areas including exterior and interior work.

Roll-up Doors:
- Install (4) 10' x10' Roll-up doors using 2500 series door with a hand chain operator.
- Test for normal operation.

Doors and Windows:
Door (4) Type "6" Exterior man doors (4 Openings)
Each opening will receive the following:
- (1) NR 3-0 X 7-0 X 18GA hollow metal door
- (1) NR 3-0 X 7-0 X 16GA welded hollow metal frame
- (3) Hinge BB31 4.5" X 4.5" NRP
- (1) Lock Astragal #5000
- (1) Closer 8501 X BF
- (1) Smoke seal S88BL X 17'
- (1) Door sweep with drip 345AV X 36"
- (1) Threshold 271A X 36" at exterior with caulking
- (1)  Rain drip cap 346C X 40"
- (1) Floor stop 1440
Door (2) Type "3" pair openings at storage room (2 Openings)
Each opening will receive the following:
- (2) NR 3-0 X 7-0 X 1 ¾" SC paint grade hardboard doors
- (1) NR 6-0 X 7-0 X 5" Alumatone Timely frame
- (6) Hinge BB31 4.5" X 4.5"
- (1) Storeroom lockset Genesys series Grade 1
- (2) Manual flush bolts 1555
- (1) T Astragal 355CV X 84"
- (1) Dust proof strike 1570
- (2) Floor stop 1440
- (2) Silencers Timely TA-5
Door (2) type "3" pair openings at warehouse with side-lites (2 Openings)
Each opening will receive the following:
- (2) NR 2-6 X 7-0 X 1 ¾" SC paint grade hardboard doors
- (1) NR 5-0 X 7-0 X 5" Alumatone Timely frame with 1-0 X 7-0 side-lite
- (6) Hinge BB31 4.5" X 4.5"
- (1) Entry lockset Genesys series Grade 1
- (1) Auto flush bolt 842 X #80 strike



*Page-7 Bishop Rebuild*

- (1) Coordinator 2021 X 72"
- (1) T Astragal 355CV X 84"
- (1) Floor stop 1440
- (2) Clear tempered side-lite glass 11" X 83" X ¼"
- (2) Silencers Timely TA-5

Door (3) type "3" openings at restrooms (3 Openings)
Each opening will receive the following:

- (1) NR 3-0 X 7-0 X 1 ¾" SC paint grade hardboard door
- (1) NR 3-0 X 7-0 X 5" Alumatone Timely frame
- (3) Hinge BB31 4.5" X 4.5"
- (1) Privacy lockset Genesys series Grade 1
- (1) Kick plate #90 10" X 34"
- (1) Wall stop 1407
- (3) Silencers Timely TA-5

Door (3) type "3" openings at janitor rooms (3 Openings)
Each opening will receive the following:

- (1) NR 3-0 X 7-0 X 1 ¾" SC paint grade hardboard door
- (1) NR 3-0 X 7-0 X 5" Alumatone Timely frame
- (3) Hinge BB31 4.5" X 4.5"
- (1) Storeroom lockset Genesys series Grade 1
- (1) Kick plate #90 10" X 34"
- (1) Floor stop 1440
- (3) Silencers Timely TA-5

Door (1) type "3" openings at storage (1 Opening)
Each opening will receive the following:

- (1) NR 3-0 X 7-0 X 1 ¾" SC paint grade hardboard door
- (1) NR 3-0 X 7-0 X 5" Alumatone Timely frame
- (3) Hinge BB31 4.5" X 4.5"
- (1) Storeroom lockset Genesys series Grade 1
- (1) Floor stop 1440
- (3) Silencers Timely TA-5

Door (2) type "4" pair openings at storage room  (2 Openings)
Each opening will receive the following:

- (2) NR 2-0 X 7-0 X 1 ¾" SC paint grade hardboard doors
- (1) NR 4-0 X 7-0 X 5" Alumatone Timely frame
- (6) Hinge BB31 4.5" X 4.5"
- (1) Storeroom lockset Genesys series Grade 1
- (2) Manual flush bolt 1555
- (1) T Astragal 355CV X 84"

*Page-8 Bishop Rebuild*

- (1) Dust proof strike 1570
- (2) Floor stop 1440
- (2) Silencers Timely TA-5

Window frames type 1.0 (2) with ¼" clear tempered glass
Each opening will receive the following:

- (1) Clear tempered glass 35 ¾" X 35 ¾" X ¼
- (1) Labor to install borrowed lites
- (1) Glazing tape

Storefront:
- Install (2) 120"x108" Storefronts with 84"x84" pair of storefront doors to match existing.
- Install (1) 120"x196" Storefront with 84"x84" pair of storefront doors to match existing.
  - Framing: 2" x 4-1/2"
  - Center glazed
  - Clear anodized finish
  - 1" IGU—1/4" SB90 on clear #2, ½" air fill, ¼" clear.

Flooring:
- Install tile flooring, LVT flooring, carpet and wall tile per plan finish schedule (Allowances of $4.00 per SF are included in pricing for Tile and LVT).

ADA Parking Upgrades / Path of Travel Entry: ($12,000.00 Allowance is included / This is not on plans but will be required)
- Layout and demo as required for ADA path of travel entry.
- Form, pour, and finish new concrete walkway at front of building to new ADA stalls with proper slope.
- Restripe parking area for van accessible parking stalls.
- Install Van Accessible Parking sign.
- Install truncated domes as required at entry to parking area.
  - ✓ Landscaping and irrigation alterations to be completed by other and are not included in this proposal.

Signage:
- Install Black ADA Tactile signage as required.

Cleaning:
- Daily housekeeping.
- Clean-up and haul away debris resulting from above.



***Page-9 Bishop Rebuild***

Miscellaneous:
- Patch back asphalt at perimeter of building as required per removal to install footing.
- Dump Fees.
- Trucking.
- Rental Equipment
- Project management, supervision and labor.

**Cost for Above:** **$1,456,620.00**

**Notes:**
1. CRM Construction Inc. will procure permits from the City of Westminster and be reimbursed by the customer at cost.
2. Above pricing does not include any trades other than what is expressed in above scope of work.
3. Third party testing, soils engineering and / or special inspections will be charged at cost to owner.

If you have any questions or require further clarification, please do not hesitate to call.

Thank you,

Gary Tracy



*Page-10 Bishop Rebuild*

### *Budget Breakdown*

| | |
|---|---|
| Area Preparation / Portable Toilets | $12,400.00 |
| Demo | $68,750.00 |
| Walls / Hardlid Ceilings | $73,750.00 |
| Wall Insulation | $8,450.00 |
| Underdeck Insulation / Foil | $7,150.00 |
| HVAC / Mechanical | $105,625.00 |
| Electrical / Lighting | $87,500.00 |
| Plumbing | $39,750.00 |
| Concrete (Structural / Wall Panels | $312,500.00 |
| Wood Framing (Roof / Façade/ Mezzanine) | $105,000.00 |
| Roofing | $133,125.00 |
| Restroom Accessories | $4,680.00 |
| T-bar Ceilings | $7,540.00 |
| Structural Steel | $136,125.00 |
| Flooring / Tile / Wall Tile | $48,000.00 |
| Painting | $39,000.00 |
| Roll-up Doors | $17,500.00 |
| Doors and Windows | $21,875.00 |
| Storefront | $39,000.00 |
| ADA Parking / Path of Travel / Ramps | $11,960.00 |
| ADA Tactile Signage | $390.00 |
| Site Services (Landscaping / Asphalt) | $5,200.00 |
| Lift / Rental Equipment | $5,200.00 |
| Clean-up and haul away | $12,400.00 |
| General Labor | $24,800.00 |
| Project Management / Supervision | $46,500.00 |
| Fire Alarm / Fire Sprinklers | NIC |
| **Sub Total:** | **$1,374,170.00** |
| Insurance | $13,741.50 |
| Overhead | $68,708.50 |
| Total Project Cost | $1,456,620.00 |

**CRM CONSTRUCTION INC**
GENERAL CONTRACTORS
Lic. No 310970
EST. 1969

# R D. Construction Co.

**629 S.E. Jonathon ave,**
**Lees Summit. Mo 64063**
**License # 502953**

**Since 1988**
**A-Engineering Contractor**
**B-General Contractor**
**C-42 Pipeline Contractor**
**HIC License**
**951-818-2414**

**Project: Skall Investment**
          **15170  Golden West Circle**
          **Westminster, Calif.**

**Architect:  Pretty Smart**
            **4117 E. 4st.**
            **Long Beach, Calif,**

| Project Address | Lot# | Census Tract | Lot Size |
|---|---|---|---|
| Tract# 4249 | 11 | 4249 | 37,103 |

| Lot coverage | Lot Coverage | Height |
|---|---|---|
| 15,550, | 42% | 20 Ft. 4-1/2 |

**Scope of work:**
**Repair and Reconstruct Damaged Units from**
**building fire.  New construction for Facade and**
**Mezzanine, Restrooms and Roof.**

Double-click to add header

| | | |
|---|---|---|
| Construction Yard- Security- Sanitation | $ | 15,500.00 |
| Demolition  Removals of Dubre | $ | 85,937.00 |
| Rental of equipment- Cranes, scissor lifts Scaffolding | $ | 6,500.00 |
| HVAC- Air-conditioning And Heat | $ | 132,031.00 |
| Ceiling/walls | $ | 92,187.00 |
| Insulation of walls | $ | 10,562.00 |
| Warehouse Insulation- foil | $ | 8,937.00 |
| Concrete Panel Walls- Crane Walls | $ | 390,625.00 |
| Framing- Wood | $ | 131,250.00 |
| Plumbing-excluding fire sprinkler system | $ | 49,687.00 |
| Electrical including lighting | $ | 109,375.00 |
| T-Bar ceiling in office area | $ | 9,425.00 |
| Restrooms | $ | 5,850.00 |
| Roofing | $ | 166,406.00 |
| Structural Steel and Supports And Certified Welding | $ | 170,156.00 |
| Storefront With Mezzanine | $ | 48,750.00 |
| Roll-up doors | $ | 21,875.00 |
| Storefront Windows and Doors (fire Rated) | $ | 27,343.00 |
| Decretive Floor and wall Tile | $ | 60,150.00 |
| Painting interior and exterior | $ | 48,750.00 |
| ADA Parking- Signage | $ | 16,400.00 |
| Landscaping | $ | 4,200.00 |
| Asphalt  Slurry Coat | $ | 5,600.00 |
| Clean-up and Detail Cleaning Haul away | $ | 31,200.00 |
| General Labor | $ | 35,000.00 |
| Project Managers Onsite | $ | 58,125.00 |
| Insurance G/L | $ | 17,176.00 |
| Overhead and Profit | $ | 85,885.00 |
| Total | $ | 1,844,882.00 |
| | | |
| alternate Price fire Sprinkler system | $ | 345,000.00 |

# EXHIBIT 4



## A's Contractor Inc.

License# 936193

| | |
|---|---|
| Client: | Bishop Place |
| Property: | 9241 Bishop Pl |
| | Westminster , CA 92683 |
| | |
| Operator: | ASCONINC |

| | | | |
|---|---|---|---|
| Estimator: | Octavian Petrut | Business: | (714) 235-8486 |
| Company: | A's Contractor Inc. | E-mail: | octavian@ascontractorinc. |
| Business: | 2440 N Glassell St, Unit T | | com |
| | Orange, CA 92865 | | |

| | | | |
|---|---|---|---|
| Type of Estimate: | Fire | | |
| Date Entered: | 6/17/2021 | Date Assigned: | |

| | |
|---|---|
| Price List: | CAOG8X_JUN21 |
| Labor Efficiency: | Restoration/Service/Remodel |
| Estimate: | 2019-08-25-1819 |

Please note that this estimate is based on an on-site inspection and unit pricing. The estimate total price represents an amount for the project in its entirely.  Any deletions or deviations from the following scope of repairs could change the line item costs.  This will result in an adjustment to the total amount.

**Access to the property**

Property owner will provide access to the property at all times for the purpose of repairing the damage and inspections as necessary until the project is complete.

**Matching Problems:**

Some repairs in this estimate assume the possibility of matching an existing material or color.  We will proceed under the assumption a match can be achieved.  If a satisfactory match cannot be achieved, the adjuster will be notified for further consideration.

**Non-Conformity:**

The presentation of this estimate for repairs does not constitute a guarantee by the contractor that a permit may be obtained to complete the repairs as stated due to possible non-conforming conditions that might exist in this property other than what is specified in this estimate.

**Hidden Damage:**

This estimate makes no provisions for repairs to additional damage, hidden or visible, that might exist in this property other than what is specified in this estimate.

**Rot or Termite:**

This estimate does not include repairs beyond the scope listed for additional work possibly required due to termite or rot damage.  Such repairs can be complete under a signed Change Order.



## A's Contractor Inc.

License# 936193

**Stop Work:**

Due to the nature of construction, some damage may not be apparent before the removal of materials. The contractor reserves the right to identify repairs not specifically outlined herein and stop work until financial considerations/terms are agreed for the necessary repairs.

### CODE UPGRADES:

ADDITIONAL WORK REQUIRED BY THE DEPARTMENT OF BUILDING AND SAFETY TO MEET CURRENT BUILDING CODES WILL BE SUBMITTED AS SUPPLEMENTAL TO THIS BID.

### HAZARDOUS MATERIALS:

REMOVAL OF HAZARDOUS MATERIALS, INCLUDING LEAD, ASBESTOS, AND MOLD WILL REQUIRE A LICENSED "SPECIALTY" CONTRACTOR IN COMPLIANCE WITH CITY AND STATE REFULATORY AGENCIES.

### WEATHER CONDITIONS:

ADDITIONAL DAMAGES DUE TO WEATHER CONDITIONS IS NOT INCLUDED IN THE SCOPE. ANY ADDITIONAL DAMAGES WILL REQUIRE A RE-INSPECTION AND FOLLOWED BY A SUPPLEMENTAL BID TO BE BILLED AS SUCH.

 **A's Contractor Inc.**

License# 936193

**2019-08-25-1819**

## GENERAL

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 1. Taxes, insurance, permits & fees (Bid Item) | 1.00 EA | | | | | INCURRED |
| 2. Independed Inspections | 1.00 EA | 0.00 | 3,000.00 | 0.00 | 600.00 | 3,600.00 |
| 3. Commercial Supervision / Project Management - per hour | 400.00 HR | 0.00 | 80.00 | 0.00 | 6,400.00 | 38,400.00 |
| 4. General Laborer - per hour | 864.00 HR | 0.00 | 44.82 | 0.00 | 7,744.90 | 46,469.38 |
| Needed for keeping the jobsite clean | | | | | | |
| 5. Cleaning Technician - per hour | 640.00 HR | 0.00 | 47.20 | 0.00 | 6,041.60 | 36,249.60 |
| *Concrete tilt-up walls* | | | | | | |
| 22. Masonry (Bid Item) | 1.00 EA | 0.00 | 420,000.00 | 0.00 | 84,000.00 | 504,000.00 |
| Replace front and left damaged section of tilt-up wall | | | | | | |
| 6. Epoxy injection - concrete repair (per LF of crack) | 300.00 LF | 0.00 | 41.54 | 39.06 | 2,500.22 | 15,001.28 |
| Repair remaining tilt-up concrete wall to remain. | | | | | | |
| 7. Dumpster load - Approx. 12 yards, 1-3 tons of debris | 9.00 EA | 443.00 | 0.00 | 0.00 | 797.40 | 4,784.40 |
| 8. General Demolition - per hour | 800.00 HR | 55.67 | 0.00 | 0.00 | 8,907.20 | 53,443.20 |
| **FRAMING** | | | | | | |
| 9. Framing & Rough Carpentry (Bid Item) | 1.00 EA | 0.00 | 345,000.00 | 0.00 | 69,000.00 | 414,000.00 |
| Framing Sub-bid Including materials and labor | | | | | | |
| **STEEL** | | | | | | |
| 10. Steel Components (Bid Item) | 1.00 EA | 0.00 | 98,000.00 | 0.00 | 19,600.00 | 117,600.00 |
| Sub-bid for replacing all the compromised steel beams and columns in 9241 & 9245 | | | | | | |
| **ROOF** | | | | | | |
| 11. Roofing (Bid Item) | 1.00 EA | 0.00 | 280,000.00 | 0.00 | 56,000.00 | 336,000.00 |
| Sub-bid for the entire roof. | | | | | | |
| **HVAC** | | | | | | |
| 12. Heat, Vent, & Air Conditioning (Bid Item) | 1.00 EA | 0.00 | 220,000.00 | 0.00 | 44,000.00 | 264,000.00 |
| **ELECTRICAL** | | | | | | |
| 13. Electrical (Bid Item) | 1.00 EA | 0.00 | 125,000.00 | 0.00 | 25,000.00 | 150,000.00 |
| **PLUMBING** | | | | | | |
| 14. Plumbing (Bid Item) | 1.00 EA | 0.00 | 48,000.00 | 0.00 | 9,600.00 | 57,600.00 |
| Repair all damaged plumbing | | | | | | |



**A's Contractor Inc.**

License# 936193

## CONTINUED - GENERAL

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **STOREFRONT** | | | | | | |
| 15. Glass, Glazing, & Storefronts (Bid Item) | 1.00 EA | 0.00 | 86,000.00 | 0.00 | 17,200.00 | 103,200.00 |
| **ROLL-UP DOORS** | | | | | | |
| 16. Doors (Bid Item) | 1.00 EA | 0.00 | 39,000.00 | 0.00 | 7,800.00 | 46,800.00 |
| *TI Offices* | | | | | | |
| 17. (TI bid) repair to fire damaged units | 1.00 EA | 0.00 | 457,000.00 | 0.00 | 91,400.00 | 548,400.00 |

Sub-bid for all office TI work.
Portion walls and t-bar ceiling as needed for repair, Drywall complete, Paint complete, Plumbing fixture and repair as needed for repair, Flooring complete in fire damaged units, Finished carpentry as needed for the fire damaged units, electrical and fixtures as needed for fire damaged units.

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals: GENERAL | | | | 39.06 | 456,591.32 | 2,739,547.86 |
| **Line Item Totals: 2019-08-25-1819** | | | | **39.06** | **456,591.32** | **2,739,547.86** |



## A's Contractor Inc.

License# 936193

## Summary

| | |
|---|---|
| Line Item Total | 2,282,917.48 |
| Material Sales Tax | 39.06 |
| | |
| Subtotal | 2,282,956.54 |
| Overhead | 228,295.66 |
| Profit | 228,295.66 |
| | |
| **Replacement Cost Value** | **$2,739,547.86** |
| **Net Claim** | **$2,739,547.86** |

Octavian Petrut

# EXHIBIT 5



February 3, 2022

Corby L. Schmautz
Executive General Adjuster – Specialty Loss Group
Engle Martin & Associates
3941 Park Drive, Suite 20
El Dorado Hills, CA 95762
Email: cschmautz@englemartin.com

| Re: | Concrete Tilt-Up Wall Panels Assessment – Third Addendum Report |
|---|---|
| File Name: | Skaii Investment LLC |
| Address: | 9241 Bishop Place, Westminster, CA 92683 |
| Claim #: | 1000259161 |
| Cause of Loss: | Fire |
| Date of Loss: | January 23, 2019 |
| J.S. Held #: | 19021205 |

Mr. Schmautz:

At your request, J.S. Held LLC (J.S. Held) was retained to examine the subject warehouse-type building located at 9241 Bishop Place in Westminster, California. The scope of our work was to determine the extent of damage related to a fire that occurred on the Date of Loss. The fire affected the structural framing (mainly roof steel H-beams) in the middle section of Unit 9241 roof.

J.S. Held performed the first site visit on March 7, 2019 and issued an engineering report dated April 10, 2019.  In the report, we recommended that concrete core testing be performed on the concrete tilt-up wall panels.

Once the concrete core tests were prepared, the results were provided and an addendum to our original report was prepared and issued on February 9, 2021.  The addendum report analyzed the results of the core testing of the tilt-up walls. It was concluded in the addendum report that Panel 1 of the west wall of Unit 9241 had relatively low compressive strength in comparison to the other tested panels. Hence, the fire had compromised the strength of this concrete panel and that all the other concrete tilt-up wall panels were recommended to remain in-place.

The Insured representative requested that the walls be tested again and that the cores be taken at a higher elevation on the wall panels than the initial areas tested.

Another set of concrete testing was performed and J.S. Held reviewed and analyzed the testing results. An addendum to our previous reports was prepared and issued on October 18, 2021.  The report had the same conclusions as the February 9, 2021, that all concrete tilt-up wall panels were recommended to remain in-place, except for Panel 1 of the west wall of Unit 9241.

By the end of 2021, the Insured representative requested that an additional site visit be performed to review the concrete tilt-up panels for cracking.

JS|HELD

Skaii Investment LLC [19021205]
February 3, 2022
Page 2 of 4

On December 21, 2021, a site visit was performed to review the condition of the tilt-up panels. Present at the site were:

- Mr. Nicholas Nguyen, PA for the Insured, Metropolitan Adjustment Bureau, Inc.
- Mr. Tristan Novotny, Tristan Novotny Construction Co.
- Adam Yala, P.E., Ph.D., J.S. Held

Mr. Nguyen showed us all the tilt-up panels and pointed to us any crack that he believed was caused by the fire. He wanted all the tilt-up panels to be removed and replaced.

J.S. Held documented all existing conditions and reviewed existing cracks in the tilt-up panels that were shown to us. The tilt-up panels had hairline cracks that were caused typically by concrete temperature and shrinkage, except for Panel # 1 of Unit 9241. Since the concrete tilt-up panels were open to the elements for a period of almost two years, we observed that more cracking, than previously observed, had developed in Panel #1 in Unit 9241. Reference **Figure 1** for Panel # 1 location and **Figure 2** for an elevation of the subject panel.



**Figure 1**: Plan illustrating initial core test locations with compressive test results.

**JS|HELD**

Skaii Investment LLC [19021205]
February 3, 2022
Page 3 of 4



**Figure 2**: Elevation of Panel # 1 in Unit 9241.

After careful review of Panel # 1, J.S. Held determined to remove and replace this panel. All other panels are to remain in place. Cracks in other panels were hairline cracks and were not related to the fire that occurred on the date of loss.

## CONCLUSIONS

Based on the above-referenced investigation and analysis, the following conclusions are provided to a reasonable degree of engineering certainty.

1. The existing structure that was affected by the fire on the date of loss has been open to the elements for a period of almost two years. The structure will need to be enclosed as soon as possible to prevent future damage.
2. J.S. Held observed that that more cracks, than previously observed, had developed in Panel #1 of Unit 9241. J.S. Held had determined that this panel will require removal and replacement.
3. All other tilt-up panels are to remain in place.

**[END OF REPORT]**



Skaii Investment LLC [19021205]
February 3, 2022
Page 4 of 4

**CLOSING**

Thank you for the opportunity to provide professional services. J.S. Held opinions are based on observable and/or identified site conditions. To the extent that hidden conditions exist, and/or additional information is made available. Please note that J.S. Held reserves the right to revise or update any of the observations, assessments and/or opinions as conditions change or additional information becomes available.

This document is to inure to the benefit of the addressee only and may not be relied upon, used by or referenced by any third party without the written consent of J.S. Held If clarification or additional information is required, please do not hesitate to contact us.

Respectfully,
**J.S. Held LLC**



> This item has been electronically signed and sealed by Adam Yala, P.E. using a Digital Signature. Printed copies of this document are not considered signed and sealed, and the signature must be verified on any electronic copies.

Adam A. Yala, PE, PhD.
Senior Engineer III
CA License No. PE C 83632 (Expires 3/31/23)

# EXHIBIT 6

## ⟨JS|HELD⟩ **J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| | | | |
|---|---|---|---|
| Insured: | Skaii Investment LLC | | |
| Property: | 9241 Bishop Place | | |
| | Westminster, CA 92683 | | |

| | | | |
|---|---|---|---|
| Estimator: | J.S. Held LLC | Business: | (951) 719-3223 |
| Business: | 25240 Hancock Avenue Suit 430 | | |
| | Murrieta , CA 92562 | | |

**Claim Number:** SKBP981657-001-001-001  **Policy Number:**  **Type of Loss:** Fire

| | | | |
|---|---|---|---|
| Date of Loss: | 1/23/2019 12:00 AM | Date Received: | 2/26/2019 12:00 AM |
| Date Inspected: | 2/27/2019 12:00 AM | Date Entered: | 2/27/2019 2:09 PM |

| | |
|---|---|
| Price List: | CAOG8X_JAN19 |
| | Restoration/Service/Remodel |
| Estimate: | SKAII_INVEST_LLC-R-1 |

**◉ JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

This estimate is based on a site inspection completed by Timothy Sanders and Kile Beltran on February 27, 2019 and Timothy Sanders, Adam Yala and Saif Jassam on March 7, 2019 and Tim Sanders, Andy Bersofsky on September 2,2021.  This opinion of probable cost is based on the level of detail of "as-built" conditions provided to us by site inspections.  We have not been provided any plans for this complex, nor was the demolition complete at the time of the inspection. Please not this estimate is preliminary pending a followup inspection after completion of demolition and debris removal in order to evaluate additional framing that was not visible at time of initial inspection.

General Building Description:  Large multi-space (6) commercial building with concrete tilt-up exterior walls, wood framed partition walls and combination of steel and wood ceiling joist system.  There is a panel roof system over much of the building, with a mansard style tile roof system over the lofts which are on units 9245, 9261 and 9265.

Cause of damage:  Fire/Smoke.

Scope recap:  Full gut of Unit 9241 (origin) 9245; including all framing and steel I-beams, roofing and M.E.P.s.  Partial framing and joist repairs to Unit 9251, interior finishes at the entrance and replacement of the foil insulation throughout.  The remaining units did not sustain structural damage and will be cleaned, painted and deodorized.

This opinion reflects J.S. Held's assumption of the pre-loss configuration. The pricing contemplates the use of contemporary materials of "like, kind and quality". Furthermore, this evaluation is governed by the following assumptions and exclusions.

Assumptions:
 - Access given by Property Management
 - Field Measurements
 - Information and documentation received and reviewed to date

Exclusions:
 - ACM/Lead/Mold sampling, testing, protocol, abatement or clearance
 - Code Upgrades
 - Permit fees
 - Architectural & Engineering Fee Budgets

This estimate is subject to review by the Insurance Carrier(s) per contract/policy terms and conditions.

J.S. Held recommends that all costs that are anticipated to be part of the claim are submitted for review prior to executing contracts. To the extent that repair costs proceed on a time and materials basis, we recommend that that the adjustment team monitor these repairs and that the insured keep appropriate records, sign in sheets and documentation of these repairs.

This document is prepared for the adjustment team. Reliance upon this document are for the sole use of the intended recipients. J.S. Held LLC reserves the right to change their opinion should further information become available following the preparation of this presentation.

**(((Ⓙ)))JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**SKAII_INVEST_LLC-R-1**

### General Items

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 1.  Commercial Supervision / Project Management - per hour | 400.00 HR @ | 70.00 = | 28,000.00 |
| *Included for Supervision (20) hours per week for (20) weeks.* | | | |
| 2.  Crane and operator - 30 ton capacity | 16.00 HR @ | 195.33 = | 3,125.28 |
| 3.  Telehandler/forklift and operator | 50.00 HR @ | 127.39 = | 6,369.50 |
| 4.  Scissor lift - 20' platform height (per month) | 10.00 MO @ | 860.46 = | 8,604.60 |
| This includes 2 lifts for 5 months. | | | |
| 5.  R&R Temporary fencing | 300.00 LF @ | 7.03 = | 2,109.00 |
| 6.  Temporary power usage (per month) - Commercial | 5.00 MO @ | 544.37 = | 2,721.85 |
| 7.  R&R Temporary power - overhead hookup | 1.00 EA @ | 514.44 = | 514.44 |
| 8.  Temporary toilet (per month) | 10.00 MO @ | 161.50 = | 1,615.00 |
| *(2) Temporary restrooms for (5) months.* | | | |
| 9.  General Laborer - per hour | 800.00 HR @ | 40.62 = | 32,496.00 |
| *Included for (1) General Laborer (40) hours per week for (20) weeks.* | | | |

### Demo & Shoring

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 10.  General Demolition (Bid Item) | 1.00 EA @ | 65,000.00 = | 65,000.00 |
| Allowance has been included for the demolition and debris removal. This demolition excludes asbestos abatement removal and disposal. | | | |
| 11.  Shoring for suspended concrete | SF @ | | AS INCURRED |

### Structural

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 12.  Tilt-up concrete panel, 8" thick | 432.00 SF @ | 19.02 = | 8,216.64 |
| 13.  Column - 4" pipe w/base pl./top bkt. | 283.50 LF @ | 39.76 = | 11,271.96 |
| 14.  Wide Flange Beam - 12 5/16"d. x 4"w. x 1/4"thick | 1,047.00 LF @ | 47.09 = | 49,303.23 |
| 15.  Concrete floor sawing - 6" slab | 168.00 LF @ | 14.77 = | 2,481.36 |
| Included to saw cut slab for new post footings. | | | |
| 16.  R&R Concrete pier or footing with post anchor | 21.00 EA @ | 110.89 = | 2,328.69 |
| 17.  Epoxy crack and joint filler (per LF of crack) | 250.00 LF @ | 5.86 = | 1,465.00 |
| Included to repair cracks in tilt up panels. | | | |
| 18.  Concrete patch / small repair | 25.00 EA @ | 103.30 = | 2,582.50 |
| Included for patching of slab. | | | |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**Framing**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

**WOOD FRAMING - INTERIOR DEMISING/PARTITION WALLS, MEZZANINE, ROOF, TRELLIS**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 19. Material Only 2" x 4" x 20' #2 & better Fir / Larch (material only) | 26.00 EA @ | 12.84 = | 333.84 |
| 20. Material Only 2" x 4" x 18' #2 & better Fir / Larch (material only) | 8.00 EA @ | 11.10 = | 88.80 |
| 21. Material Only 2" x 4" x 16' #2 & better Fir / Larch (material only) | 14.00 EA @ | 8.25 = | 115.50 |
| 22. Material Only 2" x 4" x 14' #2 & better Fir / Larch (material only) | 219.00 EA @ | 7.32 = | 1,603.08 |
| 23. Material Only 2" x 4" x 12' #2 & better Fir / Larch (material only) | 25.00 EA @ | 6.27 = | 156.75 |
| 24. Material Only 2" x 4" x 10' #2 & better Fir / Larch (material only) | 3.00 EA @ | 5.20 = | 15.60 |
| 25. Material Only 2" x 4" x 104 5/8" pre-cut stud (for 9' wall, mat only) | 37.00 EA @ | 4.52 = | 167.24 |
| 26. Material Only 2" x 4" x 8' #2 & better Fir / Larch (material only) | 286.00 EA @ | 4.16 = | 1,189.76 |
| 27. Material Only 2" x 4" x 92 5/8" pre-cut stud (for 8' wall, mat only) | 94.00 EA @ | 4.03 = | 378.82 |
| 28. Material Only 2" x 10" x 16' #2 & better Fir / Larch (material only) | 17.00 EA @ | 17.78 = | 302.26 |
| 29. Material Only 2" x 10" x 8' #2 & better Fir / Larch (material only) | 478.00 EA @ | 8.96 = | 4,282.88 |
| 30. Material Only 2" x 6" x 16' #2 & better Fir / Larch (material only) | 54.00 EA @ | 12.06 = | 651.24 |
| 31. Material Only Framing hanger - large | 8.00 EA @ | 5.91 = | 47.28 |
| Beam hangers | | | |
| 32. Material Only Framing hanger - large | 864.00 EA @ | 5.91 = | 5,106.24 |
| Joist hangers | | | |
| 33. Material Only Concrete anchor bolt - 5/8" x 10" | 264.00 EA @ | 2.15 = | 567.60 |
| 34. Material Only Drilled bottom plate - 2" x 4" treated lumber | 159.80 LF @ | 0.89 = | 142.22 |
| 35. Material Only Joist - floor or ceiling - 2x12 - w/blocking | 932.33 LF @ | 1.68 = | 1,566.31 |
| 36. Material Only Sheathing - plywood - 3/4" CDX | 480.00 SF @ | 1.04 = | 499.20 |
| 37. Material Only Add on for trayed, dropped or coffered ceiling | 507.00 SF @ | 0.97 = | 491.79 |
| Additional material accounted for in framing arched drop ceiling in unit 9241 (Orgin) | | | |
| 38. Material Only 8" x 8" square wood post (5.33 BF per LF) | 66.17 LF @ | 14.07 = | 931.01 |
| 39. Material Only Timber beam 4x10 | 140.50 EA @ | 13.23 = | 1,858.82 |
| 40. Material Only Framing post cap connector - 8" | 4.00 EA @ | 20.33 = | 81.32 |
| 41. Material Only Framing hanger - large | 8.00 EA @ | 5.91 = | 47.28 |
| Beam hangers | | | |
| 42. Concrete anchor bolt - 5/8" x 10" | 32.00 EA @ | 5.64 = | 180.48 |
| 43. Material Only Thru bolt - 5/8" | 16.00 EA @ | 51.39 = | 822.24 |
| 44. Carpenter - General Framer - per hour | 360.00 HR @ | 77.00 = | 27,720.00 |
| 3 framers for 8 hours a day for 15 days to frame interior demising/partition walls, floor systems/drop ceilings, and exterior trellis | | | |

**STOREFRONT FRAMING**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 45. Storefront - aluminum anodized frame - Single pane | 341.18 SF @ | 21.93 = | 7,482.08 |
| Square footage of Units 9241 + 9245 + 9251 | | | |
| 46. Storefront door - alum. anodized frame, 3'x7' -Single pane | 5.00 EA @ | 1,256.45 = | 6,282.25 |
| Doors for Units 9241 + 9245 + 9251 | | | |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

### Electrical

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 47. Commercial electrical (SF of bldg) - Average load | 7,945.52 | SF @ | 13.43 | = | 106,708.33 |
| Square footage of Units 9241 + 9245 + 9251 | | | | | |

### Heat, Vent, & Cool

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 48. Heating/Cooling syst. - packaged roof mounted unit - Comm. | 7,945.52 | SF @ | 10.11 | = | 80,329.21 |
| Square footage of Units 9241 + 9245 + 9251 | | | | | |

### Exterior Elevations

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 49. Clean with pressure/chemical spray - Heavy | 10,960.00 | SF @ | 0.46 | = | 5,041.60 |
| 50. Paint concrete the surface area | 10,960.00 | SF @ | 0.83 | = | 9,096.80 |
| 51. R&R Wedge anchor bolt - 5/8" x 8 1/2" | 270.00 | EA @ | 22.41 | = | 6,050.70 |
| Included for ledger anchor bolts. | | | | | |

### Plumbing

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 52. Rough in plumbing - per fixture | 9.00 | EA @ | 485.06 | = | 4,365.54 |
| Square footage of Units 9241 + 9245 + 9251 | | | | | |
| 53. Water heater - Commercial - 50 gallon - Gas | 1.00 | EA @ | 2,077.72 | = | 2,077.72 |
| 54. Water heater seismic strap kit - up to 55 gallon | 1.00 | EA @ | 47.01 | = | 47.01 |
| 55. Water heater overflow drain pan | 1.00 | EA @ | 41.33 | = | 41.33 |
| 56. Concrete floor sawing - 6" slab | 16.00 | LF @ | 14.77 | = | 236.32 |
| Included to saw cut around existing sewage line's to repair drain pipes. | | | | | |
| 57. Plumber - per hour | 20.00 | HR @ | 94.54 | = | 1,890.80 |
| Additional labor included to repair drain lines at concrete slab. | | | | | |

9241 (Origin)

9241 - Origin

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**9241 - Origin**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 58. Final cleaning - construction - Commercial | 2,567.11 | SF @ | 0.18 = | | 462.08 |

**Reception**                                                                  Height: 9'

| Door | 3' X 6' 8" | Opens into WAREHOUSE_GA |
|---|---|---|
| **Missing Wall - Goes to Floor** | 8' X 6' 8" | Opens into WAREHOUSE_GA |
| Window | 4' 6" X 8' 11 11/16" | Opens into Exterior |
| **Door** | 5' X 6' 8" | Opens into Exterior |
| Window | 5' X 2' 3 5/8" | Opens into Exterior |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 59. Batt insulation - 6" - R19 - paper faced | 702.44 | SF @ | 0.98 = | | 688.39 |
| 60. Batt insulation - 10" - R30 - unfaced batt | 506.66 | SF @ | 1.27 = | | 643.46 |
| 61. 5/8" drywall - hung, taped, floated, ready for paint | 1,209.10 | SF @ | 2.47 = | | 2,986.48 |
| 62. Mask and prep for paint - plastic, paper, tape (per LF) | 95.67 | LF @ | 1.21 = | | 115.76 |
| 63. Seal/prime then paint the walls and ceiling twice (3 coats) | 1,209.10 | SF @ | 1.13 = | | 1,366.28 |
| 64. Seal & paint door or window opening - Large (per side) | 1.00 | EA @ | 34.74 = | | 34.74 |
| 65. Seal & paint door slab only (per side) | 1.00 | EA @ | 33.31 = | | 33.31 |
| 66. Paneling - High grade | 702.44 | SF @ | 2.76 = | | 1,938.73 |
| Slotted wall paneling, display shelving | | | | | |
| 67. Shelving - 12" - in place | 125.40 | LF @ | 9.55 = | | 1,197.57 |
| 68. Metal support bracket - stainless steel | 1.00 | EA @ | 151.90 = | | 151.90 |
| 69. Carpet pad | 506.66 | SF @ | 0.52 = | | 263.46 |
| 70. Carpet | 582.00 | SF @ | 3.26 = | | 1,897.32 |
| 71. Interior door unit | 1.00 | EA @ | 176.39 = | | 176.39 |
| 72. Door knob - interior | 1.00 | EA @ | 45.67 = | | 45.67 |

**Warehouse/Garage**                                                           Height: 13' 6"

| Door | 3' X 6' 8" | Opens into Exterior |
|---|---|---|
| Door | 10' X 10' | Opens into Exterior |
| Door | 10' X 10' | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into RECEPTION |
| **Missing Wall - Goes to Floor** | 8' X 6' 8" | Opens into RECEPTION |
| Door | 2' 6" X 6' 8" | Opens into BATHROOM |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

**⟨JⰅⰅ⟩ JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Warehouse/Garage**

| DESCRIPTION | QTY | | | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 73. Soda blasting - Extra heavy | 2,034.62 | SF | @ | 3.25 = | 6,612.52 |
| 74. Batt insulation - 6" - R19 - paper faced | 1,440.00 | SF | @ | 0.98 = | 1,411.20 |
| 75. Foil vapor barrier - aluminum - double sided | 2,034.62 | SF | @ | 0.49 = | 996.96 |
| 76. 5/8" drywall - hung, taped, floated, ready for paint | 2,295.48 | SF | @ | 2.47 = | 5,669.84 |
| 77. Seal/prime then paint the walls twice (3 coats) | 2,295.48 | SF | @ | 1.13 = | 2,593.89 |
| 78. Seal & paint door or window opening (per side) | 2.00 | EA | @ | 27.70 = | 55.40 |
| 79. Seal & paint door slab only (per side) | 2.00 | EA | @ | 33.31 = | 66.62 |
| 80. Commercial overhead door opener - Hoist/jack-shaft type | 2.00 | EA | @ | 668.17 = | 1,336.34 |
| 81. Exterior door - metal - insulated - flush or panel style | 1.00 | EA | @ | 299.65 = | 299.65 |
| 82. Door lockset & deadbolt - exterior | 1.00 | EA | @ | 90.33 = | 90.33 |
| 83. Roll-up door & hardware - 10' x 10' - 22 gauge | 2.00 | EA | @ | 1,221.20 = | 2,442.40 |

**Bathroom** | | | | | **Height: 13' 6"**

**Door** | | **2' 6" X 6' 8"** | | **Opens into WAREHOUSE_GA**

| DESCRIPTION | QTY | | | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 84. Soda blasting - Extra heavy | 25.83 | SF | @ | 3.25 = | 83.95 |
| 85. 5/8" drywall - hung, taped, floated, ready for paint | 283.62 | SF | @ | 2.47 = | 700.54 |
| 86. Seal/prime then paint the walls and ceiling twice (3 coats) | 283.62 | SF | @ | 1.13 = | 320.49 |
| 87. Seal & paint door or window opening (per side) | 2.00 | EA | @ | 27.70 = | 55.40 |
| 88. Seal & paint door slab only (per side) | 2.00 | EA | @ | 33.31 = | 66.62 |
| 89. Toilet | 1.00 | EA | @ | 390.97 = | 390.97 |
| 90. Toilet seat | 1.00 | EA | @ | 50.09 = | 50.09 |
| 91. Sink - wall mounted | 1.00 | EA | @ | 267.25 = | 267.25 |
| 92. Paper towel dispenser | 1.00 | EA | @ | 71.21 = | 71.21 |
| 93. Soap dispenser - wall mounted | 1.00 | EA | @ | 40.95 = | 40.95 |
| 94. Toilet seat cover dispenser | 1.00 | EA | @ | 75.88 = | 75.88 |
| 95. Mirror - 1/4" plate glass | 8.00 | SF | @ | 13.45 = | 107.60 |
| 96. Interior door unit | 1.00 | EA | @ | 176.39 = | 176.39 |
| *Door leading to garage.* | | | | | |
| 97. Door knob - interior | 1.00 | EA | @ | 45.67 = | 45.67 |
| 98. Handicap grab bar - Stainless steel, 1 1/2" x 36" | 1.00 | EA | @ | 80.41 = | 80.41 |
| 99. Handicap grab bar - Stainless steel, 1 1/2" x 48" | 1.00 | EA | @ | 91.91 = | 91.91 |

**JS|HELD · J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

### 9245
### 9245 - Main Level

**9245 - Main Level**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 100. Final cleaning - construction - Commercial | 2,880.50 SF @ | 0.18 = | 518.49 |
| 101. Rigid foam insulation board - 3/4" | 1,954.41 SF @ | 0.80 = | 1,563.53 |

**Reception**                                                                 Height: 9'

| Door | 2' 6" X 6' 8 15/16" | Opens into ROOM2 |
|---|---|---|
| Missing Wall | 4' X 9' | Opens into STAIRS |
| Missing Wall | 3' 4" X 9' | Opens into STAIRS |
| Door | 3' X 6' 8" | Opens into WAREHOUSE_GA |
| Missing Wall - Goes to Floor | 8' X 6' 8" | Opens into WAREHOUSE_GA |
| Window - Goes to Floor | 5' X 8' 11 7/8" | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into Exterior |
| Window | 3' X 2' 3 7/8" | Opens into Exterior |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 102. 5/8" drywall - hung, taped, floated, ready for paint | 1,061.99 SF @ | 2.47 = | 2,623.12 |
| 103. Batt insulation - 10" - R30 - unfaced batt | 434.61 SF @ | 1.27 = | 551.95 |
| 104. Batt insulation - 4" - R13 - paper faced | 514.88 SF @ | 0.76 = | 391.31 |
| 105. Mask and prep for paint - plastic, paper, tape (per LF) | 89.85 LF @ | 1.21 = | 108.72 |
| 106. Seal/prime then paint the walls and ceiling twice (3 coats) | 1,061.99 SF @ | 1.13 = | 1,200.05 |
| 107. Seal & paint door or window opening (per side) | 2.00 EA @ | 27.70 = | 55.40 |
| 108. Seal & paint door slab only (per side) | 2.00 EA @ | 33.31 = | 66.62 |
| 109. Paint baseboard - two coats | 66.85 LF @ | 1.26 = | 84.23 |
| 110. Baseboard - 2 1/4" | 66.85 LF @ | 2.75 = | 183.84 |
| 111. Tile floor covering | 30.00 SF @ | 9.06 = | 271.80 |
| Entry | | | |
| 112. Carpet pad | 405.44 SF @ | 0.52 = | 210.83 |
| 113. Carpet | 466.42 SF @ | 3.26 = | 1,520.53 |
| 114. Display case - Commercial - open shelving | 40.00 LF @ | 105.92 = | 4,236.80 |
| 115. Service counter | 10.00 LF @ | 260.10 = | 2,601.00 |
| 116. Interior door unit | 1.00 EA @ | 176.39 = | 176.39 |
| *Door leading to garage.* | | | |
| 117. Door knob - interior | 1.00 EA @ | 45.67 = | 45.67 |

🐢 JS|HELD  **J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**Closet (under stairs)**                                                                          Height: Sloped

| Door | 2' 6" X 6' 8" | | Opens into Exterior | |
|---|---|---|---|---|
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 118. 5/8" drywall - hung, taped, floated, ready for paint | 131.33 | SF @ | 2.47 = | 324.39 |
| 119. Interior door unit | 1.00 | EA @ | 176.39 = | 176.39 |
| *Door leading to garage.* | | | | |
| 120. Door dummy knob - interior | 1.00 | EA @ | 26.55 = | 26.55 |
| 121. Seal/prime then paint the walls and ceiling twice (3 coats) | 131.33 | SF @ | 1.13 = | 148.40 |
| 122. Seal & paint door or window opening (per side) | 2.00 | EA @ | 27.70 = | 55.40 |
| 123. Seal & paint door slab only (per side) | 2.00 | EA @ | 33.31 = | 66.62 |
| 124. Shelving - wire (vinyl coated) | 6.00 | LF @ | 10.38 = | 62.28 |
| 125. Carpet pad | 18.07 | SF @ | 0.52 = | 9.40 |
| 126. Carpet | 20.78 | SF @ | 3.26 = | 67.74 |
| *15 % waste added for Carpet.* | | | | |

**Restroom 1**                                                                                      Height: 9'

| Door | 2' 6" X 6' 8" | | Opens into WAREHOUSE_GA | |
|---|---|---|---|---|
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 127. 5/8" drywall - hung, taped, floated, ready for paint | 187.90 | SF @ | 2.47 = | 464.11 |
| 128. Interior door unit | 1.00 | EA @ | 176.39 = | 176.39 |
| *Door leading to garage.* | | | | |
| 129. Door knob - interior | 1.00 | EA @ | 45.67 = | 45.67 |
| 130. Rough in plumbing - per fixture | 2.00 | EA @ | 485.06 = | 970.12 |
| 131. Toilet | 1.00 | EA @ | 390.97 = | 390.97 |
| 132. Toilet seat | 1.00 | EA @ | 50.09 = | 50.09 |
| 133. Sink - wall mounted | 1.00 | EA @ | 267.25 = | 267.25 |
| 134. Plumbing fixture supply line | 3.00 | EA @ | 15.75 = | 47.25 |
| 135. Paper towel dispenser | 1.00 | EA @ | 71.21 = | 71.21 |
| 136. Soap dispenser - wall mounted | 1.00 | EA @ | 40.95 = | 40.95 |
| 137. Toilet seat cover dispenser | 1.00 | EA @ | 75.88 = | 75.88 |
| 138. Fiberglass shower unit | 1.00 | EA @ | 813.63 = | 813.63 |
| 139. Shower faucet | 1.00 | EA @ | 210.67 = | 210.67 |
| 140. Shower curtain rod | 1.00 | EA @ | 31.29 = | 31.29 |
| 141. Clean with pressure/chemical spray - Very heavy | 24.91 | SF @ | 0.70 = | 17.44 |
| 142. Seal/prime then paint the walls and ceiling twice (3 coats) | 187.90 | SF @ | 1.13 = | 212.33 |
| 143. Seal & paint door or window opening (per side) | 2.00 | EA @ | 27.70 = | 55.40 |
| 144. Seal & paint door slab only (per side) | 2.00 | EA @ | 33.31 = | 66.62 |
| 145. Tile floor covering | 24.91 | SF @ | 9.06 = | 225.68 |
| 146. Handicap grab bar - Stainless steel, 1 1/2" x 36" | 1.00 | EA @ | 80.41 = | 80.41 |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Restroom 1**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 147.  Handicap grab bar - Stainless steel, 1 1/2" x 48" | 1.00 EA @ | 91.91 = | 91.91 |

**Restroom 2**                                                                 Height: 9'

**Door**                              2' 6" X 6' 8"                    Opens into WAREHOUSE_GA

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 148.  5/8" drywall - hung, taped, floated, ready for paint | 187.83 SF @ | 2.47 = | 463.94 |
| 149.  Interior door unit | 1.00 EA @ | 176.39 = | 176.39 |
| *Door leading to garage.* | | | |
| 150.  Door knob - interior | 1.00 EA @ | 45.67 = | 45.67 |
| 151.  Toilet | 1.00 EA @ | 390.97 = | 390.97 |
| 152.  Toilet seat | 1.00 EA @ | 50.09 = | 50.09 |
| 153.  Sink - wall mounted | 1.00 EA @ | 267.25 = | 267.25 |
| 154.  Plumbing fixture supply line | 3.00 EA @ | 15.75 = | 47.25 |
| 155.  Paper towel dispenser | 1.00 EA @ | 71.21 = | 71.21 |
| 156.  Soap dispenser - wall mounted | 1.00 EA @ | 40.95 = | 40.95 |
| 157.  Toilet seat cover dispenser | 1.00 EA @ | 75.88 = | 75.88 |
| 158.  Clean with pressure/chemical spray - Very heavy | 24.89 SF @ | 0.70 = | 17.42 |
| 159.  Seal/prime then paint the walls and ceiling twice (3 coats) | 187.83 SF @ | 1.13 = | 212.25 |
| 160.  Seal & paint door or window opening (per side) | 2.00 EA @ | 27.70 = | 55.40 |
| 161.  Seal & paint door slab only (per side) | 2.00 EA @ | 33.31 = | 66.62 |
| 162.  Tile floor covering | 24.89 SF @ | 9.06 = | 225.50 |
| 163.  Handicap grab bar - Stainless steel, 1 1/2" x 36" | 1.00 EA @ | 80.41 = | 80.41 |
| 164.  Handicap grab bar - Stainless steel, 1 1/2" x 48" | 1.00 EA @ | 91.91 = | 91.91 |

**Warehouse/Garage**                                                          Height: 13' 6"

| Door | 2' 6" X 6' 8" | Opens into RESTROOM_1 |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into RESTROOM_2 |
| Door | 3' X 6' 8" | Opens into Exterior |
| Door | 10' X 10' | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into RECEPTION |

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| Missing Wall - Goes to Floor | 8' X 6' 8" | | Opens into RECEPTION | |
|---|---|---|---|---|

| DESCRIPTION | | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 165. 5/8" drywall - hung, taped, floated, ready for paint | 2,322.60 | SF @ | 2.47 = | 5,736.82 |
| 166. Batt insulation - 4" - R13 - unfaced batt | 2,322.60 | SF @ | 0.70 = | 1,625.82 |
| 167. Foil vapor barrier - aluminum - double sided | 1,901.17 | SF @ | 0.49 = | 931.57 |
| 168. Mask and prep for paint - plastic, paper, tape (per LF) | 188.83 | LF @ | 1.21 = | 228.48 |
| 169. Seal/prime then paint the walls twice (3 coats) | 2,322.60 | SF @ | 1.13 = | 2,624.54 |
| 170. Seal & paint door or window opening (per side) | 4.00 | EA @ | 27.70 = | 110.80 |
| 171. Seal & paint door slab only (per side) | 4.00 | EA @ | 33.31 = | 133.24 |
| 172. Exterior door - metal - insulated - flush or panel style | 1.00 | EA @ | 299.65 = | 299.65 |
| 173. Door lockset & deadbolt - exterior | 1.00 | EA @ | 90.33 = | 90.33 |
| 174. Roll-up door & hardware - 10' x 10' - 22 gauge | 1.00 | EA @ | 1,221.20 = | 1,221.20 |
| 175. Commercial overhead door opener - Hoist/jack-shaft type | 1.00 | EA @ | 668.17 = | 668.17 |

| Stairs | | | | Height: 22' 6" |
|---|---|---|---|---|

| Missing Wall | 3' X 22' 6" | | Opens into RECEPTION | |
|---|---|---|---|---|
| Missing Wall | 4' X 22' 6" | | Opens into RECEPTION | |

| Subroom: Room2 (1) | | | | Height: 8' |
|---|---|---|---|---|
| Missing Wall | 3' X 8' | | Opens into STAIRS | |
| Door | 2' 6" X 6' 8 15/16" | | Opens into RECEPTION | |

| DESCRIPTION | | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 176. 5/8" drywall - hung, taped, floated, ready for paint | 657.28 | SF @ | 2.47 = | 1,623.48 |
| 177. Batt insulation - 10" - R30 - unfaced batt | 47.14 | SF @ | 1.27 = | 59.87 |
| 178. Sheathing - plywood - 3/4" CDX | 9.00 | SF @ | 2.14 = | 19.26 |
| *Subfloor at the stair landing.* | | | | |
| 179. Stair tread - up to 4' | 16.00 | EA @ | 20.69 = | 331.04 |
| 180. Stair riser - up to 4' | 16.00 | EA @ | 16.54 = | 264.64 |
| 181. Stair stringer - engineered wood | 60.00 | LF @ | 8.51 = | 510.60 |
| 182. Handrail - Steel pipe - Wall mounted | 12.00 | LF @ | 34.92 = | 419.04 |
| 183. Paint handrail - wall mounted | 12.00 | LF @ | 0.98 = | 11.76 |
| 184. Seal & paint balustrade - two coats | 4.00 | LF @ | 23.37 = | 93.48 |
| 185. Seal & paint door or window opening (per side) | 2.00 | EA @ | 27.70 = | 55.40 |
| 186. Seal & paint door slab only (per side) | 2.00 | EA @ | 33.31 = | 66.62 |
| 187. Seal/prime then paint the walls and ceiling twice (3 coats) | 547.73 | SF @ | 1.13 = | 618.93 |
| 188. Balustrade - handrail with iron balusters | 4.00 | LF @ | 181.72 = | 726.88 |
| 189. Carpet pad | 76.02 | SF @ | 0.52 = | 39.53 |
| 190. Carpet | 141.58 | SF @ | 3.26 = | 461.55 |
| 191. Step charge for "waterfall" carpet installation | 16.00 | EA @ | 4.75 = | 76.00 |

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**9245 - Loft**

**9245 - Loft**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 192. Final cleaning - construction - Commercial | 434.65 | SF @ | 0.18 = | 78.24 |

**Loft**                                                                 Height: 8'

| Door | 2' 6" X 6' 8" | Opens into Exterior |
|---|---|---|
| Window | 8' X 6' 5/16" | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into CLOSET |

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 193. Aluminum window, horiz. slider 3-11 sf | 1.00 | EA @ | 154.92 = | 154.92 |
| 194. 5/8" drywall - hung, taped, floated, ready for paint | 949.85 | SF @ | 2.47 = | 2,346.13 |
| 195. Batt insulation - 10" - R30 - unfaced batt | 363.40 | SF @ | 1.27 = | 461.52 |
| 196. Batt insulation - 4" - R13 - paper faced | 473.95 | SF @ | 0.76 = | 360.20 |
| 197. Mask and prep for paint - plastic, paper, tape (per LF) | 83.50 | LF @ | 1.21 = | 101.04 |
| 198. Seal/prime then paint the walls and ceiling twice (3 coats) | 949.85 | SF @ | 1.13 = | 1,073.33 |
| 199. Seal & paint door or window opening (per side) | 2.00 | EA @ | 27.70 = | 55.40 |
| 200. Seal & paint door slab only (per side) | 2.00 | EA @ | 33.31 = | 66.62 |
| 201. Paint baseboard - two coats | 78.50 | LF @ | 1.26 = | 98.91 |
| 202. Baseboard - 3 1/4" | 78.50 | LF @ | 3.18 = | 249.63 |
| 203. Carpet pad | 363.40 | SF @ | 0.52 = | 188.97 |
| 204. Carpet | 419.25 | SF @ | 3.26 = | 1,366.76 |
| 205. Interior door unit | 1.00 | EA @ | 176.39 = | 176.39 |
| 206. Door knob - interior | 1.00 | EA @ | 45.67 = | 45.67 |

**Closet**                                                              Height: 8'

| Door | 2' 6" X 6' 8" | Opens into LOFT |
|---|---|---|

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 207. 5/8" drywall - hung, taped, floated, ready for paint | 379.92 | SF @ | 2.47 = | 938.40 |
| 208. Batt insulation - 10" - R30 - unfaced batt | 71.25 | SF @ | 1.27 = | 90.49 |
| 209. Seal/prime then paint the walls and ceiling twice (3 coats) | 379.92 | SF @ | 1.13 = | 429.31 |
| 210. Seal & paint door or window opening (per side) | 2.00 | EA @ | 27.70 = | 55.40 |
| 211. Seal & paint door slab only (per side) | 2.00 | EA @ | 33.31 = | 66.62 |
| 212. Paint baseboard - two coats | 38.17 | LF @ | 1.26 = | 48.09 |
| 213. Baseboard - 3 1/4" | 38.17 | LF @ | 3.18 = | 121.38 |

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Closet**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 214. Carpet pad | 71.25 | SF @ | 0.52 = | | 37.05 |
| 215. Carpet | 108.25 | SF @ | 3.26 = | | 352.90 |
| 216. Interior door unit | 1.00 | EA @ | 176.39 = | | 176.39 |
| 217. Deadbolt | 1.00 | EA @ | 51.33 = | | 51.33 |
| 218. Door knob - interior | 1.00 | EA @ | 45.67 = | | 45.67 |

**9251**

**9251 - Main Level**

**9251 - Main Level**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 219. Final cleaning - construction - Commercial | 2,329.64 | SF @ | 0.18 = | | 419.34 |
| 220. Rigid foam insulation board - 3/4" | 1,968.70 | SF @ | 0.80 = | | 1,574.96 |

**Reception**                                                                                                  Height: 9'

| Missing Wall | 26' 15/16" X 9' | Opens into SALES_FLOOR |
|---|---|---|
| Window - Goes to Floor | 3' X 8' 11 7/8" | Opens into Exterior |
| Door | 5' X 6' 8" | Opens into Exterior |
| Window | 5' X 2' 3 11/16" | Opens into Exterior |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 221. Batt insulation - 10" - R30 - unfaced batt | 504.40 | SF @ | 1.27 = | | 640.59 |
| 222. Batt insulation - 4" - R13 - paper faced | 404.46 | SF @ | 0.76 = | | 307.39 |
| 223. 5/8" drywall - hung, taped, floated, ready for paint | 1,051.35 | SF @ | 2.47 = | | 2,596.83 |
| 224. Mask and prep for paint - plastic, paper, tape (per LF) | 68.75 | LF @ | 1.21 = | | 83.19 |
| 225. Seal/prime then paint the walls and ceiling twice (3 coats) | 1,051.35 | SF @ | 1.13 = | | 1,188.03 |
| 226. Paint baseboard - two coats | 60.75 | LF @ | 1.26 = | | 76.55 |
| 227. Paint crown molding, oversized - two coats | 68.75 | LF @ | 1.37 = | | 94.19 |
| 228. Baseboard - 3 1/4" | 60.75 | LF @ | 3.18 = | | 193.19 |
| 229. Crown molding - 6 1/8" to 7" | 108.75 | LF @ | 7.17 = | | 779.74 |

Perimeter + accent

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Reception**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 230. Tile floor covering | 23.12 | SF @ | 9.06 = | 209.47 |
| 231. Carpet pad | 481.27 | SF @ | 0.52 = | 250.26 |
| 232. Carpet | 549.75 | SF @ | 3.26 = | 1,792.19 |
| 233. Additional labor cost for Berber or patterned carpets | 553.46 | SF @ | 0.18 = | 99.62 |
| 15 % waste added for Additional labor cost for Berber or patterned carpets. | | | | |

**Restroom**                                         **Height: 9'**

**Door**                 **2' 6" X 6' 8"**            **Opens into SALES_FLOOR**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 234. 5/8" drywall - hung, taped, floated, ready for paint | 188.43 | SF @ | 2.47 = | 465.42 |
| 235. Batt insulation - 10" - R30 - unfaced batt | 25.02 | SF @ | 1.27 = | 31.78 |
| 236. Batt insulation - 4" - R11 - paper faced | 163.41 | SF @ | 0.63 = | 102.95 |
| 237. Vanity | 2.50 | LF @ | 144.12 = | 360.30 |
| 238. Sink - single | 1.00 | EA @ | 226.07 = | 226.07 |
| 239. Toilet | 1.00 | EA @ | 390.97 = | 390.97 |
| 240. Baseboard - 2 1/4" | 17.51 | LF @ | 2.75 = | 48.15 |
| 241. Plumbing fixture supply line | 3.00 | EA @ | 15.75 = | 47.25 |
| 242. Mask and prep for paint - plastic, paper, tape (per LF) | 20.01 | LF @ | 1.21 = | 24.21 |
| 243. Seal/prime then paint the walls and ceiling twice (3 coats) | 188.43 | SF @ | 1.13 = | 212.93 |
| 244. Seal & paint baseboard - two coats | 17.51 | LF @ | 1.31 = | 22.94 |
| 245. Seal & paint door slab only (per side) | 1.00 | EA @ | 33.31 = | 33.31 |
| 246. Seal & paint door or window opening (per side) | 1.00 | EA @ | 27.70 = | 27.70 |
| 247. Tile floor covering | 25.02 | SF @ | 9.06 = | 226.68 |
| 248. Interior door unit | 1.00 | EA @ | 176.39 = | 176.39 |
| 249. Door knob - interior | 1.00 | EA @ | 45.67 = | 45.67 |
| 250. Handicap grab bar - Stainless steel, 1 1/2" x 36" | 1.00 | EA @ | 80.41 = | 80.41 |
| 251. Handicap grab bar - Stainless steel, 1 1/2" x 48" | 1.00 | EA @ | 91.91 = | 91.91 |

**Storage 1**                                      **Height: 11' 6"**

**Door**                 **2' 6" X 6' 8"**            **Opens into SALES_FLOOR**

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 252. Suspended ceiling system - High grade - 2' x 2' | 38.78 | SF @ | 4.16 = | | 161.32 |
| 253. 5/8" drywall - hung, taped, floated, ready for paint | 276.68 | SF @ | 2.47 = | | 683.40 |
| 254. Baseboard - 2 1/4" | 23.01 | LF @ | 2.75 = | | 63.28 |
| 255. Mask and prep for paint - plastic, paper, tape (per LF) | 25.51 | LF @ | 1.21 = | | 30.87 |
| 256. Seal/prime then paint the walls twice (3 coats) | 276.68 | SF @ | 1.13 = | | 312.65 |
| 257. Seal & paint baseboard - two coats | 23.01 | LF @ | 1.31 = | | 30.14 |
| 258. Seal & paint door slab only (per side) | 1.00 | EA @ | 33.31 = | | 33.31 |
| 259. Seal & paint door or window opening (per side) | 1.00 | EA @ | 27.70 = | | 27.70 |
| 260. Tile floor covering | 38.78 | SF @ | 9.06 = | | 351.35 |
| 261. Interior door unit | 1.00 | EA @ | 176.39 = | | 176.39 |
| 262. Detach & Reset Door knob - interior | 1.00 | EA @ | 25.52 = | | 25.52 |

**Storage 2**                                                                    Height: 13' 6"

**Door**                          2' 6" X 6' 8"                 Opens into SALES_FLOOR

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 263. Suspended ceiling system - High grade - 2' x 2' | 80.67 | SF @ | 4.16 = | | 335.59 |
| 264. 5/8" drywall - hung, taped, floated, ready for paint | 476.20 | SF @ | 2.47 = | | 1,176.21 |
| 265. Baseboard - 2 1/4" | 34.01 | LF @ | 2.75 = | | 93.53 |
| 266. Mask and prep for paint - plastic, paper, tape (per LF) | 36.51 | LF @ | 1.21 = | | 44.18 |
| 267. Seal/prime then paint the walls twice (3 coats) | 476.20 | SF @ | 1.13 = | | 538.11 |
| 268. Seal & paint baseboard - two coats | 34.01 | LF @ | 1.31 = | | 44.55 |
| 269. Seal & paint door slab only (per side) | 1.00 | EA @ | 33.31 = | | 33.31 |
| 270. Seal & paint door or window opening (per side) | 1.00 | EA @ | 27.70 = | | 27.70 |
| 271. Interior door unit | 1.00 | EA @ | 176.39 = | | 176.39 |
| 272. Detach & Reset Door knob - interior | 1.00 | EA @ | 25.52 = | | 25.52 |

**Sales Floor**                                                                 Height: 11' 6"

| **Missing Wall - Goes to Floor** | 3' X 6' 8" | Opens into WAREHOUSE |
|---|---|---|
| **Missing Wall** | 26' 15/16" X 11' 6" | Opens into RECEPTION |
| **Door** | 2' 6" X 6' 8" | Opens into RESTROOM |
| **Door** | 2' 6" X 6' 8" | Opens into STORAGE_1 |
| **Door** | 2' 6" X 6' 8" | Opens into STORAGE_2 |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 273. Suspended ceiling system - High grade - 2' x 2' | 868.27 | SF @ | 4.16 = | | 3,612.00 |
| 274. 5/8" drywall - hung, taped, floated, ready for paint | 1,163.36 | SF @ | 2.47 = | | 2,873.50 |

SKAII_INVEST_LLC-R-1                                    2/4/2022            Page: 15

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Sales Floor**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 275.  Baseboard - 2 1/4" | 91.08 | LF @ | 2.75 = | 250.47 |
| 276.  Mask and prep for paint - plastic, paper, tape (per LF) | 101.58 | LF @ | 1.21 = | 122.91 |
| 277.  Seal/prime then paint the walls twice (3 coats) | 1,163.36 | SF @ | 1.13 = | 1,314.60 |
| 278.  Seal & paint baseboard - two coats | 91.08 | LF @ | 1.31 = | 119.31 |
| 279.  Seal & paint door slab only (per side) | 3.00 | EA @ | 33.31 = | 99.93 |
| 280.  Seal & paint door or window opening (per side) | 3.00 | EA @ | 27.70 = | 83.10 |
| 281.  Tile floor covering | 115.94 | SF @ | 9.06 = | 1,050.42 |
| 282.  Snaplock Laminate - simulated wood flooring | 752.34 | SF @ | 6.34 = | 4,769.84 |

**Warehouse**                                                                                          Height: 13' 6"

| Missing Wall - Goes to Floor | 3' X 6' 8" | Opens into SALES_FLOOR |
|---|---|---|
| Door | 3' X 6' 8" | Opens into Exterior |
| Door | 10' X 10' | Opens into Exterior |

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 283.  5/8" drywall - hung, taped, floated, ready for paint | 1,754.50 | SF @ | 2.47 = | 4,333.62 |
| 284.  Foil vapor barrier - aluminum - double sided | 951.56 | SF @ | 0.49 = | 466.26 |
| 285.  Mask and prep for paint - plastic, paper, tape (per LF) | 140.33 | LF @ | 1.21 = | 169.80 |
| 286.  Seal/prime then paint the walls twice (3 coats) | 1,754.50 | SF @ | 1.13 = | 1,982.59 |
| 287.  Prime & paint door slab only - exterior (per side) | 2.00 | EA @ | 39.98 = | 79.96 |
| 288.  Seal & paint door or window opening (per side) | 2.00 | EA @ | 27.70 = | 55.40 |
| 289.  Snaplock Laminate - simulated wood flooring | 951.56 | SF @ | 6.34 = | 6,032.89 |

**9255**
**9255 - Main Level**

**Reception 1**                                                                                          Height: 9'

| Window | 3' X 4' | Opens into RECEPTION_2 |
|---|---|---|
| Window | 6' X 4' | Opens into RECEPTION_2 |
| Door | 3' X 6' 8" | Opens into RECEPTION_2 |
| Window - Goes to Floor | 2' X 9' | Opens into Exterior |

SKAII_INVEST_LLC-R-1

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| | | |
|---|---|---|
| Door | 5' X 6' 8" | Opens into Exterior |
| Window | 4' 11" X 2' 3 5/8" | Opens into Exterior |
| Window - Goes to Floor | 2' X 8' 11 7/8" | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into STORAGE_1 |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 290. Recessed light fixture - Detach & reset trim only | 2.00 | EA @ | 2.90 | = | 5.80 |
| 291. 5/8" - drywall per LF - up to 2' tall | 49.53 | LF @ | 10.03 | = | 496.79 |
| 292. Batt insulation replacement per LF - 4" - up to 2' tall | 49.53 | LF @ | 1.63 | = | 80.73 |
| 293. 5/8" drywall - hung, taped, floated, ready for paint | 244.53 | SF @ | 2.47 | = | 603.99 |
| 294. Batt insulation - 10" - R30 - unfaced batt | 244.53 | SF @ | 1.27 | = | 310.55 |
| 295. Baseboard - 2 1/4" | 49.53 | LF @ | 2.75 | = | 136.21 |
| 296. Clean more than the walls | 668.65 | SF @ | 0.31 | = | 207.28 |
| 297. Storefront door - alum. anodized frame, 3'x7' -Double pane | 2.00 | EA @ | 1,924.33 | = | 3,848.66 |
| 298. Mask and prep for paint - plastic, paper, tape (per LF) | 64.53 | LF @ | 1.21 | = | 78.08 |
| 299. Floor protection - plastic and tape - 10 mil | 244.53 | SF @ | 0.26 | = | 63.58 |
| 300. Seal & paint baseboard - two coats | 49.53 | LF @ | 1.31 | = | 64.88 |
| 301. Seal/prime then paint the walls and ceiling (2 coats) | 668.65 | SF @ | 0.84 | = | 561.67 |
| 302. Deodorize building - Hot thermal fog | 2,200.73 | CF @ | 0.06 | = | 132.04 |

**Storage 1**                                                                                            Height: 9'

| | | |
|---|---|---|
| Door | 3' X 6' 8" | Opens into RECEPTION_1 |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 303. Recessed light fixture - Detach & reset trim only | 4.00 | EA @ | 2.90 | = | 11.60 |
| 304. 5/8" - drywall per LF - up to 2' tall | 57.01 | LF @ | 10.03 | = | 571.81 |
| 305. Batt insulation replacement per LF - 4" - up to 2' tall | 57.01 | LF @ | 1.63 | = | 92.93 |
| 306. 5/8" drywall - hung, taped, floated, ready for paint | 199.19 | SF @ | 2.47 | = | 492.00 |
| 307. Batt insulation - 10" - R30 - unfaced batt | 199.19 | SF @ | 1.27 | = | 252.97 |
| 308. Baseboard - 2 1/4" | 57.01 | LF @ | 2.75 | = | 156.78 |
| 309. Clean more than the walls | 719.25 | SF @ | 0.31 | = | 222.97 |
| 310. Storefront door - alum. anodized frame, 3'x7' -Double pane | 2.00 | EA @ | 1,924.33 | = | 3,848.66 |
| 311. Mask and prep for paint - plastic, paper, tape (per LF) | 60.01 | LF @ | 1.21 | = | 72.61 |
| 312. Floor protection - plastic and tape - 10 mil | 199.19 | SF @ | 0.26 | = | 51.79 |
| 313. Seal & paint baseboard - two coats | 57.01 | LF @ | 1.31 | = | 74.68 |
| 314. Seal/prime then paint the walls and ceiling (2 coats) | 719.25 | SF @ | 0.84 | = | 604.17 |
| 315. Deodorize building - Hot thermal fog | 1,792.72 | CF @ | 0.06 | = | 107.56 |

**Reception 2**                                                                                          Height: 9'

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| | | |
|---|---|---|
| Window | 6' X 4' | Opens into RECEPTION_1 |
| Door | 3' X 6' 8" | Opens into RECEPTION_1 |
| Door | 6' X 6' 8" | Opens into WAREHOUSE |
| Door | 2' 6" X 6' 8" | Opens into RESTROOM |
| Door | 2' 6" X 6' 8" | Opens into STORAGE_2 |
| Window | 3' X 4' | Opens into RECEPTION_1 |

| DESCRIPTION | QTY | | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|---|
| 316.  Recessed light fixture - Detach & reset trim only | 4.00 | EA | @ | 2.90 | = | 11.60 |
| 317.  5/8" - drywall per LF - up to 2' tall | 101.02 | LF | @ | 10.03 | = | 1,013.23 |
| 318.  5/8" drywall - hung, taped, floated, ready for paint | 463.66 | SF | @ | 2.47 | = | 1,145.24 |
| 319.  Batt insulation - 10" - R30 - unfaced batt | 463.66 | SF | @ | 1.27 | = | 588.85 |
| 320.  Baseboard - 2 1/4" | 101.02 | LF | @ | 2.75 | = | 277.81 |
| 321.  Clean more than the walls | 1,369.53 | SF | @ | 0.31 | = | 424.55 |
| 322.  Storefront door - alum. anodized frame, 3'x7' -Double pane | 2.00 | EA | @ | 1,924.33 | = | 3,848.66 |
| 323.  Mask and prep for paint - plastic, paper, tape (per LF) | 115.02 | LF | @ | 1.21 | = | 139.17 |
| 324.  Floor protection - plastic and tape - 10 mil | 463.66 | SF | @ | 0.26 | = | 120.55 |
| 325.  Seal & paint baseboard - two coats | 101.02 | LF | @ | 1.31 | = | 132.34 |
| 326.  Seal/prime then paint the walls and ceiling (2 coats) | 1,369.53 | SF | @ | 0.84 | = | 1,150.41 |
| 327.  Deodorize building - Hot thermal fog | 4,172.92 | CF | @ | 0.06 | = | 250.38 |

**Storage 2**                                                                                         Height: 9'

| Door | 2' 6" X 6' 8" | Opens into RECEPTION_2 |
|---|---|---|

| DESCRIPTION | QTY | | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|---|
| 328.  Recessed light fixture - Detach & reset trim only | 1.00 | EA | @ | 2.90 | = | 2.90 |
| 329.  5/8" - drywall per LF - up to 2' tall | 17.50 | LF | @ | 10.03 | = | 175.53 |
| 330.  5/8" drywall - hung, taped, floated, ready for paint | 25.00 | SF | @ | 2.47 | = | 61.75 |
| 331.  Batt insulation - 10" - R30 - unfaced batt | 25.00 | SF | @ | 1.27 | = | 31.75 |
| 332.  Baseboard - 2 1/4" | 17.50 | LF | @ | 2.75 | = | 48.13 |
| 333.  Clean more than the walls | 188.33 | SF | @ | 0.31 | = | 58.38 |
| 334.  Storefront door - alum. anodized frame, 3'x7' -Double pane | 2.00 | EA | @ | 1,924.33 | = | 3,848.66 |
| 335.  Mask and prep for paint - plastic, paper, tape (per LF) | 20.00 | LF | @ | 1.21 | = | 24.20 |
| 336.  Floor protection - plastic and tape - 10 mil | 25.00 | SF | @ | 0.26 | = | 6.50 |
| 337.  Seal & paint baseboard - two coats | 17.50 | LF | @ | 1.31 | = | 22.93 |
| 338.  Seal/prime then paint the walls and ceiling (2 coats) | 188.33 | SF | @ | 0.84 | = | 158.20 |
| 339.  Deodorize building - Hot thermal fog | 225.00 | CF | @ | 0.06 | = | 13.50 |

**Restroom**                                                                                          Height: 9'

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| Door | 2' 6" X 6' 8" | | Opens into RECEPTION_2 | |
|---|---|---|---|---|
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 340. Recessed light fixture - Detach & reset trim only | | 1.00 EA @ | 2.90 = | 2.90 |
| 341. 5/8" - drywall per LF - up to 2' tall | | 18.83 LF @ | 10.03 = | 188.86 |
| 342. Batt insulation replacement per LF - 4" - up to 2' tall | | 18.83 LF @ | 1.63 = | 30.69 |
| 343. 5/8" drywall - hung, taped, floated, ready for paint | | 28.33 SF @ | 2.47 = | 69.98 |
| 344. Batt insulation - 10" - R30 - unfaced batt | | 28.33 SF @ | 1.27 = | 35.98 |
| 345. Baseboard - 2 1/4" | | 18.83 LF @ | 2.75 = | 51.78 |
| 346. Clean more than the walls | | 232.00 SF @ | 0.31 = | 71.92 |
| 347. Mask and prep for paint - plastic, paper, tape (per LF) | | 21.33 LF @ | 1.21 = | 25.81 |
| 348. Floor protection - plastic and tape - 10 mil | | 28.33 SF @ | 0.26 = | 7.37 |
| 349. Seal & paint baseboard - two coats | | 18.83 LF @ | 1.31 = | 24.67 |
| 350. Seal/prime then paint part of the walls (2 coats) | | 116.00 SF @ | 0.84 = | 97.44 |
| 351. Deodorize building - Hot thermal fog | | 255.00 CF @ | 0.06 = | 15.30 |
| 352. Install Vanity | | 2.50 LF @ | 42.12 = | 105.30 |
| 353. Install Toilet | | 1.00 EA @ | 161.36 = | 161.36 |

**Warehouse**                                                                                          Height: 13' 6"

| Door | 6' X 6' 8" | | Opens into RECEPTION_2 | |
|---|---|---|---|---|
| Door | 3' X 6' 8" | | Opens into Exterior | |
| Door | 10' X 10' | | Opens into Exterior | |
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 354. 5/8" - drywall per LF - up to 2' tall | | 148.17 LF @ | 10.03 = | 1,486.15 |
| 355. Batt insulation replacement per LF - 4" - up to 2' tall | | 148.17 LF @ | 1.63 = | 241.52 |
| 356. Clean more than the walls | | 5,374.56 SF @ | 0.31 = | 1,666.11 |
| 357. Mask and prep for paint - plastic, paper, tape (per LF) | | 167.17 LF @ | 1.21 = | 202.28 |
| 358. Floor protection - plastic and tape - 10 mil | | 1,638.90 SF @ | 0.26 = | 426.11 |
| 359. Seal/prime then paint the walls (2 coats) | | 2,096.75 SF @ | 0.84 = | 1,761.27 |
| 360. Deodorize building - Hot thermal fog | | 22,125.19 CF @ | 0.06 = | 1,327.51 |

**9261**

**9261 - Main Level**

**Reception**                                                                                          Height: 9'

| Missing Wall | 2' 11 11/16" X 9' | Opens into STAIRS |
|---|---|---|
| Door | 2' 3" X 6' 8" | Opens into ROOM2 |
| Door | 5' X 6' 8" | Opens into Exterior |

SKAII_INVEST_LLC-R-1

## JS|HELD J.S. HELD LLC

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| Window | 5' X 2' 3 13/16" | Opens into Exterior |
|---|---|---|
| Window - Goes to Floor | 3' X 8' 11 7/8" | Opens into Exterior |
| Missing Wall - Goes to Floor | 10' 11" X 8' | Opens into OFFICE_SALES |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 361. Recessed light fixture - Detach & reset trim only | 4.00 | EA @ | 2.90 = | | 11.60 |
| 362. 5/8" - drywall per LF - up to 2' tall | 72.32 | LF @ | 10.03 = | | 725.37 |
| 363. Batt insulation replacement per LF - 4" - up to 2' tall | 72.32 | LF @ | 1.63 = | | 117.88 |
| 364. 5/8" drywall - hung, taped, floated, ready for paint | 443.68 | SF @ | 2.47 = | | 1,095.89 |
| 365. Batt insulation - 10" - R30 - unfaced batt | 443.68 | SF @ | 1.27 = | | 563.47 |
| 366. Baseboard - 2 1/4" | 72.32 | LF @ | 2.75 = | | 198.88 |
| 367. Clean more than the walls | 1,105.61 | SF @ | 0.31 = | | 342.74 |
| 368. Storefront door - alum. anodized frame, 3'x7' -Double pane | 2.00 | EA @ | 1,924.33 = | | 3,848.66 |
| 369. Mask and prep for paint - plastic, paper, tape (per LF) | 94.21 | LF @ | 1.21 = | | 113.99 |
| 370. Floor protection - plastic and tape - 10 mil | 443.68 | SF @ | 0.26 = | | 115.36 |
| 371. Seal & paint baseboard - two coats | 72.32 | LF @ | 1.31 = | | 94.74 |
| 372. Seal/prime then paint the walls and ceiling (2 coats) | 1,105.61 | SF @ | 0.84 = | | 928.71 |
| 373. Deodorize building - Hot thermal fog | 3,993.08 | CF @ | 0.06 = | | 239.58 |

**Office/Sales Floor**        **Height: 9'**

| Door | 2' 6" X 6' 8" | Opens into SHOWER_ROOM |
|---|---|---|
| Door | 6' X 6' 8" | Opens into WAREHOUSE |
| Door | 6' X 6' 8" | Opens into WAREHOUSE |
| Missing Wall - Goes to Floor | 10' 11" X 8' | Opens into RECEPTION |
| Door | 2' 6" X 6' 8" | Opens into RESTROOM |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 374. Recessed light fixture - Detach & reset trim only | 4.00 | EA @ | 2.90 = | | 11.60 |
| 375. 5/8" - drywall per LF - up to 2' tall | 45.09 | LF @ | 10.03 = | | 452.25 |
| 376. Batt insulation replacement per LF - 4" - up to 2' tall | 45.09 | LF @ | 1.63 = | | 73.50 |
| 377. 5/8" drywall - hung, taped, floated, ready for paint | 303.10 | SF @ | 2.47 = | | 748.66 |
| 378. Batt insulation - 10" - R30 - unfaced batt | 303.10 | SF @ | 1.27 = | | 384.94 |
| 379. Baseboard - 2 1/4" | 45.09 | LF @ | 2.75 = | | 124.00 |
| 380. Clean more than the walls | 759.46 | SF @ | 0.31 = | | 235.43 |
| 381. Mask and prep for paint - plastic, paper, tape (per LF) | 73.00 | LF @ | 1.21 = | | 88.33 |
| 382. Floor protection - plastic and tape - 10 mil | 303.10 | SF @ | 0.26 = | | 78.81 |
| 383. Seal & paint baseboard - two coats | 45.09 | LF @ | 1.31 = | | 59.07 |
| 384. Seal/prime then paint the walls and ceiling (2 coats) | 759.46 | SF @ | 0.84 = | | 637.95 |
| 385. Deodorize building - Hot thermal fog | 2,727.88 | CF @ | 0.06 = | | 163.67 |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**Restroom**                                                                                          Height: 9'

**Door**                                  2' 6" X 6' 8"                    **Opens into OFFICE_SALES**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 386. Recessed light fixture - Detach & reset trim only | 1.00 EA @ | 2.90 = | 2.90 |
| 387. 5/8" - drywall per LF - up to 2' tall | 26.47 LF @ | 10.03 = | 265.49 |
| 388. Batt insulation replacement per LF - 4" - up to 2' tall | 26.47 LF @ | 1.63 = | 43.15 |
| 389. 5/8" drywall - hung, taped, floated, ready for paint | 52.45 SF @ | 2.47 = | 129.55 |
| 390. Batt insulation - 10" - R30 - unfaced batt | 52.45 SF @ | 1.27 = | 66.61 |
| 391. Baseboard - 2 1/4" | 26.47 LF @ | 2.75 = | 72.79 |
| 392. Clean more than the walls | 348.98 SF @ | 0.31 = | 108.18 |
| 393. Mask and prep for paint - plastic, paper, tape (per LF) | 28.97 LF @ | 1.21 = | 35.05 |
| 394. Floor protection - plastic and tape - 10 mil | 52.45 SF @ | 0.26 = | 13.64 |
| 395. Seal & paint baseboard - two coats | 26.47 LF @ | 1.31 = | 34.68 |
| 396. Seal/prime then paint part of the walls (2 coats) | 174.49 SF @ | 0.84 = | 146.57 |
| 397. Deodorize building - Hot thermal fog | 472.02 CF @ | 0.06 = | 28.32 |
| 398. Install Vanity | 2.50 LF @ | 42.12 = | 105.30 |
| 399. Install Toilet | 1.00 EA @ | 161.36 = | 161.36 |

**Shower Room**                                                                                      Height: 9'

**Door**                                  2' 6" X 6' 8"                    **Opens into OFFICE_SALES**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 400. Recessed light fixture - Detach & reset trim only | 1.00 EA @ | 2.90 = | 2.90 |
| 401. 5/8" - drywall per LF - up to 2' tall | 22.93 LF @ | 10.03 = | 229.99 |
| 402. Batt insulation replacement per LF - 4" - up to 2' tall | 22.93 LF @ | 1.63 = | 37.38 |
| 403. 5/8" drywall - hung, taped, floated, ready for paint | 39.36 SF @ | 2.47 = | 97.22 |
| 404. Batt insulation - 10" - R30 - unfaced batt | 39.36 SF @ | 1.27 = | 49.99 |
| 405. Baseboard - 2 1/4" | 22.93 LF @ | 2.75 = | 63.06 |
| 406. Clean more than the walls | 290.87 SF @ | 0.31 = | 90.17 |
| 407. Mask and prep for paint - plastic, paper, tape (per LF) | 25.43 LF @ | 1.21 = | 30.77 |
| 408. Floor protection - plastic and tape - 10 mil | 39.36 SF @ | 0.26 = | 10.23 |
| 409. Seal & paint baseboard - two coats | 22.93 LF @ | 1.31 = | 30.04 |
| 410. Seal/prime then paint part of the walls (2 coats) | 145.44 SF @ | 0.84 = | 122.17 |
| 411. Deodorize building - Hot thermal fog | 354.21 CF @ | 0.06 = | 21.25 |
| 412. Install Vanity | 2.50 LF @ | 42.12 = | 105.30 |
| 413. Install Toilet | 1.00 EA @ | 161.36 = | 161.36 |

**Warehouse**                                                                                        Height: 13' 6"

SKAII_INVEST_LLC-R-1                                              2/4/2022              Page: 21

**⬩JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| Door | 6' X 6' 8" | Opens into OFFICE_SALES |
|------|-----------|------------------------|
| Door | 6' X 6' 8" | Opens into OFFICE_SALES |
| Door | 10' X 10' | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into Exterior |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|-------------|-----|-----------|-------|
| 414.  Clean more than the walls | 5,193.23  SF @ | 0.31 = | 1,609.90 |
| 415.  Mask and prep for paint - plastic, paper, tape (per LF) | 164.00  LF @ | 1.21 = | 198.44 |
| 416.  Floor protection - plastic and tape - 10 mil | 1,589.62  SF @ | 0.26 = | 413.30 |
| 417.  Seal/prime then paint the walls (2 coats) | 2,014.00  SF @ | 0.84 = | 1,691.76 |
| 418.  Deodorize building - Hot thermal fog | 21,459.83  CF @ | 0.06 = | 1,287.59 |

| Stairs | | Height: 17' |
|--------|--|-------------|
| **Missing Wall** | 2' 11 11/16" X 17' | Opens into RECEPTION |
| **Subroom:  Room2 (1)** | | Height: 8' |
| **Door** | 2' 3" X 6' 8" | Opens into RECEPTION |
| **Missing Wall** | 2' 11 11/16" X 8' | Opens into STAIRS |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|-------------|-----|-----------|-------|
| 419.  Clean the walls and ceiling | 457.21  SF @ | 0.31 = | 141.74 |
| 420.  Clean more than the floor | 96.04  SF @ | 0.31 = | 29.77 |
| 421.  Mask and prep for paint - plastic, paper, tape (per LF) | 35.69  LF @ | 1.21 = | 43.18 |
| 422.  Floor protection - plastic and tape - 10 mil | 76.83  SF @ | 0.26 = | 19.98 |
| 423.  Seal/prime then paint more than the walls (2 coats) | 457.21  SF @ | 0.84 = | 384.06 |
| 424.  Deodorize building - Hot thermal fog | 587.73  CF @ | 0.06 = | 35.26 |

**9261 - Loft**

| Loft | | Height: 8' |
|------|--|-----------|
| **Missing Wall - Goes to Ceiling** | 3' X 5' | Opens into Exterior |
| **Door** | 2' 3" X 6' 8" | Opens into Exterior |
| **Missing Wall - Goes to Ceiling** | 14' 7" X 5' | Opens into Exterior |
| **Window - Goes to Floor** | 8' X 6' 1/4" | Opens into Exterior |
| **Door** | 2' 6" X 6' 8" | Opens into BEDROOM |
| **Window** | 8' X 3' 6" | Opens into BEDROOM |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|-------------|-----|-----------|-------|
| 425.  Recessed light fixture - Detach & reset trim only | 4.00  EA @ | 2.90 = | 11.60 |

SKAII_INVEST_LLC-R-1

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Loft**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 426.  5/8" - drywall per LF - up to 2' tall | 62.42 | LF @ | 10.03 = | 626.07 |
| 427.  Batt insulation replacement per LF - 4" - up to 2' tall | 62.42 | LF @ | 1.63 = | 101.74 |
| 428.  5/8" drywall - hung, taped, floated, ready for paint | 289.16 | SF @ | 2.47 = | 714.23 |
| 429.  Batt insulation - 10" - R30 - unfaced batt | 289.16 | SF @ | 1.27 = | 367.23 |
| 430.  Baseboard - 2 1/4" | 62.42 | LF @ | 2.75 = | 171.66 |
| 431.  Clean more than the walls | 694.74 | SF @ | 0.31 = | 215.37 |
| 432.  Mask and prep for paint - plastic, paper, tape (per LF) | 57.58 | LF @ | 1.21 = | 69.67 |
| 433.  Floor protection - plastic and tape - 10 mil | 289.16 | SF @ | 0.26 = | 75.18 |
| 434.  Seal/prime then paint more than the walls (2 coats) | 694.74 | SF @ | 0.84 = | 583.58 |
| 435.  Seal & paint baseboard - two coats | 62.42 | LF @ | 1.31 = | 81.77 |
| 436.  Deodorize building - Hot thermal fog | 2,313.25 | CF @ | 0.06 = | 138.80 |

**Bedroom**                                                                    **Height: 8'**

| Door | 2' 6" X 6' 8" | Opens into LOFT |
|---|---|---|
| Window | 8' X 3' 6" | Opens into LOFT |
| Window | 4' X 2' 8 1/8" | Opens into Exterior |

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 437.  Recessed light fixture - Detach & reset trim only | 2.00 | EA @ | 2.90 = | 5.80 |
| 438.  5/8" - drywall per LF - up to 2' tall | 47.84 | LF @ | 10.03 = | 479.84 |
| 439.  Batt insulation replacement per LF - 4" - up to 2' tall | 47.84 | LF @ | 1.63 = | 77.98 |
| 440.  5/8" drywall - hung, taped, floated, ready for paint | 147.87 | SF @ | 2.47 = | 365.24 |
| 441.  Batt insulation - 10" - R30 - unfaced batt | 147.87 | SF @ | 1.27 = | 187.79 |
| 442.  Baseboard - 2 1/4" | 47.84 | LF @ | 2.75 = | 131.56 |
| 443.  Clean more than the walls and ceiling | 643.13 | SF @ | 0.31 = | 199.37 |
| 444.  Mask and prep for paint - plastic, paper, tape (per LF) | 50.34 | LF @ | 1.21 = | 60.91 |
| 445.  Floor protection - plastic and tape - 10 mil | 147.87 | SF @ | 0.26 = | 38.45 |
| 446.  Seal & paint baseboard - two coats | 47.84 | LF @ | 1.31 = | 62.67 |
| 447.  Seal/prime then paint more than the walls (2 coats) | 495.26 | SF @ | 0.84 = | 416.02 |
| 448.  Deodorize building - Hot thermal fog | 1,182.95 | CF @ | 0.06 = | 70.98 |

**⊕ JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

### 9265 - Main Level

**Reception**                                                                    Height: 9'

| Door | 5' X 6' 8" | Opens into Exterior |
| Window | 5' X 2' 3 13/16" | Opens into Exterior |
| Window - Goes to Floor | 3' X 8' 11 7/8" | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into WAREHOUSE_GA |
| Missing Wall | 3' 2" X 9' | Opens into STAIRS |
| Door | 2' 6" X 6' 8" | Opens into RESTROOM_1 |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 449. Recessed light fixture - Detach & reset trim only | 4.00 | EA @ | 2.90 = | | 11.60 |
| 450. 5/8" - drywall per LF - up to 2' tall | 83.17 | LF @ | 10.03 = | | 834.20 |
| 451. Batt insulation replacement per LF - 4" - up to 2' tall | 83.17 | LF @ | 1.63 = | | 135.57 |
| 452. 5/8" drywall - hung, taped, floated, ready for paint | 457.09 | SF @ | 2.47 = | | 1,129.01 |
| 453. Batt insulation - 10" - R30 - unfaced batt | 457.09 | SF @ | 1.27 = | | 580.50 |
| 454. Baseboard - 2 1/4" | 83.17 | LF @ | 2.75 = | | 228.72 |
| 455. Clean more than the walls | 1,218.54 | SF @ | 0.31 = | | 377.75 |
| 456. Mask and prep for paint - plastic, paper, tape (per LF) | 96.67 | LF @ | 1.21 = | | 116.97 |
| 457. Floor protection - plastic and tape - 10 mil | 457.09 | SF @ | 0.26 = | | 118.84 |
| 458. Seal & paint baseboard - two coats | 83.17 | LF @ | 1.31 = | | 108.95 |
| 459. Seal/prime then paint the walls and ceiling (2 coats) | 1,218.54 | SF @ | 0.84 = | | 1,023.57 |
| 460. Deodorize building - Hot thermal fog | 4,113.80 | CF @ | 0.06 = | | 246.83 |

**Restroom 1**                                                                  Height: 9'

| Door | 2' 6" X 6' 8" | Opens into RECEPTION |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 461. Recessed light fixture - Detach & reset trim only | 1.00 | EA @ | 2.90 = | | 2.90 |
| 462. 5/8" - drywall per LF - up to 2' tall | 26.33 | LF @ | 10.03 = | | 264.09 |
| 463. Batt insulation replacement per LF - 4" - up to 2' tall | 26.33 | LF @ | 1.63 = | | 42.92 |
| 464. 5/8" drywall - hung, taped, floated, ready for paint | 51.94 | SF @ | 2.47 = | | 128.29 |
| 465. Batt insulation - 10" - R30 - unfaced batt | 51.94 | SF @ | 1.27 = | | 65.96 |
| 466. Baseboard - 2 1/4" | 26.33 | LF @ | 2.75 = | | 72.41 |
| 467. Clean more than the walls | 346.72 | SF @ | 0.31 = | | 107.48 |
| 468. Mask and prep for paint - plastic, paper, tape (per LF) | 28.83 | LF @ | 1.21 = | | 34.88 |
| 469. Floor protection - plastic and tape - 10 mil | 51.94 | SF @ | 0.26 = | | 13.50 |
| 470. Seal & paint baseboard - two coats | 26.33 | LF @ | 1.31 = | | 34.49 |
| 471. Seal/prime then paint part of the walls (2 coats) | 173.36 | SF @ | 0.84 = | | 145.62 |
| 472. Deodorize building - Hot thermal fog | 467.50 | CF @ | 0.06 = | | 28.05 |
| 473. Install Vanity | 2.50 | LF @ | 42.12 = | | 105.30 |

**(JSHELD) J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Restroom 1**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 474. Install Toilet | 1.00 EA @ | 161.36 = | 161.36 |

**Warehouse/Garage**                                                  Height: 13' 6"

| Door | 2' 6" X 6' 8" | Opens into RESTROOM_2 |
|---|---|---|
| Door | 10' X 10' | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into RECEPTION |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 475. 5/8" - drywall per LF - up to 2' tall | 131.83 LF @ | 10.03 = | 1,322.25 |
| 476. Batt insulation replacement per LF - 4" - up to 2' tall | 131.83 LF @ | 1.63 = | 214.88 |
| 477. Clean more than the walls | 5,401.19 SF @ | 0.31 = | 1,674.37 |
| 478. Mask and prep for paint - plastic, paper, tape (per LF) | 188.83 LF @ | 1.21 = | 228.48 |
| 479. Floor protection - plastic and tape - 10 mil | 1,525.31 SF @ | 0.26 = | 396.58 |
| 480. Seal/prime then paint the walls (2 coats) | 2,007.58 SF @ | 0.84 = | 1,686.37 |
| 481. Deodorize building - Hot thermal fog | 25,222.13 CF @ | 0.06 = | 1,513.33 |

**Restroom 2**                                                        Height: 9'

| Door | 2' 6" X 6' 8" | Opens into WAREHOUSE_GA |
|---|---|---|

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 482. Recessed light fixture - Detach & reset trim only | 1.00 EA @ | 2.90 = | 2.90 |
| 483. 5/8" - drywall per LF - up to 2' tall | 20.00 LF @ | 10.03 = | 200.60 |
| 484. Batt insulation replacement per LF - 4" - up to 2' tall | 20.00 LF @ | 1.63 = | 32.60 |
| 485. 5/8" drywall - hung, taped, floated, ready for paint | 28.72 SF @ | 2.47 = | 70.94 |
| 486. Batt insulation - 10" - R30 - unfaced batt | 28.72 SF @ | 1.27 = | 36.47 |
| 487. Baseboard - 2 1/4" | 20.00 LF @ | 2.75 = | 55.00 |
| 488. Clean more than the walls | 243.28 SF @ | 0.31 = | 75.42 |
| 489. Mask and prep for paint - plastic, paper, tape (per LF) | 22.50 LF @ | 1.21 = | 27.23 |
| 490. Floor protection - plastic and tape - 10 mil | 28.72 SF @ | 0.26 = | 7.47 |
| 491. Seal & paint baseboard - two coats | 20.00 LF @ | 1.31 = | 26.20 |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Restroom 2**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 492. Seal/prime then paint part of the walls (2 coats) | 121.64 SF @ | 0.84 = | 102.18 |
| 493. Deodorize building - Hot thermal fog | 258.50 CF @ | 0.06 = | 15.51 |
| 494. Install Vanity | 2.50 LF @ | 42.12 = | 105.30 |
| 495. Install Toilet | 1.00 EA @ | 161.36 = | 161.36 |

**Stairs** | | | **Height: 12' 5"**

**Missing Wall**       3' 2" X 12' 4 1/2"              **Opens into RECEPTION**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 496. Clean the walls and ceiling | 157.22 SF @ | 0.31 = | 48.74 |
| 497. Clean more than the floor | 71.13 SF @ | 0.31 = | 22.05 |
| 498. Mask and prep for paint - plastic, paper, tape (per LF) | 16.35 LF @ | 1.21 = | 19.78 |
| 499. Floor protection - plastic and tape - 10 mil | 56.90 SF @ | 0.26 = | 14.79 |
| 500. Seal/prime then paint more than the walls (2 coats) | 157.22 SF @ | 0.84 = | 132.06 |
| 501. Deodorize building - Hot thermal fog | 217.86 CF @ | 0.06 = | 13.07 |

**9265 - Loft**

**Loft** | | | **Height: 8'**

| **Missing Wall** | 3' 4" X 8' | **Opens into Exterior** |
|---|---|---|
| **Missing Wall** | 9' 11 5/16" X 8' | **Opens into Exterior** |
| **Missing Wall** | 3' 4" X 8' | **Opens into Exterior** |
| **Window** | 2' 5" X 2' 6" | **Opens into Exterior** |
| **Door** | 2' 6" X 4' 3/16" | **Opens into Exterior** |
| **Window** | 8' X 6' 5/16" | **Opens into Exterior** |
| **Door** | 2' 6" X 6' 8" | **Opens into BEDROOM** |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 502. Recessed light fixture - Detach & reset trim only | 4.00 EA @ | 2.90 = | 11.60 |
| 503. 5/8" - drywall per LF - up to 2' tall | 59.39 LF @ | 10.03 = | 595.68 |
| 504. Batt insulation replacement per LF - 4" - up to 2' tall | 59.39 LF @ | 1.63 = | 96.81 |
| 505. 5/8" drywall - hung, taped, floated, ready for paint | 304.64 SF @ | 2.47 = | 752.46 |

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Loft**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 506. Batt insulation - 10" - R30 - unfaced batt | 304.64 | SF @ | 1.27 = | 386.89 |
| 507. Baseboard - 2 1/4" | 59.39 | LF @ | 2.75 = | 163.32 |
| 508. Clean more than the walls | 738.82 | SF @ | 0.31 = | 229.03 |
| 509. Mask and prep for paint - plastic, paper, tape (per LF) | 64.39 | LF @ | 1.21 = | 77.91 |
| 510. Floor protection - plastic and tape - 10 mil | 304.64 | SF @ | 0.26 = | 79.21 |
| 511. Seal/prime then paint more than the walls (2 coats) | 738.82 | SF @ | 0.84 = | 620.61 |
| 512. Seal & paint baseboard - two coats | 59.39 | LF @ | 1.31 = | 77.80 |
| 513. Deodorize building - Hot thermal fog | 2,437.14 | CF @ | 0.06 = | 146.23 |

**Bedroom**                                                                                      Height: 8'

**Door**                          2' 6" X 6' 8"                          Opens into LOFT

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 514. Recessed light fixture - Detach & reset trim only | 2.00 | EA @ | 2.90 = | 5.80 |
| 515. 5/8" - drywall per LF - up to 2' tall | 47.33 | LF @ | 10.03 = | 474.72 |
| 516. Batt insulation replacement per LF - 4" - up to 2' tall | 47.33 | LF @ | 1.63 = | 77.15 |
| 517. 5/8" drywall - hung, taped, floated, ready for paint | 143.82 | SF @ | 2.47 = | 355.24 |
| 518. Batt insulation - 10" - R30 - unfaced batt | 143.82 | SF @ | 1.27 = | 182.65 |
| 519. Baseboard - 2 1/4" | 47.33 | LF @ | 2.75 = | 130.16 |
| 520. Clean more than the walls and ceiling | 669.64 | SF @ | 0.31 = | 207.59 |
| 521. Mask and prep for paint - plastic, paper, tape (per LF) | 49.83 | LF @ | 1.21 = | 60.29 |
| 522. Floor protection - plastic and tape - 10 mil | 143.82 | SF @ | 0.26 = | 37.39 |
| 523. Seal & paint baseboard - two coats | 47.33 | LF @ | 1.31 = | 62.00 |
| 524. Seal/prime then paint more than the walls (2 coats) | 525.82 | SF @ | 0.84 = | 441.69 |
| 525. Deodorize building - Hot thermal fog | 1,150.56 | CF @ | 0.06 = | 69.03 |

**Roof**
**Roof**

**Roof**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

*The following scope is for the roof at Units; 9241, 9245 and partial replacement at 9251.*

SKAII_INVEST_LLC-R-1                                          2/4/2022          Page: 27

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Roof**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

**Built Up Roof**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 526. Remove Sheathing - plywood - 5/8" CDX | 9,000.00 | SF @ | 0.53 = | 4,770.00 |
| 527. Remove Tear off Built-up roof with granulated cap sheet - in place | 117.00 | SQ @ | 70.34 = | 8,229.78 |
| 528. Sheathing - plywood - 5/8" CDX | 9,000.00 | SF @ | 2.30 = | 20,700.00 |
| 529. Panelized roof structure. | 8,500.00 | SF @ | 10.00 = | 85,000.00 |
| Includes purlins & sub purlins etc. | | | | |
| 530. Built-up roof with granulated cap sheet - in place | 117.00 | SQ @ | 417.18 = | 48,810.06 |
| 531. Flash parapet wall only - bitumen | 231.00 | LF @ | 11.57 = | 2,672.67 |
| Figured at 3' stretch out. | | | | |
| 532. Flash baseflashings at curbs & walls - bitumen | 90.00 | LF @ | 11.57 = | 1,041.30 |
| 12" baseflashing figured. | | | | |
| 533. Skylight - double dome fixed, 4 - 6.5 sf | 4.00 | EA @ | 273.29 = | 1,093.16 |
| 534. Skylight - double dome fixed, 9.1 - 12.5 sf | 6.00 | EA @ | 375.48 = | 2,252.88 |
| 535. Membrane roofing - cant strips - perlite | 501.00 | LF @ | 2.10 = | 1,052.10 |
| 536. Cap flashing | 231.00 | LF @ | 19.31 = | 4,460.61 |
| 537. Roof scupper - aluminum | 3.00 | EA @ | 155.38 = | 466.14 |
| 538. Roof vent - turbine type | 8.00 | EA @ | 114.98 = | 919.84 |
| 539. Flashing - pipe jack - split boot | 4.00 | EA @ | 74.39 = | 297.56 |
| 540. Roofer - per hour - Loading materials - mobilization | 40.00 | HR @ | 142.01 = | 5,680.40 |

**Upper Built Up Roof**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 541. Remove Sheathing - plywood - 5/8" CDX | 351.00 | SF @ | 0.53 = | 186.03 |
| 542. Remove Tear off Built-up roof with granulated cap sheet - in place | 3.51 | SQ @ | 70.34 = | 246.89 |
| 543. Sheathing - plywood - 5/8" CDX | 351.00 | SF @ | 2.30 = | 807.30 |
| 544. Built-up roof with granulated cap sheet - in place | 3.51 | SQ @ | 417.18 = | 1,464.30 |
| 545. Flash parapet wall only - bitumen | 54.00 | LF @ | 11.57 = | 624.78 |
| Figured at 3' stretch out. | | | | |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

**CONTINUED - Upper Built Up Roof**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 546. Membrane roofing - cant strips - perlite | 54.00 LF @ | 2.10 = | 113.40 |
| 547. Drip edge | 26.00 LF @ | 2.31 = | 60.06 |
| 548. Cap flashing | 54.00 LF @ | 19.31 = | 1,042.74 |

**Mansard Tile Roof**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 549. Roofing felt - 30 lb. | 21.00 SQ @ | 39.81 = | 836.01 |
| 550. Tile roofing - Concrete - "S" or flat tile | 21.00 SQ @ | 553.30 = | 11,619.30 |
| 551. Ridge / Hip / Rake cap - tile roofing | 198.00 LF @ | 12.09 = | 2,393.82 |
| 552. Cap flashing | 53.00 LF @ | 19.31 = | 1,023.43 |
| 553. Flashing - L flashing - color finish | 106.00 LF @ | 4.34 = | 460.04 |
| 554. Hip/ridge/rake/eave nailer board - 2x2 | 48.00 LF @ | 2.21 = | 106.08 |
| 555. Drip edge | 74.00 LF @ | 2.31 = | 170.94 |
| 556. Bird stop - Eave closure strip for tile roofing - metal | 74.00 LF @ | 3.62 = | 267.88 |
| 557. Prime & paint roofing | 640.00 SF @ | 0.87 = | 556.80 |

**Grand Total Areas:**

| | | | | | |
|---|---|---|---|---|---|
| 25,598.79 | SF Walls | 16,318.80 | SF Ceiling | 41,917.59 | SF Walls and Ceiling |
| 15,891.98 | SF Floor | 1,765.78 | SY Flooring | 2,272.46 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 2,640.05 | LF Ceil. Perimeter |
| 15,891.98 | Floor Area | 16,867.17 | Total Area | 24,014.17 | Interior Wall Area |
| 26,658.46 | Exterior Wall Area | 2,523.28 | Exterior Perimeter of Walls | | |
| 15,859.44 | Surface Area | 158.59 | Number of Squares | 750.73 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 61.28 | Total Hip Length | | |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

## Summary for Dwelling

| | |
|---|---:|
| Line Item Total | 929,178.37 |
| California Lumber Assessment Fee | 220.16 |
| California Carpet Stewardship Assessment Fee | 89.10 |
| Subtotal | 929,487.63 |
| Overhead | 92,949.05 |
| Profit | 92,949.05 |
| Material Sales Tax | 20,104.46 |
| **Replacement Cost Value** | **$1,135,490.19** |
| **Net Claim** | **$1,135,490.19** |

J.S. Held LLC

**⊕JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

## Recap of Taxes, Overhead and Profit

|  | Overhead (10%) | Profit (10%) | Material Sales Tax (7.75%) | Storage Rental Tax (7.75%) |
|---|---|---|---|---|
| **Line Items** | 92,918.12 | 92,918.12 | 20,104.46 | 0.00 |
| **Additional Charges** | 30.93 | 30.93 | 0.00 | 0.00 |
| **Total** | **92,949.05** | **92,949.05** | **20,104.46** | **0.00** |

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

## Recap by Room

**Estimate: SKAII_INVEST_LLC-R-1**

| | | |
|---|---:|---:|
| General Items | 85,555.67 | 9.21% |
| Demo & Shoring | 65,000.00 | 7.00% |
| Structural | 77,649.38 | 8.36% |
| Framing | 63,111.89 | 6.79% |
| Electrical | 106,708.33 | 11.48% |
| Heat, Vent, & Cool | 80,329.21 | 8.65% |
| Exterior Elevations | 20,189.10 | 2.17% |
| Plumbing | 8,658.72 | 0.93% |

**Area: 9241 (Origin)**

| | | |
|---|---:|---:|
| Area: 9241 - Origin | 462.08 | 0.05% |
| Reception | 11,539.46 | 1.24% |
| Warehouse/Garage | 21,575.15 | 2.32% |
| Bathroom | 2,625.33 | 0.28% |
| **Area Subtotal: 9241 - Origin** | **36,202.02** | **3.90%** |
| **Area Subtotal: 9241 (Origin)** | **36,202.02** | **3.90%** |

**Area: 9245**

| | | |
|---|---:|---:|
| Area: 9245 - Main Level | 2,082.02 | 0.22% |
| Reception | 14,328.26 | 1.54% |
| Closet (under stairs) | 937.17 | 0.10% |
| Restroom 1 | 4,405.27 | 0.47% |
| Restroom 2 | 2,379.11 | 0.26% |
| Warehouse/Garage | 13,670.62 | 1.47% |
| Stairs | 5,378.08 | 0.58% |
| **Area Subtotal: 9245 - Main Level** | **43,180.53** | **4.65%** |
| Area: 9245 - Loft | 78.24 | 0.01% |
| Loft | 6,745.49 | 0.73% |
| Closet | 2,413.03 | 0.26% |
| **Area Subtotal: 9245 - Loft** | **9,236.76** | **0.99%** |
| **Area Subtotal: 9245** | **52,417.29** | **5.64%** |

**Area: 9251**

| | | |
|---|---:|---:|
| Area: 9251 - Main Level | 1,994.30 | 0.21% |
| Reception | 8,311.24 | 0.89% |

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| | | |
|---|---:|---:|
| Restroom | 2,615.04 | 0.28% |
| Storage 1 | 1,895.93 | 0.20% |
| Storage 2 | 2,495.09 | 0.27% |
| Sales Floor | 14,296.08 | 1.54% |
| Warehouse | 13,120.52 | 1.41% |
| **Area Subtotal:  9251 - Main Level** | **44,728.20** | **4.81%** |
| **Area Subtotal:  9251** | **44,728.20** | **4.81%** |

**Area: 9255**

**Area: 9255 - Main Level**

| | | |
|---|---:|---:|
| Reception 1 | 6,590.26 | 0.71% |
| Storage 1 | 6,560.53 | 0.71% |
| Reception 2 | 9,102.79 | 0.98% |
| Storage 2 | 4,452.43 | 0.48% |
| Restroom | 889.36 | 0.10% |
| Warehouse | 7,110.95 | 0.77% |
| **Area Subtotal:  9255 - Main Level** | **34,706.32** | **3.74%** |
| **Area Subtotal:  9255** | **34,706.32** | **3.74%** |

**Area: 9261**

**Area: 9261 - Main Level**

| | | |
|---|---:|---:|
| Reception | 8,396.87 | 0.90% |
| Office/Sales Floor | 3,058.21 | 0.33% |
| Restroom | 1,213.59 | 0.13% |
| Shower Room | 1,051.83 | 0.11% |
| Warehouse | 5,200.99 | 0.56% |
| Stairs | 653.99 | 0.07% |
| **Area Subtotal:  9261 - Main Level** | **19,575.48** | **2.11%** |

**Area: 9261 - Loft**

| | | |
|---|---:|---:|
| Loft | 3,156.90 | 0.34% |
| Bedroom | 2,096.61 | 0.23% |
| **Area Subtotal:  9261 - Loft** | **5,253.51** | **0.57%** |
| **Area Subtotal:  9261** | **24,828.99** | **2.67%** |

**Area: 9265**

**Area: 9265 - Main Level**

SKAII_INVEST_LLC-R-1

**⬡JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| | | |
|---|---:|---:|
| Reception | 4,912.51 | 0.53% |
| Restroom 1 | 1,207.25 | 0.13% |
| Warehouse/Garage | 7,036.26 | 0.76% |
| Restroom 2 | 919.18 | 0.10% |
| Stairs | 250.49 | 0.03% |
| **Area Subtotal: 9265 - Main Level** | 14,325.69 | 1.54% |
| **Area: 9265 - Loft** | | |
| Loft | 3,237.55 | 0.35% |
| Bedroom | 2,103.71 | 0.23% |
| **Area Subtotal: 9265 - Loft** | 5,341.26 | 0.57% |
| **Area Subtotal: 9265** | 19,666.95 | 2.12% |
| **Area: Roof** | | |
| **Area: Roof** | | |
| Built Up Roof | 187,446.50 | 20.17% |
| Upper Built Up Roof | 4,545.50 | 0.49% |
| Mansard Tile Roof | 17,434.30 | 1.88% |
| **Area Subtotal: Roof** | 209,426.30 | 22.54% |
| **Area Subtotal: Roof** | 209,426.30 | 22.54% |
| **Subtotal of Areas** | 929,178.37 | 100.00% |
| **Total** | 929,178.37 | 100.00% |

**(JS|HELD) J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

## Recap by Category

| O&P Items | Total | % |
|---|---:|---:|
| ACOUSTICAL TREATMENTS | 4,108.91 | 0.36% |
| CABINETRY | 3,639.70 | 0.32% |
| CLEANING | 27,481.18 | 2.42% |
| CONCRETE & ASPHALT | 17,405.28 | 1.53% |
| GENERAL DEMOLITION | 81,723.55 | 7.20% |
| DOORS | 8,207.70 | 0.72% |
| DRYWALL | 54,368.84 | 4.79% |
| ELECTRICAL | 106,708.33 | 9.40% |
| MISC. EQUIPMENT - COMMERCIAL | 4,236.80 | 0.37% |
| HEAVY EQUIPMENT | 18,099.38 | 1.59% |
| FLOOR COVERING - CARPET | 8,634.11 | 0.76% |
| FLOOR COVERING - CERAMIC TILE | 2,560.90 | 0.23% |
| FLOOR COVERING - WOOD | 10,802.73 | 0.95% |
| FINISH CARPENTRY / TRIMWORK | 6,052.21 | 0.53% |
| FINISH HARDWARE | 706.23 | 0.06% |
| FRAMING & ROUGH CARPENTRY | 135,477.82 | 11.93% |
| GLASS, GLAZING, & STOREFRONTS | 33,007.63 | 2.91% |
| HEAT, VENT & AIR CONDITIONING | 80,329.21 | 7.07% |
| INSULATION | 18,490.23 | 1.63% |
| LABOR ONLY | 60,496.00 | 5.33% |
| LIGHT FIXTURES | 116.00 | 0.01% |
| MIRRORS & SHOWER DOORS | 107.60 | 0.01% |
| METAL STRUCTURES & COMPONENTS | 419.04 | 0.04% |
| PLUMBING | 14,107.34 | 1.24% |
| PANELING & WOOD WALL FINISHES | 1,938.73 | 0.17% |
| PAINTING | 47,911.96 | 4.22% |
| ROOFING | 107,090.76 | 9.43% |
| STEEL COMPONENTS | 60,575.19 | 5.33% |
| STAIRS | 1,106.28 | 0.10% |
| TOILET & BATH ACCESSORIES | 1,253.40 | 0.11% |
| TIMBER FRAMING | 1,858.82 | 0.16% |
| TEMPORARY REPAIRS | 6,655.55 | 0.59% |
| WINDOWS - ALUMINUM | 154.92 | 0.01% |
| WINDOWS - SKYLIGHTS | 3,346.04 | 0.29% |
| **O&P Items Subtotal** | **929,178.37** | **81.83%** |
| **Permits and Fees** | 309.26 | 0.03% |
| **Overhead** | 92,949.05 | 8.19% |
| **Profit** | 92,949.05 | 8.19% |
| **Material Sales Tax** | 20,104.46 | 1.77% |

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562

| Total | 1,135,490.19 | 100.00% |
|-------|--------------|---------|

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562



| 1 | 1-Overhead | Date Taken: 5/20/2017 | Taken By: geomni |

Xactware Report Number: 1843245, Claim Number: 19021205, Report Completion Date: 01 Mar 2019, Address: 9241 BISHOP PLACE WESTMINSTER, CA 92683
Latitude: 33.741600  Longitude: -117.967809

JS|HELD  **J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562



2        3-East                        Date Taken: 5/8/2017              Taken By: Other
Xactware Report Number: 1843245, Claim Number: 19021205, Report Completion Date: 01 Mar 2019, Address: 9241
BISHOP PLACE WESTMINSTER, CA 92683
Latitude: 33.741600  Longitude: -117.967809

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562



3    4-South             Date Taken: 5/20/2017         Taken By: Other
Xactware Report Number: 1843245, Claim Number: 19021205, Report Completion Date: 01 Mar 2019, Address: 9241
BISHOP PLACE WESTMINSTER, CA 92683
Latitude: 33.741600 Longitude: -117.967809

**JS|HELD J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562



4        5-West                    Date Taken: 5/20/2017              Taken By: Other

Xactware Report Number: 1843245, Claim Number: 19021205, Report Completion Date: 01 Mar 2019, Address: 9241 BISHOP PLACE WESTMINSTER, CA 92683
Latitude: 33.741600 Longitude: -117.967809

**JS|HELD  J.S. HELD LLC**

25240 Hancock Avenue
Suite 430
Murrieta CA 92562



5      6-North                    Date Taken: 5/20/2017                Taken By: Other

Xactware Report Number: 1843245, Claim Number: 19021205, Report Completion Date: 01 Mar 2019, Address: 9241
BISHOP PLACE WESTMINSTER, CA 92683
Latitude: 33.741600  Longitude: -117.967809

Warehouse/Garage

30' 9"

14'

Paint Booth (B E

Restroom

Restroom

Reception

N

**9265 - Main Level**



9265 - Loft



9261 - Main Level



9261 - Loft





9255 - Main Level

SKAII_INVEST_LLC-R-1

2/4/2022    Page: 46



9251 - Main Level

2/4/2022        Page: 47



Warehouse/Garage

Restroom 2

Restroom 1

Closet (under stairs)

Reception
Area (A17)



N

9245 - Main Level



9245 - Loft



Warehouse/Garage

Bathroom

Reception



9241 - Origin



SKYLIGHT7 (B7) SKYLIGHT6 (B6) SKYLIGHT5 (B5)  SKYLIGHT4 (B4)  SKYLIGHT3 (B3)  SKYLIGHT2 (B2)  SKYLIGHT1 (B1)

Built Up Roof

SKYLIGHT15 (B15) SKYLIGHT14 (B14) SKYLIGHT13 (B13) SKYLIGHT12 (B12) SKYLIGHT11 (B11) SKYLIGHT10 (B10) SKYLIGHT9 (B9)

F10

F6

TREE3 (B3)

TREE1 (B1)

TREE2 (B2)  TREE4 (B4)

TREE5 (B5)



Roof

SKAII_INVEST_LLC-R-1

# EXHIBIT 7

# SWORN STATEMENT IN PROOF OF LOSS

| | |
|---|---|
| AMOUNT OF POLICY: 2142000 | DATE ISSUED: 04/25/2018 |
| POLICY NUMBER:    SKBP981657 | DATE EXPIRED: 04/25/2019 |
| POLICYHOLDER:    Skall Investment LLC | |

**To** Berkshire Hathaway GUARD Insurance Companies
of Wilkes-Barre, Pennsylvania:

At the time of loss, you insured the Policyholder shown above (by the policy of insurance listed) against loss by covered peril to the property described according to the terms and conditions of the policy and all attached forms, endorsements, transfers, and assignments.

**1. Time and Origin:** A property loss occurred on 01/23/2019 . The cause and origin of the loss were:
Fire

**2. Occupancy:** The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose of any kind: Shopping Center

**3. Title and Interest:** At the time of loss, the interest of your insured in the property described therein was the owner. No other person or persons had any interest therein or encumbrance thereon, except:
Royal Business Bank ISAOA

**4. Changes:** Since the policy was issued, no assignment thereof, or change of interest, use, occupancy, possession, location, or exposure of the property described has taken place except: None.

**5. The Total Amount of Insurance** upon the described property was       $ 2142000
(NOT INCLUDE 2% inflation guard)

**6. The Actual Cash Value** of the property at the time of loss was           $ N/A

**7. The Whole Loss and Damage** was                                            $ 1,167,393.97
Undisputed RCV   (NOT FINAL SETTLEMENT)

**8. Less the Amount of the Deductible** and/or advance payment/depreciation    $ 762,095.66
($106,821.80) Depreciation ($1,000.00) Deductible ($654,273.86) Prior Payment

**9. The Amount Claimed** under the above numbered policy as of the date subscribed is   $ 405,298.31
Undisputed ACV   (NOT FINAL SETTLEMENT)

The loss did not originate by any act, design, or procurement on the part of your insured or the person providing this affidavit. Nothing has been done by us with the consent of your insured or this affiant to violate or void the conditions of the policy. No articles are mentioned herein or in annexed schedules besides those destroyed or damaged at the time of loss. No property saved has in any manner been concealed, and no attempt to deceive the company as to the extent of the loss has in any manner been made.

State of      California

6 / 27 / 22
Date

6-27-2022
Date

_____
Insured

_____
Witness

For your protection California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ ORANGE _____ )

On __06/27/2022__ before me, __KEVIN P. NGUYEN__
(insert name and title of the officer)

personally appeared __NGUYEN, LAN BICH----------------------------------__,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

KEVIN PHUONG NGUYEN
COMM. #2290019
Notary Public - California
Orange County
My Comm. Expires May 25, 2023

# EXHIBIT 8



8/08/2022

Mimi Nguyen
Skaii Investments, LLC
15170 Goldenwest Circle
Westminster, CA 92683

Re: Building fire damage,  9241 Bishop Place, Westminster, CA

Ms. Nguyen,

I have reviewed the damage analysis and cost estimate (report) prepared by JS Held, I also visited the site to fully ascertain the present site and building condition as it relates to the report.

From my review and observation, the report seems thorough enough but lacks context as the structural components – steel columns, concrete walls and slab still remaining could have damage and also look damaged beyond those acknowledged in the report and are listed as needing replacement.

It is my opinion that with a building with this sever of damage it would be prudent to demolish all existing building components and start over, building to today's structural building code.  Please note that the Building Department Engineer may require these components to be replaced to meet current code.
There are risks in depending on these components structurally (Seismic Standards), as well as practically trying to salvage substandard components during renovation.

Please feel free to contact me if you have any questions or need further clarification.

Sincerely,

Jeff Bergsma,
Architect C21,085
General Contractor B502,378
221 Main St. Unit S
Huntington Beach, CA 92648
949-887-9542

# EXHIBIT 9



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

January 23, 2025

Skaii Investment LLC
c/o Glenn Nahmias
Metropolitan Adjustment Bureau
16133 Ventura Blvd., #470
Encino, CA 91436

> Re:    Insured:          Skaii Investment LLC
>        Claim No.:        SKBP981657-001-001-001
>        Policy No.:       SKBP981657
>        Date of Loss:     January 23, 2019
>        Loss Location:    9241 Bishop Place #9265
>                          Westminster, CA 92683-6503

Dear Mr. Nahmias:

As you know, AmGUARD Insurance Company ("AmGUARD") issued the referenced insurance policy number SKBP981657 ("Policy") to Skaii Investment LLC ("Skaii"), and has investigated the referenced loss involving a fire on or about January 23, 2019 at the warehouse located at 9241 Bishop Place #9265, Westminster, California 92683-6503 ("Loss").

This letter will describe AmGUARD's investigation of Policy coverage for the Loss including prior payments made by AmGUARD to Skaii, as well as AmGUARD's coverage position concerning the Loss.

### Policy Information

AmGUARD issued businessowner's policy number SKBP981657 to Skaii for the period of April 25, 2018 to April 25, 2019 ("Policy"). The property at 9241 Bishop Place #9265, Westminster, California 92683-6503 ("Property") is identified as Location 001/Building 001 in the Policy's Declarations. The Policy includes replacement cost coverage for the building up to a limit of $2,142,000, subject to a $1,000 deductible. Also included in the Policy is business income and extra expense coverage for "[A]ctual Loss Sustained up to 12 Months..."

The Businessowners Coverage Form is the BP 00 03 01 10. The Policy contains a "CALIFORNIA CHANGES" endorsement (BP 01 55 05 17) which modifies the Loss Payment provisions as follows in pertinent part:

> **4.**    Paragraphs **E.5.d.(1)(d)** and **E.5.d.(5)** of the **Loss Payment** Property Loss Conditions are replaced as follows:
>
>> **(d)**    We will not pay on a replacement cost basis for any loss or damage until the lost or damaged property is actually repaired or replaced. Prior to such repair or replacement, we



**Berkshire Hathaway**
**GUARD** Insurance
Companies

**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

will pay the actual cash value of the lost
or damaged property as described in Paragraph
**A.1.** of this Endorsement.  If the actual cash value
does not exhaust the applicable Limit of Insurance,
we will then pay the difference between the actual
cash value and the replacement cost, provided the
repair or replacement is completed:

**(i)**    Within 12 months after we pay

the actual cash value; or

**(ii)**    Within 24 months after we pay the

actual cash value if the loss or damage
relates to a state of emergency as described
in Section 8558 of the Government Code;

unless we extend the time period for good cause...

("RC Condition").

The Policy also includes the following additional Property Loss Conditions and definition:

      **E.**    **Property Loss Conditions**

          *    *    *

          **3.**    **Duties In The Event Of Loss or Damage**

              **a.**    You must see that the following are
done in the event of loss or damage
to Covered Property:

                  *    *    *

                  **(9)**    Resume all or part of your
"operations" as quickly as possible...

                  *    *    *

          **4.**    **Legal Action Against Us**

              No one may bring a legal action against us
under this insurance unless:

              **a.** There has been full compliance with all of

the terms of this insurance; and

              **b.** The action is brought within two years

after the date on which the direct physical



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

loss or damage occurred.

\*     \*     \*

**H.**     **Property Definitions**

\*     \*     \*

**8.**     "Operations" means your business activities occurring at the described premises.

### The Insurance Claim and Coverage Investigation

The Property was a one-story warehouse divided into six leasable units at the time of the Loss. The fire involved in the Loss originated in one of the tenant spaces, and caused damage including destruction of the roof above the northern portion of the Property and internal fixtures.

AmGUARD was notified of the Loss in January 2019, and engaged independent adjuster Engle Martin & Associates ("Engle Martin") to assist in the coverage investigation. Other vendors were engaged on behalf of AmGUARD as part of the investigation including building consultant JS Held to determine the scope and cost of necessary building repairs and accounting firm TD Davidson ("TDD"), which evaluated Skaii's claim for lost business income due to the Loss. Skaii engaged public adjuster Metropolitan Adjustment Bureau, Inc. ("MAB") in connection with the Loss.

AmGUARD issued a $250,000 advance for the building damage on April 10, 2019, and subsequently issued an actual cash value ("ACV") payment totaling $404,273.86 on October 9, 2019 based on JS Held's initial repair cost estimate. AmGUARD also issued business income loss payments to Skaii totaling $114,450.65 as of September 10, 2019 based on TDD's business income loss calculations.

JS Held subsequently revised its repair cost estimate based on disputes raised by MAB, as well as additional inspection and testing of the Property damage in 2020 and 2021. JS Held's revised estimated replacement cost totaled $1,167,393.97, while the actual cash value of the Property damage was $1,054,352.17. Those amounts are based on a 2021 price list that was in effect when core testing was performed at the Property in September 2021. A further ACV payment of $405,298.31 was issued to Skaii on July 12, 2022 after accounting for the Policy's deductible and prior payments for damage to the Property.

MAB subsequently reported that Skaii was still working to gather all expenses and estimates, and would provide the same to AmGUARD for consideration. Engle Martin sent Skaii a 30-day letter dated October 5, 2022 after receiving no additional information concerning the claim.

In November 2022, a repair bid from J.A. Stowell Construction, Inc. totaling $2,556,755.60 was provided to AmGUARD on Skaii's behalf. The bid, however, did not include details about the scope of work reflected in the bid, bid sheets or subcontractor bids. Engle Martin requested some type of scope break down necessary to compare the repair estimates, and MAB noted in an email to Engle Martin on December 14, 2022 that "we will try to put some detail together."



Engle Martin continued to reach out to MAB for additional information about the claim without success from December 2022 through April 2023. The claim was closed by AmGUARD on or about May 10, 2023 due to the insured's failure to provide additional information about the claim.

MAB requested that the claim be reopened on or about February 1, 2024, noting Skaii's representative had cancer and needed time to review the documents and MAB finally had time to review the documents. AmGUARD agreed to consider the additional documents referenced by MAB.

MAB thereafter advised AmGUARD on February 22, 2024 that lost rent payments for certain of the units only accounted for 11 months of lost rent. AmGUARD responded on March 4th, agreeing to release payment for an additional month. That additional payment totaled $9,510.47 and was issued on March 29, 2024.

AmGUARD received additional documents from MAB and Skaii on or about September 23, 2024, including Excel sheets, invoices (for onsite plumbing, lights, temporary roof, inspections, cleaning, consulting, architectural services), proposals for structural plans and engineering services as well as multiple repair cost bids.

On October 10, 2024, Skaii's representative Mimi Nguyen advised AmGUARD that "the condition of the building remains exactly the same as when…your adjuster from Engle Martin & Associates, last visited the site…", and "[w]e are still paying for the shoring equipment rental, which was put in place back in 2019…to stabilize the building for assessment."

### Coverage Position

AmGUARD has paid a total of $123,961.12 to Skaii for lost business income due to the Loss. This amount represents the "[A]ctual Loss Sustained up to 12 Months…", and as a result, AmGUARD has issued all payments for lost income owed under the Policy. No additional funds will be paid for lost income due to the Loss.

AmGUARD has issued multiple payments totaling $1,059,572.17 for the actual cash value of damage to the Property, the last of which was made on July 12, 2022. These payments represent the total amount due under the Policy for the ACV of the damaged Property. No further ACV payments will be made due to the Loss.

As discussed above, the Policy requires Skaii to "[R]esume all or part of your 'operations' as quickly as possible…" As well, pursuant to the Policy's RC Condition, AmGUARD has no duty to pay any amounts for replacement cost coverage until the Property is actually repaired and repairs are required to be completed within 12 months after AmGUARD pays the actual cash value unless AmGUARD agrees to extend that time period for good cause. Please be advised that AmGUARD hereby agrees to extend the time for Skaii to complete repairs to the Property, necessary to recover replacement cost benefits under the Policy, to one year from the date of this letter.

Please be further advised that any suit against AmGUARD relative to the Loss must be filed within two years after the Loss, as indicated above in the "Legal Action Against Us" Policy provisions.



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

The foregoing does not constitute, and should not be considered, a waiver or relinquishment by AmGUARD of any or all other rights or defenses available to it under the terms and provisions of the Policy and/or any applicable laws.  AmGUARD expressly reserves any and all such rights and defenses.  Additionally, the foregoing does not restrict or limit AmGUARD from relying upon and asserting other facts or grounds that are, or may become, available to it.

If Skaii has any additional documentation or information which it believes may affect our decision, please forward it to our immediate attention for consideration.

Also, if you believe this matter has been improperly evaluated, you may have the matter reviewed by the California Department of Insurance, Claims Services Bureau, 300 South Spring Street, 11th floor, Los Angeles, California 90013.  Said Department's phone number is (213) 897-2921 or (800) 927-4357.

Should you have any questions regarding our position in this matter, please do not hesitate to contact us.

Respectfully,

Melinda Champluvier
P&C Claims Manager
Berkshire Hathaway GUARD Insurance Company

# EXHIBIT 10

# witkow | baskin

March 7, 2025

**Via E-Mail and Regular Mail**

Attn: Melinda Champluvier
Berkshire Hathaway Guard Insurance Co.
P & C Claims
P.O. Box 1368
Wilkes-Barre, PA 18703
Melinda.Champluvier@guard.com

Re:  **Insured:        Skaii Investment LLC**
     **Claim No.:      SKBP981657-001-001-001**
     **Policy No.:     SKBP981657**
     **Date of Loss:   January 23, 2019**
     **Loss Location:  9241 Bishop Place #9265**
     **                Westminster, CA 92683-6503**

Dear Ms. Champluvier:

As you may recall, this Firm has been retained by your insured, Skaii Investment LLC ("Skaii"), in connection with the above-referenced claim (the "Claim") for the covered loss due to fire, on or about January 23, 2019 (the "Loss"), of real and personal property located at 9241 Bishop Place #9265, Westminster, California 92683-6503 (the "Property") owned by Skaii and insured by AmGUARD Insurance Company ("AmGUARD" or "you(r)") under policy #SKBP981657 (the "Policy").

This letter shall serve as Skaii's response to your letter to Skaii (c/o of Glenn Nahmias) dated January 23, 2025 (the "Position Letter"). In the Position Letter, you detail AmGUARD's payments to date to Skaii in connection with the Loss in the total amount of $1,183,533,29, comprised of $123,961.12 in monies for lost business income and $1,059,572.17 for the amount AmGUARD determined to be the actual cash value ("ACV") of damage to the Property. The Position Letter states "[n]o additional funds will be paid for lost income due to the Loss" and "[n]o further ACV payments will be made due to the Loss."

Crucially, however, the Position Letter also recognizes that where, as here, the ACV "does not exhaust the applicable Limit of Insurance, [AmGUARD] will then pay the difference between the [ACV] and the replacement cost [("hereinafter, "Replacement Cost(s)")], provided the repair or replacement is completed" within the time specified in the Policy "unless [AmGUARD] extend[s] the time period for good cause" (the "RC Condition").

# witkow|baskin

Re: Skaii Investment LLC, Claim No. SKBP981657-001-001-001
March 7, 2025
Page 2

Finally, the Position Letter also states that AmGUARD has "agree[d] to extend the time for Skaii to complete repairs to the Property, necessary to recover replacement cost benefits under the Policy, to one year from the date of this letter [*i.e.*, to and including January 23, 2026]" (the "Replacement Deadline").

So that there is no misunderstanding between or among the parties with respect to their continuing obligations and/or responsibilities under the Policy, we now set forth our understanding, under both the Position Letter and controlling California law, of the pertinent circumstances and conditions giving rise to Skaii's receipt of further payments from AmGUARD under the Policy.

    1.    *First*, while Skaii appreciates AmGUARD's agreement to extend the Repair Deadline to January 23, 2026, we are concerned that this timeline may not be sufficient in light of the ongoing bureaucratic delays associated with Skaii's efforts to obtain the permits and approvals from the City of Westminster and other responsible municipal bodies necessary to commence and complete the repairs to and/or replacement of the Property (hereinafter, the "Replacement"). Indeed, in the spirit of proactivity and pursuant to its obligations under the Policy to expeditiously undertake the Replacement, Skaii had already submitted applications for permits and approvals for the Replacement before its receipt of the Position Letter. Skaii has also retained specialized counsel to assist with and expedite the permitting process. Nevertheless, Skaii has yet to receive the requisite permits and approvals and thus still cannot yet commence the Replacement. Accordingly, in light of this good cause owing to bureaucratic matters outside of Skaii's control, **Skaii respectfully requests that AmGUARD further agree to extend the Replacement Deadline to one year from the date Skaii receives permission from the pertinent authority(ies) to commence the Replacement construction**. Skaii will of course promptly advise AmGUARD in writing as to the date of its receipt of such permission to enable the parties to agree to a date certain for a new Replacement Deadline. **Please include in your written reply to this letter AmGUARD's position regarding Skaii's request for an extension of the Replacement Deadline**. Please note that your failure to agree to this request or a reasonable alternative may require Skaii to commence legal proceedings to obtain injunctive and/or declaratory relief with respect to the Replacement Deadline.

    2.    *Second*, as you acknowledge in the Position Letter, in November 2022, Skaii submitted for AmGUARD's review and approval a bid from J.A. Stowell Construction, Inc. detailing a Replacement Cost of $2,556,755.60. The Position Letter further acknowledges your receipt, on or about September 23, 2024, of additional documents pertaining to the proposed Replacement, "including Excel sheets, invoices (for onsite plumbing, lights, temporary roof, inspections, cleaning, consulting, architectural services), proposals for structural plans and engineering services as well as multiple repair cost bids." Thus, by any measure, it is clear that the Replacement Cost will necessarily exceed the Replacement Cost

**witkow | baskin**

Re: Skaii Investment LLC, Claim No. SKBP981657-001-001-001
March 7, 2025
Page 3

Policy Limit of $2,142,000. Accordingly, we understand that, so long as Skaii complies with the RC Condition by providing proof to AmGUARD of its incursion of total Replacement Costs of (or exceeding) $2,142,000 *before* the expiration of the Replacement Deadline—which deadline Skaii has requested be further extended as set forth in item 1 immediately hereinabove—AmGUARD *shall* promptly thereafter remit additional payment(s) to Skaii in at least the total amount of $1,082,427.83, *i.e.,* the difference between the Policy Limit of $2,142,000 and the ACV paid out thus far of $1,059,572.17. **Please include in your written reply to this letter AmGUARD's position regarding the maximum amount Skaii remains eligible to be reimbursed by AmGUARD, and, in particular, whether and to what extent this amount or calculation is in any way inconsistent with Skaii's position as set forth in this paragraph.** Please note that Skaii will interpret AmGUARD's failure to timely refute Skaii's position as set forth in this paragraph as its agreement and consent thereto. Please also note that AmGUARD's failure to convey its written confirmation that it shares Skaii's understanding regarding the available Replacement Cost amount may require Skaii to commence legal proceedings to obtain injunctive and/or declaratory relief with respect this issue.

      3.    *Third* and finally, please be advised that, under controlling California law, Skaii is *not* required to rebuild a structure on the same premises identical to, or to be used for the same purpose as, the pre-Loss structure. *Conway v. Farmers Home Mut. Ins. Co.*, 26 Cal.App.4th 1185, 1189-90 (1994). Analyzing policy language identical to the instant Policy (including the pertinent RC Condition), *Conway* explains:

> "*This particular limitation does not require repair or replacement of an identical building on the same premises, but places that rebuilding amount as one of the measures of damage to apply in calculating liability under the replacement cost coverage. The effect of this limitation comes into play when the insured desires to rebuild either a different structure or on different premises. In those instances, the company's liability is not to exceed what it would have cost to replace an identical structure to the one lost on the same premises. Although liability is limited to rebuilding costs on the same site, the insured may then take that amount and build a structure on another site, or use the proceeds to buy an existing structure as the replacement, but paying any additional amount from his or her own funds.*"

*Id.* (emphasis in original) (quoting with approval *Hess v. North Pacific Ins. Co.*, 122 Wn.2d 180 [859 P.2d 586, 588] (1993). Significantly—and indeed, dispositively—*Conway* was decided by the Fourth District of the California Court of Appeal, which is the very district overseeing matters venued (or to be venued) in Orange County. If, notwithstanding the above, AmGUARD intends to take the position that Skaii shall only be eligible to receive additional reimbursements for Replacement Costs associated with expenditures incurred to rebuild the same commercial warehouse-type structure on the Property as in existence prior to the Loss—or that any other particular limitations apply to the type, purpose, location, etc. of the

**witkow|baskin**

Re: Skaii Investment LLC, Claim No. SKBP981657-001-001-001
March 7, 2025
Page 4

replacement structure eligible for Replacement Cost reimbursement—then **please include in your written reply to this letter AmGUARD's position in this regard.** Please note that Skaii will interpret AmGUARD's failure to timely refute Skaii's position as set forth in this paragraph as its agreement and consent thereto. Please also note that AmGUARD's failure to convey its written confirmation that it shares Skaii's understanding regarding the nature of the permissible replacement structure may require Skaii to commence legal proceedings to obtain injunctive and/or declaratory relief with respect this issue.

***

By sending you this correspondence, Skaii is not waiving any of its rights or remedies, all of which are expressly reserved.

We request that you provide AmGUARD's reply to this letter—and in particular its positions with respect to items 1, 2, and 3 enumerated hereinabove—by no later than **March 21, 2025.** Please direct such reply, and all further communications regarding this claim (until further notice otherwise) to the undersigned, preferably via email to cb@witkowlaw.com.

Sincerely,

Cory A. Baskin, Esq.

Cc:  Claims Processing-BH GUARD (claims@guard.com)
     Mimi Nguyen (mimi.t.nguyen@gmail.com)
     Lan Nguyen (lan@langvan.com)
     Nicholas Nguyen (nicholas@metroadjusters.com)
     Glenn Nahmias (glenn@metroadjusters.com)

# EXHIBIT 11

# witkow | baskin

August 1, 2025

**Via E-Mail (rweston@westonagnesslaw.com)**

Attn: Richard C. Weston
Weston & Agness LLP
1960 E. Grand Avenue, Suite 400
El Segundo, California 90245

Re:   **Insured:       Skaii Investment LLC**
      **Claim No.:     SKBP981657-001-001-001**
      **Policy No.:    SKBP981657**
      **Date of Loss:  January 23, 2019**
      **Loss Location: 9241 Bishop Place #9265, Westminster, CA 92683-6503**

Dear Mr. Weston:

Thank you and your client for participating in last week's mediation. Although the matter did not settle, I believe the mediation was a worthy venture that helped clarify and crystallize the issues. In the spirit of compromise, and in furtherance of both sides' manifest interest in avoiding expensive and uncertain (albeit potentially precedent setting!) litigation, I write to you today with a proposal (or rather, request) that was not addressed at mediation, but which should nevertheless resolve this matter to your client's satisfaction.

Specifically (and notwithstanding my client's strong preference to replace the damaged warehouse with a residential structure—which election, as set forth in my prior correspondence to you and my client's mediation papers, we still believe to be authorized under the policy language and California law), **my client will agree to settle this claim pursuant to California Code of Regulations, Title 10, Section 2695.9(d)(2)**.

As you know, Section 2695.9(d) requires, at a minimum, that losses "settled on the basis of a written scope and/or estimate prepared by or for the insurer . . . shall be . . . of an amount which will restore the damaged property to no less than its condition prior to the loss and which will allow for repairs to be made in a manner which meets accepted trade standards for good and workmanlike construction." Section 2695.9(d) further requires the insurer "take reasonable steps to verify that the repair or rebuilding costs utilized by the insurer or its claims agents are accurate and representative of costs in the local market area." In this case, your client continues to insist that the 2021 estimates of actual cash value ("ACV") and replacement cost obtained from its consultant, JS Held—$1,054,352.17 and $1,167,393.97, respectively—are fair, full, and compliant with your client's obligations under the policy and Insurance Code.

# witkow | b.

Re: Skaii Investment LLC, Claim No. SKBP981657-001-001-001
August 1, 2025
Page 2

Pursuant to Section 2695.9(d)(2), my client hereby requests that you/your client promptly provide "the name of at least one repair individual or entity that will make the repairs for the amount of the written estimate." In so doing, your client must ensure that said individual or entity "shall cause the damaged property to be restored to no less than its condition prior to the loss and which will allow for repairs in a manner which meets accepted trade standards for good and workmanlike construction at no additional cost to [my client] other than as stated in the policy or as otherwise allowed by the [California's insurance] regulations." The import and effect of this election under Section 2695.9(d)(2) is that my client shall only be obligated to pay your client's chosen contractor the $1,054,352.17 ACV amount it has heretofore received from your client, while your client shall remain solely liable for any and all construction costs or expenses in excess of this amount.

To be clear, my client understands and agrees that, by invoking Section 2695.9(d)(2)— assuming your client hereafter honors its obligations to perform under the Insurance Code—my client will have to forego its desire to replace the damaged warehouse with a residential structure. So be it. Of course, if, prior to your client's chosen contractor's commencement of construction of the replacement warehouse, your client decides to reconsider an alternative resolution that would extricate it from its de facto warehouse project overseer responsibilities in exchange for a lump sum payment to my client of the approximately $1 million delta between the ACV and policy limits to be used by my client at its discretion (e.g., towards the construction of townhomes on the property), please do not hesitate to transmit such a proposal. In such event, we promise to refrain from saying "I told you so." But, unless or until that day comes, my client hereby invokes its right to settle this claim pursuant to Section 2695.9(d)(2).

We look forward to your prompt response to this Notice and your client's expeditious compliance with Section 2695.9(d)(2).

Sincerely,

Cory A. Baskin, Esq.

\* By sending you this correspondence, and unless or until this matter is fully and finally resolved by written agreement, my client is not waiving any of its rights or remedies, all of which are expressly reserved.

# EXHIBIT 12

# WESTON & AGNESS LLP

1960 East Grand Avenue, Suite 400
El Segundo, California 90245
Telephone (213) 596-8000
Facsimile (213) 596-8039

August 11, 2025

**VIA EMAIL ONLY Cb@witkowlaw.com**

Cory A. Baskin, Esq.
Witkow Baskin
21031 Ventura Boulevard
Suite 700
Woodland Hills, California 91364

|  |  |  |
|---|---|---|
| Re: | Insured: | Skaii Investment LLC |
|  | Claim No. | SKBP981657-001-001-001 |
|  | Date of Loss: | January 23, 2019 |
|  | Location: | 9241 Bishop Place #9265, |
|  |  | Westminster, CA 92683-6503 |
|  | Our File No. | GD594 |

Dear Mr. Baskin:

I am writing in response to your letter of August 1, 2025 regarding this matter.

You have asserted in your letter that due to your client's purported election under the California Insurance Regulations, specifically, Cal. Code Regs. Tit. 10, § 2695.9(d)(2), AmGUARD is obligated as follows:

> Pursuant to Section 2695.9(d)(2), my client hereby requests that you/your client promptly provide "the name of at least one repair individual or entity that will make the repairs for the amount of the written estimate." In so doing, your client must ensure that said individual or entity "shall cause the damaged property to be restored to no less than its condition prior to the loss and which will allow for repairs in a manner which meets accepted trade standards for good and workmanlike construction at no additional cost to [my client] other than as stated in the policy or as otherwise allowed by the [California's insurance] regulations." The import and effect of this election under Section 2695.9(d)(2) is that my client shall only be obligated to pay your client's chosen contractor the $1,054,352.17 ACV amount it has heretofore received from your client, while your client shall remain solely liable for any and all construction costs or expenses in excess of this amount.

Contrary to your position, AmGUARD has no such obligation. Cal. Code Regs., tit. 10, § 2695.9 provides in relevant part as follows:

(d)    If losses are settled on the basis of a written scope and/or estimate prepared by or for the insurer, the insurer shall supply the claimant with a copy of each document upon which the settlement is based. The estimate prepared by or for the insurer shall be in accordance with applicable policy provisions, of an amount which will restore the damaged property to no less than its condition prior to the loss and which will allow for repairs to be made in a manner which meets accepted trade standards for good and workmanlike construction. The insurer shall take reasonable steps to verify that the repair or rebuilding costs utilized by the insurer or its claims agents are accurate and representative of costs in the local market area. If the claimant subsequently contends, based upon a written estimate which the claimant obtains, that necessary repairs will exceed the written estimate prepared by or for the insurer, the insurer shall:

> (1) pay the difference between its written estimate and a higher estimate obtained by the claimant; or,
> (2) if requested by the claimant, promptly provide the claimant with the name of at least one repair individual or entity that will make the repairs for the amount of the written estimate. The insurer shall cause the damaged property to be restored to no less than its condition prior to the loss and which will allow for repairs in a manner which meets accepted trade standards for good and workmanlike construction at no additional cost to the claimant other than as stated in the policy or as otherwise allowed by these regulations; or,
> (3) reasonably adjust any written estimates prepared by the repair individual or entity of the insured's choice and provide a copy of the adjusted estimate to the claimant.

Thus, while AmGUARD may, under section (d)(2), exercise the option of paying the difference between the estimates or provide the name and contact information for a contractor who has agreed to do the work at the property for the amount estimated, those are not its only options under the regulation. It may instead proceed under section (d)(3), and reasonably adjust the insured's estimate. This is what it has done in this case.

As the court stated in Garske v. California Automobile Insurance Company (Cal. Ct. App., Oct. 24, 2023, No. D080685) 2023 WL 6982028, at 13:

> Second, the Garskes contend Gove violated California Code of Regulations, title 10, section 2695.9, subdivision (d), by rejecting the later RestoraCore repair estimate commissioned by the Garskes. That regulation requires an insurer to take one of three actions if an insured "contends, based upon a written estimate ... that *necessary* repairs will exceed the written estimate prepared by or for the insurer." (Cal. Code Regs., tit. 10, § 2695.9, subd. (d), italics added.) The insurer may (1) pay the difference between its estimate and the insured's higher estimate; (2) provide the insured with the name of an individual or entity that will make the repairs for the insurer's estimate, provided that those repairs "cause the damaged property to be restored to no less than its condition prior to the loss"; or (3)

SKBP981657-001-001-001
August 11, 2025
Page 3

"reasonably adjust" the insured's higher estimate. (*Ibid.*)

Based upon the foregoing, AmGUARD will not comply with the legally unsuppotable demands set forth in your letter.

If you believe that AmGUARD Insurance Company has wrongfully denied or rejected coverage, you may have this matter reviewed by the California Department of Insurance, Consumer Communications Bureau, whose address and telephone number are as follows: 300 South Spring Street, South Tower, Los Angeles, CA 90013; (800) 927-4357.

Sincerely,

Richard C. Weston
Weston & Agness LLP

# EXHIBIT 13

# witkow|baskin

August 19, 2025

**Via E-Mail (rweston@westonagnesslaw.com)**

Attn: Richard C. Weston
Weston & Agness LLP
1960 E. Grand Avenue, Suite 400
El Segundo, California 90245

| Re: | **Insured:** | **Skaii Investment LLC** |
|-----|--------------|--------------------------|
| | **Claim No.:** | **SKBP981657-001-001-001** |
| | **Policy No.:** | **SKBP981657** |
| | **Date of Loss:** | **January 23, 2019** |
| | **Loss Location:** | **9241 Bishop Place #9265, Westminster, CA 92683-6503** |

Dear Mr. Weston:

This letter is in response to your letter of August 11, 2025.

Specifically, you assert in your letter that, notwithstanding Skaii's request therefor, AmGuard has no obligation under Cal. Code Regs. Tit. 10, Section 2695.9(d)(2) to provide Skaii with the name and contact information of a contractor who has agreed (or will agree) to repair/rebuild/replace the subject warehouse property to an acceptable trade standard for the amount set forth in the estimate(s) AmGuard obtained from JS Held. Instead, you purport that JS Held's manifestly trifling adjustment of its original replacement cost estimate from $1,054,352.17 to $1,167,393.97 in response to Skaii's submission from public adjuster Metropolitan Adjustment Bureau, Inc. was "reasonable" and thus fully satisfies AmGuard's obligations under Section 2695.9(d)(3).

Contrary to your conclusory assertion, the California Court of Appeal's unpublished opinion in *Garske v. California Automobile Insurance Co.,* 2023 WL 6982028, at 13, 2023 LEXIS 6285, at *40 (Cal. Ct. App., Oct. 24, 2023, No. D080685) does not support AmGuard's position. Ironically, rather than "reasonably adjusting" its replacement cost estimate under Section 2695.9(d)(3), the insurer in *Garske* instead satisfied its obligations to its insured by offering to provide not one, but two contractors who would complete the repairs for the amount estimated by the insurer's adjuster pursuant to Section 2695.9(d)(2)—which is exactly the remedy Skaii has requested here (though Skaii will settle for the commitment of even one such reputable contractor). *See id.,* 2023 LEXIS 6285, at *40-41 ("Gove testified he sent the RestoraCore estimate to Gardner for review. After completing his review, Gardner informed Gove the RestoraCore estimate did not include any 'necessary repairs' missing from his February 6 revised estimate. Pursuant to the second option of the applicable regulation,

**witkow | baskin**

Re: Skaii Investment LLC, Claim No. SKBP981657-001-001-001
August 19, 2025
Page 2

Gove informed the Garskes that both A Premier Restoration and Team 1 Restoration could complete the previously agreed repairs for the estimated amount. Contrary to the Garskes' claim, Gove's actions complied with the applicable regulatory requirements.").

Given that Skaii has (utterly unsurprisingly) been unable to locate any contractor willing or able to rebuild the warehouse in a warrantied and workmanlike manner for less than the $2,142,000 policy limit, AmGuard's refusal to provide Skaii with a contractor pursuant to Section 2695.9(d)(2) who will agree to complete the work within the policy limit (let alone the $1,167,393.97 amount AmGuard purports to be "reasonable") puts Skaii in an unfair and untenable predicament. If AmGuard legitimately believes the construction can be completed for the amount of its adjustment, Skaii simply invites AmGuard, like the insurer in *Garske*, to "put its money where its mouth is."

Unless AmGuard reverses course and agrees to Skaii's reasonable request to settle this matter under Section 2695.9(d)(2) by providing a contractor who will agree to complete the project for the "reasonable" replacement amount estimated by AmGuard/JS Held (with AmGuard being responsible for all expenses in excess of Skaii's contribution of the ACV amount previously paid to Skaii by AmGuard)—Skaii will be forced to commence legal proceedings against AmGuard for declaratory relief and bad faith. Please note that, if such a lawsuit is necessitated by AmGuard's intransigent and unreasonable position, Skaii will not only seek judicial declarations that it is entitled to a reasonable extension of time to complete the replacement construction, but also a judicial determination that the policy and applicable California law requires AmGuard to pay Skaii the full delta between the policy limit and the ACV ("Delta") regardless of whether Skaii constructs townhomes or a like-for-like warehouse on the property. Skaii is willing to forego seeking such relief in court (and the potential establishment of very detrimental precedent concerning the meaning and scope of "replacement" that would have tremendous consequences for AmGuard and insurers statewide), but only if AmGuard agrees to resolve this matter under Section 2695.9(d)(2).

In light of the above, Skaii invites AmGuard, one final time, to reconsider its position vis-à-vis Section 2695.9(d)(2). We look forward to your prompt and considered response.

Sincerely,

Cory A. Baskin, Esq.

*By sending this correspondence, and until this matter is fully resolved by written agreement, Skaii is not waiving any of its rights or remedies, all of which are expressly reserved.